# Exhibit 3

# (pp. 6-9)

Request No. 26

Admit that the protest committee appointed by the New York Yacht Club for the Regatta ("Protest Committee") conducted a hearing ("Protest Hearing") on the Protest.

Response No. 26

Admitted.

Request No. 27

Admit that a representative of SIRENA attended the Protest Hearing.

Response No. 27

Admitted.

Request No. 28

Admit that the Protest Committee disqualified SIRENA from Race 3 for breaking RRS 10.

Response No. 28

Admitted.

Request No. 29

Admit that SFORZANDO was not penalized for breaking a *Rule* relating to the Incident.

Response No. 29

Admitted.

Request No. 30

Admit that the attached Exhibit F is a true and accurate copy of the decision of the Protest Committee ("Decision") on the Protest.

Response No. 30

Admitted.

Request No. 31

Admit that SIRENA filed no request to reopen the Protest Hearing.

Response No. 31

Admitted.

Request No. 32

Admit that SIRENA filed no appeal of the Decision with the Narragansett Bay Sailing Association Appeals Committee.

Response No. 32

Admitted.

Request No. 33

Admit that SIRENA filed no appeal of the Decision with the US SAILING Appeals Committee.

Response No. 33

Admitted.

Request No. 34

Admit that SIRENA filed no request for redress concerning the Incident.

Response No. 34

Admitted.

Request No. 35

Admit that SIRENA filed no request for redress concerning the Protest Hearing.

Response No. 35

Admitted.

Request No. 36

Admit that SIRENA filed no request for redress concerning the actions of the Protest Committee.

Response No. 36

Admitted.

Request No. 37

Admit that SIRENA filed no request for redress concerning the Decision.

Response No. 37

Admitted.

Request No. 38

Admit that Defendant Steven M. Loeb was steering SIRENA at the time of the Incident.

Response No. 38

Admitted that at the precise time of the incident Steven Loeb was steering SIRENA.

Request No. 39

Admit that Steven M. Loeb was the "person in charge" (see RRS 46) during Race 3.

Response No. 39

Admitted.

Blad Company

BLAD CO.
By its attorneys

PANNONE LOPES & DEVEREAUX LLC

William E. O'Gara (#4257)
Pannone Lopes & Devereaux LLC
1800 One Financial Plaza
Providence, RI 02903
(401) 824-5100 (telephone)
(401) 824-5123 (fax)

**CERTIFICATION**

The undersigned hereby certifies that a true copy of the within was sent on 1st day of ~~April~~ May, 2006 via first class mail postage prepaid to:

John P. Graceffa, Esq.
Charles A. Cook, Esq.
Morrison Mahoney Miller, LLP
250 Summer Street
Boston, MA 02210-1134

Benjamin V. White, Esq.
Michael J. Daly, Esq.
Vetter & White
20 Washington Place
Providence, RI 02903-1358

Thomas C. Plunkett, Esq.
Kiernan, Plunkett & Redihan
91 Friendship Street
Providence, RI 02903

John K. Fulweiler, Esq.
DeOrchis & Partners, LLP
61 Broadway
New York, NY 10006

Suzy Oliveira

# Exhibit 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

-------------------------------)
JACK FOLEY, MARY )
O'DONOGHUE AND DAVID )
ROBBINS )
PLAINTIFF )
)
VS. )
) C.A. NO. 06-0053
STEVEN M. LOEB, BLAD ) S-LDA
CO., KEVIN DAILEY, )
WILLIAM TRIPP, )
INDIVIDUALLY, AND D/B/A )
TRIPP DESIGN NAVAL )
ARCHITECTURE
DEFENDANT
-------------------------------)

DEPOSITION OF BLAIR BROWN, A WITNESS IN THE ABOVE-ENTITLED CASE, TAKEN ON BEHALF OF THE DEFENDANT, BEFORE PATRICIA QUIRK, CSR, NOTARY PUBLIC IN AND FOR THE STATE OF RHODE ISLAND, AT THE OFFICES OF KIERNAN, PLUNKETT & REDIHAN, 91 FRIENDSHIP STREET, PROVIDENCE, RHODE ISLAND ON MARCH 1, 2007, SCHEDULED AT 9:30 A.M.

COPY

PRESENT:

FOR THE PLAINTIFF......MORRISON MAHONEY LLP
(MARY O'DONOGHUE) BY: CHARLES A. COOK, ESQUIRE

FOR THE DEFENDANT......KIERNAN, PLUNKETT & REDIHAN
(WILLIAM TRIPP) BY: THOMAS C. PLUNKETT, ESQUIRE

FOR THE DEFENDANT......WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
BY: LAWRENCE BRENNAN, ESQUIRE

FOR THE DEFENDANT......DEORCHIS WIENER & PARTNERS
BY: CARY R. WIENER, ESQUIRE

FOR THE DEFENDANT......OFFICE OF WILLIAM O'GARA
(LOEB, BLAD CO.) BY: WILLIAM O'GARA, ESQUIRE

FOR THE DEFENDANT......HOLBROOK & MURPHY
(BLAIR BROWN) BY: SETH S. HOLBROOK, ESQUIRE

RHODE ISLAND COURT REPORTING
747 NORTH MAIN STREET
PROVIDENCE, RHODE ISLAND 02904
(401) 437-3366

SUPPLIES.

Q. AND FOR HOW LONG WAS THAT YOUR OCCUPATION?

A. FROM 1964 UNTIL 1992.

Q. WOULD YOU TELL ME JUST GENERALLY WHAT YOUR SAILING EXPERIENCE HAS BEEN?

A. I'VE BEEN SAILING SINCE I WAS A YOUNGSTER IN 1950. I'VE RACED EXTENSIVELY FOR -- SINCE 1978.

Q. DO YOU CURRENTLY KEEP A BOAT?

A. YES.

Q. DO YOU STILL RACE?

A. YES.

Q. WHAT TYPE OF BOAT DO YOU HAVE?

A. I HAVE A 45-FOOT OCEAN RACER.

Q. IS IT THE SAME ONE THAT WAS INVOLVED IN THIS INCIDENT?

A. YES.

Q. HOW LONG HAVE YOU OWNED THAT BOAT, THIS SFORZANDO?

A. SINCE 1998.

Q. ALL RIGHT, AND JUST TO JUMP AHEAD A BIT TO DIRECT YOUR ATTENTION TO THE DAY OF THIS RACE, ON THAT DATE WERE YOU THE OWNER OF THE BOAT?

A. YES.

A. YES, YES.

**Q. AND THE OTHER PEOPLE WITH WHOM YOU'VE SPOKEN ABOUT THIS, IT WAS NOT IN PREPARATION FOR THIS DEPOSITION?**

A. I'VE SPOKEN WITH OTHER PEOPLE IN THE YEARS SINCE THIS ACCIDENT. THESE WERE PEOPLE ON THE BOAT WITH ME.

**Q. ALL RIGHT, I'LL GET INTO THAT LATER. DID YOU REVIEW ANY DOCUMENTS IN PREPARATION FOR THIS DEPOSITION?**

A. NO. WELL -- I -- I'VE READ THE DEPOSITIONS.

**Q. ALL RIGHT, WHAT DEPOSITIONS HAVE YOU READ?**

A. THE DEPOSITION FOR DAVE ROBBINS, JACK FOLEY AND MARY O'DONOGHUE.

**Q. HAVE YOU READ MR. SLATTERY'S DEPOSITION?**

A. YES.

**Q. ON THAT DATE, ON THE DATE OF THE RACE, CAN YOU REMEMBER WHO WAS ON BOARD THE BOAT?**

A. I THINK SO.

**Q. COULD YOU NAME THEM FOR ME?**

A. THERE WAS THE THREE PEOPLE I JUST MENTIONED WERE THE PLAINTIFFS, I GUESS, STEVE CRUSE, JACK SLATTERY, TODD ENGLISH, WARWICK

OLNEY, O-L-N-E-Y, JIM TAYLOR. I CAN'T REMEMBER THE OTHERS.
**Q. LET ME READ OFF A FEW NAMES, ONE YOU MENTIONED, ENGLISH?**
A. TODD ENGLISH.
**Q. DO YOU REMEMBER A TODD YANKEE?**
A. I'M SORRY, IT'S TODD YANKEE.
**Q. DAVID ROBBINS?**
A. ANN MARIE ROSE.
**Q. MARY O'DONOGHUE, AND /PHREUBG /KEBG KNEE?**
A. THAT'S RIGHT.
**Q. STEVE CRUSE, JIM TAYLOR, MR. SLATTERY AND YOURSELF, DO YOU REMEMBER A WOMAN BY THE NAME OF JANE?**
A. THERE WAS ANOTHER WOMAN THERE. I DON'T REMEMBER HER NAME.
**Q. AND MR. FOLEY?**
A. RIGHT.
**Q. ANYONE ELSE THAT YOU CAN THINK OF WHO WAS ON BOARD?**
A. I CAN'T THINK OF ANY OTHERS.
**Q. ON THAT DATE, WHAT WERE MR. SLATTERY'S DUTIES?**
A. HE WAS TACTICIAN.
**Q. AND WHAT WERE HIS RESPONSIBILITIES DURING THE**

A. WE TURNED DOWN MODESTLY. IT WAS A QUESTION OF FINESSE AT THAT POINT. HAD WE NOT TURNED, WE WOULD HAVE PROBABLY SUNK HER. HAD WE TURNED MORE, WE WOULD HAVE THROWN OUR STERN INTO HER BOW AND SHE PROBABLY WOULD HAVE SUNK US. SHE TURNED DOWN SOME, AND WE TURNED DOWN SOME.

**Q. DID YOU CONSIDER TACKING OVER TO THE RIGHT?**

A. YOU MEAN HEADING UP INTO THE WIND?

**Q. YES. ACTUALLY TACKING OVER TO THE RIGHT?**

A. IF WE HAD CRASH TACKED, WE PROBABLY WOULD HAVE SUNK OUR BOAT. SHE WOULD HAVE -- OUR PORT SIDE WOULD HAVE GONE INTO YOUR BOW.

**Q. OKAY. GO AHEAD.**

A. AS IT WAS, IT WAS REMARKABLE HOW THE COLLISION WAS AS BENIGN AS IT WAS. I DON'T MEAN TO IMPLY THAT IT WAS BENIGN. IT COULD HAVE BEEN PHYSICALLY MUCH WORSE ON THE BOAT. I'M NOT TALKING ABOUT PERSONAL INJURIES.

**Q. NOW, SO YOU TURNED DOWN WHILE SIRENA WAS TURNING DOWN, WHAT HAPPENED?**

A. WE, THE BOWS CAME CLOSE TOGETHER AND EVENTUALLY, AS THE BOATS WIDENED GOING AFTER THE BOAT, WE HIT AND PROBABLY WE SURGED TWO OR

THREE TIMES. AS I SAID, THERE WAS A SWELL IN RHODE ISLAND SOUND, WHICH IS NOT UNUSUAL, AND THE BOATS WOULD HIT, AND THEN AS A SWELL CAME THROUGH, THEN AS THE SWELL DIMINISHED, THEY WOULD GO APART, AND THEN THEY WOULD MEET AGAIN.

**Q. DO YOU KNOW WHAT PARTS OF THE BOAT CAME IN CONTACT?**

A. HER STARBOARD SIDE HIT OUR STARBOARD SIDE.

**Q. THE --**

A. YES, THE PULPITS AND MY FLAGS WERE SNARLED. THE BOAT SPINNAKER PULLS WERE BROKEN. I ASSUME HER SPINNAKER PULL WAS ON THE STARBOARD SIDE. WE HAD BOTH SET UP FOR A MARK ROUNDING?

**Q. WHO HAD SET YOUR BOAT UP FOR THE ROUNDING, WAS THAT TODD YANKEE?**

A. IT WOULD HAVE BEEN HIM, YES.

**Q. NOW, THERE WAS THIS YELLING TO THE OTHER BOAT, TO SIRENA, WAS THERE ANY YELLING TO THE CREW ABOUT THE CLOSENESS OF SIRENA OR THE POTENTIAL OR THE IMPENDING COLLISION?**

A. EVERYONE KNEW WHERE SIRENA WAS BY THE

INJURIES, TRY NOT TO TRANSFER THEM ON THE WATER. IT TOOK US ABOUT 45 MINUTES TO AN HOUR TO GET INTO THE YACHTING CENTER. WE WERE MET BY EMT'S FROM NEWPORT. THEY PICKED UP THE CREW AND TOOK THEM TO THE NEWPORT HOSPITAL.

**Q. BACK OUT ON THE COURSE, DID YOU ACTUALLY SEE ANY CONTACT WITH THE THREE PLAINTIFFS HERE, SEE ANY CONTACT WITH THE BOATS AND WITH THE THREE PLAINTIFFS HERE, WHERE THEY RECEIVED THE INJURIES?**

A. YES.

**Q. YOU SAW ALL THREE OF THEM RECEIVE THE INJURIES?**

A. RIGHT, TO THE EXTENT THAT I COULD FROM INSIDE THE BOAT. I'M NOT LOOKING -- I CAN'T SEE THE OUTSIDE OF MY BOAT.

**Q. DO YOU KNOW IF ANY CREW MEMBERS WERE ABLE TO GET OFF THE RAIL BEFORE THE COLLISION?**

A. I THINK, YES. I THINK THREE OR FOUR OR FIVE OF THEM DID.

**Q. NOW, YOU GOT INTO THE YACHTING CENTER. THE RESCUE CAME, WHO WENT IN THE RESCUE TO THE HOSPITAL?**

A. I BELIEVE DAVE ROBBINS AND JACK FOLEY AND

I WENT.
**Q. WITH THEM?**
A. YES.
**Q. AT THAT POINT, ONCE YOU GOT BACK INTO THE DOCK, WHAT INJURIES DID YOU OBSERVE AS TO MR. FOLEY?**
A. WELL, I SAW A LOT OF BLOOD.
**Q. WHERE?**
A. ON HIS LEG, AND OTHER THAN THAT, I DON'T -- I MEAN, I DON'T KNOW THE SPECIFIC INJURIES. I KNEW HE HAD DIFFICULTY STANDING UP.
**Q. DID HE COMPLAIN TO YOU ABOUT INJURIES?**
A. HE SAID THERE WERE INJURIES.
**Q. HIS LEG?**
A. YES.
**Q. ANYTHING ELSE?**
A. I CAN'T RECALL.
**Q. HOW ABOUT MR. ROBBINS, DID YOU SEE ANY INJURIES?**
A. HE ALSO HAD A LEG PROBLEM.
**Q. DID HE COMPLAIN TO YOU ABOUT THAT?**
A. WELL, I ASKED, AND HE TOLD ME.
**Q. HIS LEG?**

A. RIGHT.
**Q. AND HOW ABOUT MARY O'DONOGHUE?**
A. SHE ALSO HAD A PROBLEM, BUT SHE WAS RETICENT ABOUT GOING TO THE HOSPITAL.
**Q. DO YOU KNOW WHAT PROBLEMS SHE HAD?**
A. NO, I DON'T.
**Q. DID YOU SEE ANY INJURIES AS TO MARY O'DONOGHUE?**
A. I COULD TELL SHE WAS INJURED.
**Q. HOW COULD YOU TELL?**
A. SHE WAS LIMPING AND SHE WAS GRIMACING.
**Q. WHERE DID MARY O'DONOGHUE GO, IF YOU KNOW, AFTER THE THREE OF YOU LEFT FOR THE HOSPITAL?**
A. I DON'T KNOW.
**Q. DID YOU SEE HER AGAIN THAT EVENING?**
A. I BELIEVE SHE WENT -- I DID SEE HER BEFORE SHE WENT, I BELIEVE BACK TO BOSTON, WITH ONE OF THE CREW MEMBERS.
**Q. WAS THERE ANY DISCUSSION ON THE WAY IN OR WHILE WERE YOU AT THE DOCK ABOUT HOW THIS COLLISION OCCURRED?**
A. THAT'S A HARD QUESTION TO ANSWER. I ASSUME WE -- I MEAN, WE TALKED ABOUT IT. I WOULD HAVE TO SAY YES THERE WAS SOME

A. NO.

**Q. AND YOU LEARNED, I TAKE IT, AT SOME POINT THERE WAS A PROTEST HEARING. YES?**

A. YES.

**Q. HOW DID YOU FIND OUT ABOUT THAT?**

A. WELL, WHILE I WAS AT THE HOSPITAL I THINK, I THINK JACK SLATTERY HAD ACTUALLY COME TO THE HOSPITAL, AND I THINK HE SUGGESTED THAT HE GO TO THE PROTEST MEETING, AND I ASKED HIM TO DO SO.

**Q. YOU ASKED HIM TO FILE A PROTEST, AND TO GO TO THE HEARING?**

A. RIGHT.

**Q. DID YOU PARTICIPATE IN THE HEARING AT ALL?**

A. NO.

**Q. YOU DIDN'T ATTEND IT?**

A. NO.

**Q. DID YOU EVEN STAND OUTSIDE THE ROOM WHERE IT WAS TAKING PLACE?**

A. I DIDN'T LEAVE THE HOSPITAL. I STAYED WITH THE INJURED CREW.

**Q. BY THE TIME YOU GOT BACK, HAD THE PROTEST HEARING, TO YOUR KNOWLEDGE, BEEN COMPLETED?**

A. I THINK IT WAS OVER BEFORE I LEFT THE