# Exhibit 5

# (pp. 1-19)

ORIGINAL

VOLUME I
PAGES 1-121
EXHIBITS 7

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND
C.A. NO. 06-CV-00053-S-LDA

*****************************
**JACK FOLEY, MARY O'DONOGHUE AND DAVID ROBBINS,**
**Plaintiffs,**

**v.**

**STEVEN M. LOEB, BLAD CO. AND WILLIAM TRIPP, Individually and d/b/a TRIPP DESIGN NAVAL ARCHITECTURE,**
**Defendants,**
**And**
**BLAIR BROWN,**
**Third-Party Defendant.**
*****************************

**DEPOSITION OF STEVEN M. LOEB,** a witness called on behalf of the plaintiffs, taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Shaunna L. O'Connell, Registered Professional Reporter and Commissioner in and for the State of Rhode Island, at the offices of Morrison Mahoney, LLP, 121 South Main Street, Providence, Rhode Island, on Tuesday, **February 27, 2007,** commencing at 10:05 a.m.

APPEARANCES:

Charles A. Cook, Esq.
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210-1181
(617) 439-7505
Counsel on behalf of the Plaintiffs.

William E. O'Gara, Esq.
PANNONE LOPES & DEVEREAUX LLC
1800 Financial Plaza
Providence, RI 02903
(401) 824-5100
Counsel on behalf of Steven Loeb.

Thomas C. Plunkett, Esq.
KIERNAN, PLUNKETT & REDIHAN
91 Friendship Street
Providence, RI 02903
(401) 831-2900
Counsel on behalf of William Tripp.

Cary R. Wiener, Esq.
DeORCHIS, WIENER & PARTNERS, LLP
61 Broadway
New York, NY 10006-2802
(212) 344-4700
Counsel on behalf of William Tripp.

Lawrence B. Brennan, Esq.
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
150 East 42nd Street
New York, NY 10017-5639
(212) 490-3000
Counsel on behalf of William Tripp.

Seth S. Holbrook, Esq.
HOLBROOK & MURPHY
238-240 Lewis Wharf
Boston, MA 02110
(617) 428-1151
Counsel on behalf of Blair Brown.

Also present: Patrick Coughlin, Liberty Mutual

as Exhibits 1 and 2; is that correct?
A. Yes.
Q. So you're the designated 30(b)6 witness for Blad Co. to testify regarding some subjects attached to Exhibit 2; is that correct?
A. I don't know what 30(b)6 is, so I can't answer that question.
Q. Are you the witness designated by Blad Co. to testify today?
A. Yes.
Q. Thank you. Are you taking any medication today, Mr. Loeb, that would affect your ability to recall, understand or testify?
A. No.
Q. What is your position with Blad Co.?
A. President and secretary.
Q. Are you a director?
A. Yes. Sole director.
Q. Are you the treasurer?
A. If there is one, yes.
Q. Are you a shareholder?
A. Yes.
Q. Are you the only shareholder?

A. Yes.
Q. Are you the only officer?
A. Yes.
Q. Is Blad Co. -- do you know the type of corporation? Is it an LLC, an S-corp or a C-corp?
A. It's a corporation.
Q. Organized under the laws of what state?
A. Delaware.
Q. Who is the registered agent, if you know?
A. I don't remember.
Q. Did you organize Blad Co.?
A. Yes, I did.
Q. When did you organize Blad Co.?
A. In 1990 -- I'm not sure, actually.
Q. What assets does Blad Co. own at the present?
A. A sail boat known as *Sirena*.
Q. Does it have any other assets?
A. Small bank account.
Q. In what bank is that account?
A. At UBS.
Q. What branch, if you know?
A. I don't know the address.

Q. What else did you review, if anything?
A. That's it.
Q. Moving on to the day of the incident, the incident, for clarity, is a collision or contact between *Sirena* and *Sforzando* on July 14th of 2002. Is that an acceptable basis for continuing?
A. Yes.
Q. So when I talk about incident, you understand that it's that?
A. I do.
Q. You entered into a race run by the New York Yacht Club; is that correct?
A. A regatta.
Q. And what regatta was that?
A. New York Yacht Club Race Week Regatta.
Q. Are you a member of New York Yacht Club?
A. I am.
Q. How long have you been a member?
A. I don't recall.
Q. Were you a member at the time when you competed in the New York Yacht Club Race Week 2002?
A. Yes.

yourself as the entrant name?
A. Yes.
Q. And you circled the word "owner"?
A. Yes.
Q. You weren't the owner, were you?
A. Indirectly I was.
Q. And is that your writing where you report that you were to be the helmsman and skipper?
A. Yes.
Q. Did you know when you were entering this -- excuse me -- that when you signed this, you were agreeing to be bound by the rules of the International Sailing Federation and U.S. Sailing Prescriptions?
MR. O'GARA: Objection. You can answer.
A. Yes.
Q. The next two pages, I take it, is the IMS Certificate for *Sirena*; is that correct?
A. That's correct.
Q. And a measurement inventory apparently signed by Patrick Mannion when the boat was measured in 2000; is that correct?

A. Correct.
Q. Do you recognize that as his signature?
A. I don't.
Q. Do you have any reason to believe that he wasn't operating as Blad Co.'s agent at the time the boat was measured?
A. No. I just don't know his signature.
Q. Fair enough. And then in whose name was that IMS Certificate issued? Was it issued in your name or Blad Co.?
A. It appears my name.
Q. You weren't actually the owner though, were you?
A. Correct. Again, indirectly I was.
Q. As best you recall, who was aboard the boat *Sirena* at the time of the incident?
A. I believe Dave Dempsey, Brian O'Farrell.
Q. Hold on. Please go a little slower. Brian O'Farrell.
A. Paul Bury, B-u-r-y. Gary Payne.
Q. Is that Barry or Gary?
A. Gary.
Q. And spell the last name, please.
A. P-a-y-n-e, I believe. David Langhorn,

Ellen Fetterman, Joe Nanartowich.
Q. Spell that, please.
A. N-a-n-a-r-t-o-w-i-c-h, I think. Myself, Bill Tripp. Is that ten?
Q. That's nine so far.
A. There would have been 11 people.
Q. Patrick Mannion?
A. Patrick Mannion. I'm sorry. Thank you. And one more. I can't recall the name of the 11th.
Q. What was Patrick Mannion's role during the race?
A. He was the pitman.
Q. And what was Ellen Fetterman's role?
A. The navigator.
Q. What was Dave Dempsey's role?
A. Bowman.
Q. What was Brian O'Farrell's role?
A. Mastman.
Q. And what was Paul Bury's role?
A. Trimmer.
Q. On main or jib?
A. Jib or spinnaker. I don't recall. Could have been alternating.

Q. What was Gary Payne's role?
A. Trimmer.
Q. What was David Langhorn's role?
A. Trimmer.
Q. What was Joe Nanartowich's role?
A. Main trimmer.
Q. What was your role?
A. Helmsman.
Q. What was Bill Tripp's role?
A. Tactician. The last person would have been another trimmer, but I can't recall his name right now. I can see his face, but I can't recall his name.
Q. When was the last time you spoke with Ellen Fetterman?
A. At her wedding.
Q. When was that?
A. I don't recall. A couple years ago.
Q. Do you know where she lives now?
A. I'm not sure.
Q. Do you know her married name?
A. I don't.
Q. Do you know where she works?
A. I do not know where she works now.

A. Yes.
Q. To the windward side of the jib and main?
A. Yes.
Q. Where was Mr. Tripp?
A. Standing behind me.
Q. Was he to windward or leeward?
A. I would say mostly to windward.
Q. What did you understand to be Mr. Tripp's role as tactician?
A. To make tactical decisions relating to the race.
Q. Did you understand it to be his role to also advise you of nearby boats and traffic?
A. Yes.
Q. Did he tell you that *Sforzando* was nearby?
A. Yes.
Q. When did he first tell you that?
A. I would say -- I don't recall.
Q. Well, when you were a minute away from the mark, did you know *Sforzando* was in that area?
A. Probably not.
Q. When you were 30 seconds from the mark, or

approximately ten boat lengths, did you know *Sforzando* was in the area?
A. Yes.
Q. Who informed you?
A. Mr. Tripp.
Q. What did he tell you?
A. He told me that *Sforzando* was on starboard but that we would pass in front of them.
Q. By pass in front, you mean cross ahead?
A. Yes.
Q. And you understood that *Sforzando* had the right of way as starboard tack bow?
A. I did.
Q. Were you still cracked off 3 to 4 degrees 30 seconds to go?
A. I think probably maybe slightly less.
Q. Do you have any specific recollection of your heading?
A. I do not.
Q. Do you have any specific recollection as to whether you were above or below the port tack lay line at the time?
A. I think we were pretty close to the lay line.

Q. Were you above or below the lay line or on the lay line at that point?
A. Close to the lay line, maybe slightly below.
Q. So you would have tacked just at the mark?
A. Mm-hmm.
Q. So at ten seconds to go, three boat lengths, where was *Sforzando*?
A. On the starboard lay line.
Q. Were you crossing at the time?
A. It was close.
Q. What heading were they on? Were they still close hauled?
A. Yes.
Q. They hadn't altered their course?
A. I don't think so.
Q. At five seconds to go to the mark, how far from the mark were you?
A. We were closer, but I think we had already altered course at that point.
Q. So you altered course between ten and five second to the mark?
A. Yes.
Q. And what was your alteration of course?

A. It was Bill Tripp's alteration of course. I think we altered course about 45 degrees.
Q. And why is that?
A. To duck *Sforzando*.
Q. Why did he want to duck *Sforzando*? Did he say?
A. He said we were no longer crossing.
Q. Who was your main trimmer?
A. Joe Nanartowich.
Q. Did someone ask him to let the main out?
A. No.
Q. Did he let the main out as you came down?
A. He did.
Q. How much did he let it out?
A. Just a little. Maybe a few feet.
Q. Only a few feet for a 45-degree duck?
A. (Witness nods.)
Q. Is that normal?
MR. O'GARA: Objection.
Q. Would it have been more seamanlike to let out the main more than a few feet?
MR. O'GARA: Objection. You can answer.

Q. And did you have any physical contact with Mr. Tripp when you took the wheel back?
A. No.
Q. How much did you alter course to port at that point?
A. Maybe 4, 5 degrees. Very little.
Q. And by port, that means you're heading up or you're heading to windward; is that correct?
A. Right. That's correct.
Q. And at some point after that, the boats made contact?
A. Yes.
Q. What parts of the boat made the initial contact?
A. The forward starboard quarter of *Sirena* and I guess the forward starboard quarter of *Sforzando*.
Q. So now the boats are bow to bow on their starboard sides, correct?
A. Yes.
Q. What happened next?
A. The spinnaker poles hit each other and they broke, and we slid along the next 10

discussion with Jack Slattery at the hospital?
A. Same -- regrets.
Q. Do you recall any discussion regarding Bill Tripp's involvement?
A. No.
Q. And did you have a discussion with Blair Brown at the hospital?
A. Yes.
Q. What do you recall of that discussion?
A. Same -- regrets.
Q. At some point did you learn that *Sirena* was being protested by *Sforzando*?
A. Yes.
Q. When and how did you learn of that?
A. At the yacht club later that day.
Q. By yacht club you mean New York Yacht Club?
A. Yes.
Q. Who informed you?
A. I don't recall.
Q. Did you attend a protest hearing?
A. I did.
Q. Were you *Sirena*'s representative

throughout the hearing?
A. I was not.
Q. Who was?
A. Bill Tripp.
Q. So was he in the hearing from start to finish?
A. Yes.
Q. Were you in the hearing from start to finish?
A. I don't recall.
Q. Did you provide testimony at the hearing?
A. Yes.
Q. Were you questioned by anyone after you provided testimony?
A. I don't recall.
Q. Do you recall if Bill Tripp asked any questions?
A. I don't recall.
Q. Do you recall Bill Tripp being told that he couldn't ask any questions?
A. I do not.
Q. Do you recall who represented *Sforzando*?
A. Jack Slattery.
Q. Did he ask you any questions?

A. I don't recall.
Q. Do you recall him being denied the opportunity to ask any questions?
A. I do not.
Q. Do you know who the Protest Committee -- do you know the names of the Protest Committee members?
A. I think so.
Q. Who do you believe were the members of the committee?
A. John Osmond. I can't remember the others. I did review it on the decision, and I know all three of them.
Q. Were you there when the decision was announced?
A. I was.
Q. And was Bill Tripp there when the decision was announced?
A. He was.
Q. Was Jack Slattery there when the decision was announced?
A. I don't recall.
Q. Were you or Bill Tripp denied the right to call any witness that you wanted to call?

A. We were not.
Q. So if you had wanted to, you could have brought in -- as far as you know, you could have brought in anyone you wanted to appear as a witness?
A. Right.
Q. On behalf of *Sirena*?
A. Yes. But there was little point at that point.
Q. And why was that?
A. Because both boats were already out of the regatta, so the results of the hearing were really of no importance to us.
Q. But you had no objection as to how the hearing was conducted?
A. I did not.
Q. As you sit here today, do you believe the hearing was conducted in accordance with the racing rules and procedures for Protest Committees?
A. Yes.
Q. You have no quarrel as to how the hearing was conducted?
A. I do not.

decision, the final page of what we just marked.
A. Correct.
Q. Do you see the names -- Robert Conner, Chair; John Osmond; and John Bonds?
A. Right.
Q. Are you acquainted with Mr. Conner?
A. Yes.
Q. What experience do you understand him to have in the hearing of protests and serving as a judge in racing?
A. Significant.
Q. And are you acquainted with John Osmond?
A. I am.
Q. Do you have any knowledge as to his level of experience?
A. Significant.
Q. Do you happen to know where he is?
A. I don't.
Q. And are you familiar with the name John Bonds?
A. I am.
Q. What do you understand to be Mr. Bonds' experience?