# Exhibit 5

# (pp. 20-25)

A. Significant.
Q. Are you aware that he was a principal race officer at the 1996 Olympics?
A. I am not.
Q. Do you have any reason to question that?
A. No.
Q. Are you aware that he was, at one time, executive director for U.S. Sailing?
A. Yes.
Q. And are you aware that at one time he was a captain in the United States Navy?
A. Yes.
Q. Are you aware that Mr. Conner has served on the jury for a number of world championships?
A. I'm not aware of that, but it doesn't surprise me.
Q. Are you aware that he served on the jury for several America's Cup and challenger selection trials?
A. Yes.
Q. So you have no quarrel with the abilities of Mr. Conner, Doctor Osmond or Mr. Bonds to serve as Protest Committee members?

A. No quarrel with them.
Q. Did *Sirena* or anyone on *Sirena*'s behalf file a protest against *Sforzando*?
A. We did not.
Q. Now, when you received this protest decision of the final page of what we've just -- strike that.
When did you receive this written decision that's the final page of Exhibit 5?
A. I don't recall.
Q. Did you get it the day of the incident?
A. I don't recall.
Q. Do you remember disagreeing with the decision when it was reported to you?
A. I agree with the facts found. I'm not in total agreement with the conclusion, but it didn't make any difference.
Q. So you agree that at some point *Sirena* believed that she could cross ahead?
A. Yes.
Q. And then at some point it became clear that she could not?
A. Most likely, yes.

A. I don't recall.

Q. Other than to Mr. O'Gara or the other lawyers who have represented you in this action, have you provided a written statement to anyone?

A. I don't recall.

Q. Do you think Jack Foley, Mary O'Donoghue or Dave Robbins were negligent in any way?

A. I do not.

MR. O'GARA: Objection.

Q. You do not think they were negligent?

A. NO.

MR. O'GARA: Objection.

MR. PLUNKETT: I object.

Q. Is there anything that Dave Robbins, Mary O'Donoghue or Jack Foley could have done to avoid the incident?

MR. O'GARA: Objection.

A. Not to avoid the incident. They could have diminished their injuries by getting out faster.

Q. Do you have any reason to believe that they delayed in getting out from the lifelines?

A. I think both boats should have been disqualified.
Q. Anything else?
A. That's it.
Q. When you found out that only *Sirena* was disqualified, did you talk to anybody about that?
A. I don't recall.
Q. Did you take any steps as the owner of the *Sirena* to address the issue of your disagreement?
A. I didn't because it was of no import.
Q. Did you talk to anyone from the yacht club from the Race Committee about the Protest Committee decision afterwards?
A. I did not.
Q. I believe that when you were asked questions by Mr. Cook about where you were just before the impact with *Sforzando* that you had gone to the deck of the vessel, correct?
A. I fell to the deck, yes.
Q. Were you still on the port side?
A. No.

correct?
A. Sitting on the combing.
Q. Sitting on the combing. And you were facing forward, obviously?
A. Correct.
Q. And then I'm trying to understand where Mr. Tripp was. He was directly behind you?
A. Either standing or sitting. Probably standing.
Q. And when he grabbed the wheel from you, did he then effectively reached over you?
A. Yes. I was then crouched down because I was watching *Sforzando*.
Q. When is the last specific memory you have of Mr. Tripp going from the position directly behind you to somewhere else?
MR. O'GARA: Objection. You can answer.
A. I don't have any memory. I wouldn't know. I don't pay attention to what he's doing behind me. I'm focused in a different direction.
Q. What's the last thing you remember as far

as him saying something to you before --
A. He said duck.
Q. -- before he grabbed the wheel?
A. He said duck.
Q. And did he say anything else?
A. No.
Q. And then in response to him saying duck, what did you do?
A. I said no. My plan was to go straight through.
Q. And then what did he say?
A. Then he grabbed the wheel.
Q. Can you remember before Mr. Tripp said duck, what had he last said to you, if anything?
MR. O'GARA: Objection. You can answer.
A. He said we have a close crossing, which is what caused me to crouch down to assess the situation for myself.
Q. That's when you went to the starboard side?
A. No. No. I just crouched down on the port side off the combing. I could see from

# Exhibit 6

# (pp. 1-12)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

------------------------------)
JACK FOLEY, MARY )
O'DONOGHUE AND DAVID )
ROBBINS )
PLAINTIFF )
)
VS. )
) C.A. NO. 06-0053
STEVEN M. LOEB, BLAD ) S-LDA
CO., KEVIN DAILEY, )
WILLIAM TRIPP, )
INDIVIDUALLY, AND D/B/A )
TRIPP DESIGN NAVAL )
ARCHITECTURE
DEFENDANT
------------------------------)

DEPOSITION OF WILLIAM H. TRIPP, III, A DEFENDANT IN THE ABOVE-ENTITLED CASE, TAKEN ON BEHALF OF THE DEFENDANT, BEFORE PATRICIA QUIRK, CSR, NOTARY PUBLIC IN AND FOR THE STATE OF RHODE ISLAND, AT THE OFFICES OF KIERNAN, PLUNKETT & REDIHAN, 91 FRIENDSHIP STREET, PROVIDENCE, RHODE ISLAND ON MARCH 1, 2007, SCHEDULED AT 1:30 P.M.

RHODE ISLAND COURT REPORTING
747 NORTH MAIN STREET
PROVIDENCE, RHODE ISLAND 02904
(401) 437-3366

ORIGINAL

PRESENT:

FOR THE PLAINTIFF......MORRISON MAHONEY LLP
(MARY O'DONOGHUE) BY: CHARLES A. COOK, ESQUIRE

FOR THE DEFENDANT......KIERNAN, PLUNKETT & REDIHAN
(WILLIAM TRIPP) BY: THOMAS C. PLUNKETT, ESQUIRE

FOR THE DEFENDANT......WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
BY: LAWRENCE BRENNAN, ESQUIRE

FOR THE DEFENDANT.......DEORCHIS WIENER & PARTNERS
BY: CARY R. WIENER, ESQUIRE

FOR THE DEFENDANT....OFFICE OF WILLIAM O'GARA
(LOEB, BLAD CO.) BY: WILLIAM O'GARA, ESQUIRE

FOR THE DEFENDANT....HOLBROOK & MURPHY
(BLAIR BROWN) BY: SETH S. HOLBROOK, ESQUIRE

RHODE ISLAND COURT REPORTING
747 NORTH MAIN STREET
PROVIDENCE, RHODE ISLAND 02904
(401) 437-3366

Q. ALL RIGHT, DO YOU -- LET'S NOW TURN TO THE DAY OF THE INCIDENT, DO YOU RECALL SAILING ABOARD SIRENA ON THE 14TH OF JULY, 2002?
A. THAT'S THE DAY OF THE INCIDENT.
Q. I WILL REPRESENT TO YOU THAT'S THE DAY OF THE INCIDENT. YOU WERE ABOARD SIRENA AT THE TIME?
A. YES, I WAS.
Q. WHAT WAS YOUR ROLE ON THE BOAT?
A. TACTICIAN.
Q. WHAT DO YOU UNDERSTAND THE DUTIES OF A TACTICIAN TO BE?
A. TO HELP GUIDE THE OWNER.
Q. GUIDE THE OWNER WITH WHAT?
A. WITH DIALOGUE.
Q. WHAT SORT OF DIALOGUE IS IT, DO YOU BELIEVE IS YOUR ROLE TO GIVE TO THE OWNER?
A. WELL, IT'S ANYTHING, ANY INFORMATION THAT'S APPROPRIATE, ANY AND ALL INFORMATION THAT'S APPROPRIATE.
Q. POSITION OF OTHER BOATS?
A. CERTAINLY.
Q. POTENTIAL WIND SHIFTS?
A. CERTAINLY.
Q. CURRENT?

A. YES.
Q. **TACTICAL DECISIONS AS TO WHICH WAY TO GO?**
A. CERTAINLY.
Q. **OR HOW TO MANEUVER IN THE PRESENCE OF OTHER BOATS?**
A. CERTAINLY.
Q. **HOW TO APPROACH THE MARK IN THE MOST EFFICIENT WAY?**
A. YES, IT IS TO ADVISE.
Q. **ULTIMATELY WHOSE DECISION IS IT?**
A. THE OWNER'S.
Q. **HAVE YOU EVER BEEN A TACTICIAN ABOARD SIRENA BEFORE?**
A. YES.
Q. **WHAT WAS THE LAST TIME PRIOR TO THIS INCIDENT WHERE YOU WERE TACTICIAN ABOARD SIRENA?**
A. I DON'T KNOW THAT I SAILED ON BOARD THE BOAT IN 2001. I KNOW THAT I DIDN'T SAIL ON BOARD THE BOAT IN 2002 PRIOR TO THAT EVENT. THAT WOULD MAKE IT THE ONE I'M CERTAIN WOULD HAVE BEEN THE WORLDS, WHICH WAS IN 2000.
Q. **LAST YEAR DID YOU RACE ON ANY BOATS AS TACTICIAN?**
A. LAST YEAR, 2006, YOU'LL HAVE TO GIVE ME A

A. THAT WE WERE GOING TO HAVE TO EITHER CROSS OR NOT CROSS.

**Q. DID YOU THINK YOU WERE GOING TO CROSS AT THE TIME?**

A. WITH ONE MINUTE TO GO, IT WAS TOO EARLY TO TELL.

**Q. WERE YOU CLOSE ENOUGH TO SHORE YOU COULD GET A RANGE ACROSS THE BOW OF SFORZANDO AT SOME POINT ON SHORE?**

A. YES, I WAS WATCHING THE RANGE, AND I DON'T NEED THE SHORE TO JUDGE THE RANGE, AND AT ONE MINUTE I WAS TALKING AND SAYING SFORZANDO IS THERE. WE HAD BEEN QUITE A BIT AHEAD OF SFORZANDO. WE MAY STILL BE AHEAD. WE HAVE TO SEE.

**Q. YOU ARE FAMILIAR WITH THE TERM MAKING BEARING OR LOSING BEARING ON A BOAT?**

A. YES.

**Q. DO YOU RECALL ONE MINUTE BEFORE THE COLLISION WHETHER YOU WERE MAKING BEARING, LOSING BEARING, OR HOLDING BEARING?**

A. AT ONE MINUTE I WOULDN'T BE COMMENTING YET. I DIDN'T COMMENT YET. IT WAS TOO EARLY.

**Q. THIRTY SECONDS TO GO TO THE COLLISION, WAS**

**SIRENA STILL ON PORT TACK?**

A. YES.

**Q. WERE YOU STILL SLIGHTLY CRACKED OFF?**

A. YES.

**Q. WERE YOU STILL ABOVE THE LAY LINE AT THAT POINT?**

A. YES.

**Q. WHAT WAS YOUR SPEED AT THAT POINT?**

A. SEVEN POINT FIVE.

**Q. AT 30 SECONDS BEFORE THE INCIDENT, WAS SFORZANDO ON PORT OR STARBOARD TACK?**

A. STARBOARD.

**Q. DO YOU HAVE A SENSE OF THEM RELATIVE TO THE WIND, DO YOU REMEMBER WHETHER THEY WERE CLOSE HAULED, ABOVE CLOSE HAULED, OR CRACKED OFF?**

A. AT THAT TIME I THOUGHT THEY WERE LAYING THE MARK.

**Q. THE GENOA APPEARED TO BE FULLY TRIMMED, NOT SHEETED OUT?**

A. IT WAS STILL A LITTLE FAR TO SEE THAT.

**Q. YOU THOUGHT THEY WERE ON STARBOARD LAY LINE AT THAT POINT?**

A. I WASN'T MAKING THAT ASSUMPTION.

**Q. YOU SAID --**

A. I WAS LOUD.

**Q. WHAT WAS YOUR TACTICAL PLAN? WERE YOU PLANNING TO GO STRAIGHT INTO THE MARK AND TACK RIGHT AT THE MARK OR OUTSIDE OF THE TWO-LENGTH ZONE?**

A. MY PLAN THEN WAS TO TACK AROUND THE MARK IF WE COULD DO THAT WITHOUT FOULING.

**Q. AND NOW 20 SECONDS FROM THE COLLISION, WHAT WAS YOUR COURSE?**

A. WE WERE CRACK SHEET, SLIGHTLY CRACK SHEET, SEVEN POINT FIVE, GAINING BEARING.

**Q. DID YOU -- DID THE BOAT ALTER ITS COMPASS COURSE AT THAT POINT?**

A. TWENTY SECONDS, NO.

**Q. WAS CRACK SHEET THE SAME AS IT WAS PREVIOUSLY OR DID THE SHEETS GO OUT A LITTLE BIT?**

A. SAME, WE WERE TRIMMING THE BOAT TO SPEED.

**Q. THERE WERE NO CHANGES IN THE SET OF YOUR SAILS BETWEEN 30 SECONDS AND 20 SECONDS?**

A. NO.

**Q. DID YOU TELL MR. LOEB ANYTHING AT THAT POINT?**

A. I SAID, "WE ARE CROSSING BUT IT'S CLOSE". HE SAID, "BE PREPARED TO HAVE TO DUCK".

**Q. OKAY, DO YOU RECALL WHERE SIRENA WAS AT 15**

**SECONDS BEFORE THE INCIDENT?**
A. YES, I DO. THE SITUATION CHANGED BETWEEN 20 AND 15 SECONDS.
**Q. HOW DID IT CHANGE?**
A. SFORZANDO PUT THEIR BOW UP.
**Q. PUT THEIR BOW WHAT --**
A. UP.
**Q. HOW FAR UP DO YOU THINK THEY PUT IT?**
A. FIVE TO TEN DEGREES.
**Q. DID YOU SEE IT ALTER COURSE?**
A. I SAW THE BOW MOVE, YES. I WAS ANTICIPATING IT.
**Q. WHY WERE YOU ANTICIPATING IT?**
A. BECAUSE IT'S A GOOD MOVE.
**Q. WHY IS THAT A GOOD MOVE?**
A. IT PREVENTS US FROM CROSSING THEM.
**Q. HOW MANY SECONDS BEFORE THE COLLISION DO YOU THINK SFORZANDO PUT HER BOW UP?**
A. BETWEEN 15 AND 20, CLOSER, WELL, RIGHT IN THE MIDDLE OF 15 TO 20.
**Q. 17 TO 18 SECONDS?**
A. I'LL GO WITH 17.
**Q. WERE YOU STILL MAKING BEARING AT THAT POINT?**
A. NO.

**Q. SO, WHAT DID YOU DO?**
A. I SAID, "WE HAVE TO DUCK IMMEDIATELY".
**Q. DID MR. LOEB RESPOND?**
A. HE SAID, "NO".
**Q. DID HE SAY WHY?**
A. HE SAID, "IT'S TOO LATE".
**Q. SO, WHAT HAPPENED NEXT?**
A. I TOLD HIM TO TURN DOWN IMMEDIATELY.
**Q. AND WHAT DID HE DO OR SAY?**
A. HE SAID "NO".
**Q. THEN WHAT HAPPENED NEXT?**
A. I GRABBED THE WHEEL AND SPUN THE BOAT 45 DEGREES. I SPUN THE BOAT PROBABLY 55 DEGREES.
**Q. AT THE TIME YOU GRABBED THE WHEEL, DID YOU ASK ANY OF THE TRIMMERS TO LET THEIR SAILS OUT TO ADJUST FOR YOUR CHANGE IN COURSE?**
A. NO, IT WAS TOO FAST.
**Q. DID THEY LET THEIR SAILS OUT?**
A. AFTER WE TURNED DOWN.
**Q. DID THE MAIN BEING TRIMMED AS IT WAS IN ANY WAY INTERFERE WITH YOUR ABILITY TO TURN DOWN?**
A. NO, THE BOAT TURNED LIKE THAT. (WITNESS INDICATING WITH SLAP OF HANDS).
**Q. BECAUSE OF THE GOOD DESIGN?**

BUT I CAN GIVE YOU APPROXIMATELY.

**Q. PLEASE.**

A. FROM WHEN I SAID WE HAD TO TURN, APPROXIMATELY THREE-AND-A-HALF, BUT IT'S -- I THINK IT'S A LITTLE ODD DOING THIS VERBALLY.

**Q. IF MR. LOEB HAD DUCKED IMMEDIATELY WOULD, IN YOUR OPINION, A COLLISION HAVE BEEN AVOIDED?**

A. ABSOLUTELY.

**Q. AND THEN MR. LOEB SAID, "NO, IT'S TOO LATE," OR WORDS TO THAT EFFECT?**

A. YES.

**Q. AND THEN THERE WAS SOME PASSAGE OF TIME AFTER WHICH YOU SAID AGAIN THAT HE NEEDED TO TURN DOWN OR WORDS TO THAT EFFECT?**

A. THERE WAS NO PASSAGE OF TIME.

**Q. SO IMMEDIATELY AFTER HE SAID, "NO, IT'S TOO LATE," YOU SAID SOMETHING LIKE, "YOU HAVE TO TURN DOWN"?**

A. I SAID, "WE HAVE TO DUCK IMMEDIATELY".

**Q. IF HE HAD DONE IT AT THAT POINT, WOULD A COLLISION HAVE BEEN AVOIDED?**

A. YES, DEPENDING ON THE COURSE.

**Q. AT THAT POINT, IF YOU HAD TURNED DOWN IMMEDIATELY?**

A. PROVIDED SFORZANDO STAYED ON HER COURSE.
**Q. THE ONE WHERE SHE PUT HER BOW UP FIVE OR TEN DEGREES, IF SHE HELD THAT COURSE AND MR. LOEB TURNED DOWN IMMEDIATELY, SIRENA COULD HAVE AVOIDED THE COLLISION?**
A. CORRECT.
**Q. THEN YOU GRABBED THE WHEEL?**
A. CORRECT.
**Q. WAS SIRENA, AT THE TIME YOU GRABBED THE WHEEL, STILL ON THAT SAME COURSE?**
A. CORRECT.
**Q. AND YOU TURNED THE WHEEL TO STARBOARD?**
A. CORRECT.
**Q. WHAT HAPPENED TO MR. LOEB AS YOU TURNED THE WHEEL?**
A. SOME DISCOMFORT. I DIDN'T WATCH WHAT HAPPENED TO HIM. I HEARD FUMBLING. I THINK HE MAY HAVE -- HE EITHER STUMBLED OR HE FELL.
**Q. DO YOU HAVE A RECOLLECTION OF SEEING HIM ON THE COCKPIT?**
A. THAT WAS THE LAST PLACE I WAS LOOKING.
**Q. FAIR ENOUGH. DO YOU EVER REMEMBER SEEING HIM ON THE COCKPIT SOLE?**
A. NO.

**AIMED RELATIVE TO SIRENA?**

A. SFORZANDO'S BOW WAS AIMED AT OUR BOW, AND SHE WAS SLIGHTLY TO OUR -- WAS STILL SLIGHTLY TO -- WHICH WAY WOULD IT BE? LET ME BACKTRACK HERE. AT THE TIME WE STARTED TO TURN OUR BOW, SFORZANDO WAS GOING TO HIT US JUST ABOUT DEAD ON.

**Q. WHEN YOU SAY TURNED YOUR BOW, YOU MEAN BACK TO WINDWARD?**

A. WHEN SIRENA'S BOW TURNED BACK TO WEATHER, WE WERE ABOUT TO HIT DEAD ON.

**Q. WHAT PARTS OF THE BOAT, THE TWO BOATS MADE CONTACT?**

A. OUR SPINNAKER PULL HIT THEIR STEM DEAD ON. OUR SPINNAKER POLE WAS LAYING ALONG -- WAS ON THE DECK, STILL LAYING ALONG THE HEAD STAY OR JUST OUTBOARD OF THE HEAD STAY ENCAPSULATED BY THE PULPIT.

**Q. ON THE STARBOARD SIDE OF THE HEAD STAY?**

A. YES.

**Q. HOW FAR BEYOND THE STEM WAS THE POLE EXTENDED?**

A. THE POLE WAS NOT BEYOND THE STEM. THE POLE WAS RIGHT ABOUT EVEN WITH THE STEM, BUT OFF TO STARBOARD.