# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JACK FOLEY, MARY O'DONOGHUE AND DAVID ROBBINS PLAINTIFF | ) | |
| VS. | ) | C.A. NO. 06-0053 S-LDA |
| STEVEN M. LOEB, BLAD CO., KEVIN DAILEY, WILLIAM TRIPP, INDIVIDUALLY, AND D/B/A TRIPP DESIGN NAVAL ARCHITECTURE DEFENDANT | ) | |

DEPOSITION OF BLAIR BROWN, A WITNESS IN THE ABOVE-ENTITLED CASE, TAKEN ON BEHALF OF THE DEFENDANT, BEFORE PATRICIA QUIRK, CSR, NOTARY PUBLIC IN AND FOR THE STATE OF RHODE ISLAND, AT THE OFFICES OF KIERNAN, PLUNKETT & REDIHAN, 91 FRIENDSHIP STREET, PROVIDENCE, RHODE ISLAND ON MARCH 1, 2007, SCHEDULED AT 9:30 A.M.

10:14:45 SUPPLIES.
10:14:47 Q. AND FOR HOW LONG WAS THAT YOUR OCCUPATION?
10:14:52 A. FROM 1964 UNTIL 1992.
10:14:57 Q. WOULD YOU TELL ME JUST GENERALLY WHAT YOUR
10:15:06 SAILING EXPERIENCE HAS BEEN?
10:15:07 A. I'VE BEEN SAILING SINCE I WAS A YOUNGSTER
10:15:11 IN 1950. I'VE RACED EXTENSIVELY FOR -- SINCE
10:15:19 1978.
10:15:21 Q. DO YOU CURRENTLY KEEP A BOAT?
10:15:24 A. YES.
10:15:24 Q. DO YOU STILL RACE?
10:15:26 A. YES.
10:15:27 Q. WHAT TYPE OF BOAT DO YOU HAVE?
10:15:29 A. I HAVE A 45-FOOT OCEAN RACER.
10:15:33 Q. IS IT THE SAME ONE THAT WAS INVOLVED IN THIS
10:15:37 INCIDENT?
10:15:38 A. YES.
10:15:38 Q. HOW LONG HAVE YOU OWNED THAT BOAT, THIS
10:15:42 SFORZANDO?
10:15:44 A. SINCE 1998.
10:15:46 Q. ALL RIGHT, AND JUST TO JUMP AHEAD A BIT TO
10:15:49 DIRECT YOUR ATTENTION TO THE DAY OF THIS RACE,
10:15:51 ON THAT DATE WERE YOU THE OWNER OF THE BOAT?
10:15:54 A. YES.

10:15:54 Q. THERE WAS NO CORPORATION OR ANY OTHER ENTITY INVOLVED?
10:15:59 A. NO.
10:15:59 Q. AND WERE YOU THE SKIPPER?
10:16:01 A. YES.
10:16:01 Q. AND YOU UNDERSTOOD THE RULES? WERE YOU THE PERSON IN CHARGE OF THE BOAT DURING THE RACE?
10:16:07 A. YES.
10:16:09 Q. PRIOR TO COMING HERE TODAY, IF YOU COULD JUST ANSWER THIS YES OR NO, DID YOU SPEAK WITH ANYBODY TO PREPARE FOR THIS DEPOSITION, JUST ANSWER THAT YES OR NO? I UNDERSTAND YOU PROBABLY SPOKE WITH YOUR LAWYER, THAT'S WHY I ASK YOU JUST TO ANSWER YES OR NO. I'M NOT GOING TO GET INTO THE SUBSTANCE OF WHAT YOU DISCUSSED WITH YOUR LAWYER.
10:16:41 MR. HOLBROOK: DO YOU UNDERSTAND THE QUESTION?
10:16:44 A. YES. I'VE SPOKEN WITH PEOPLE, BUT NOT TO PREPARE FOR THIS DEPOSITION.
10:16:52 Q. ALL RIGHT, LET ME ASK YOU THIS, HAVE YOU SPOKEN WITH -- HAVE YOU SPOKEN WITH YOUR LAWYER? AGAIN, JUST YES OR NO? HAVE YOU SPOKEN WITH YOUR LAWYER ABOUT THIS INCIDENT?

10:17:04 A. YES, YES.
10:17:28 Q. AND THE OTHER PEOPLE WITH WHOM YOU'VE SPOKEN ABOUT THIS, IT WAS NOT IN PREPARATION FOR THIS DEPOSITION?
10:17:36 A. I'VE SPOKEN WITH OTHER PEOPLE IN THE YEARS SINCE THIS ACCIDENT. THESE WERE PEOPLE ON THE BOAT WITH ME.
10:17:43 Q. ALL RIGHT, I'LL GET INTO THAT LATER. DID YOU REVIEW ANY DOCUMENTS IN PREPARATION FOR THIS DEPOSITION?
10:17:50 A. NO. WELL -- I -- I'VE READ THE DEPOSITIONS.
10:17:56 Q. ALL RIGHT, WHAT DEPOSITIONS HAVE YOU READ?
10:18:00 A. THE DEPOSITION FOR DAVE ROBBINS, JACK FOLEY AND MARY O'DONOGHUE.
10:18:08 Q. HAVE YOU READ MR. SLATTERY'S DEPOSITION?
10:18:11 A. YES.
10:18:13 Q. ON THAT DATE, ON THE DATE OF THE RACE, CAN YOU REMEMBER WHO WAS ON BOARD THE BOAT?
10:18:20 A. I THINK SO.
10:18:22 Q. COULD YOU NAME THEM FOR ME?
10:18:24 A. THERE WAS THE THREE PEOPLE I JUST MENTIONED WERE THE PLAINTIFFS, I GUESS, STEVE CRUSE, JACK SLATTERY, TODD ENGLISH, WARWICK

10:18:43 OLNEY, O-L-N-E-Y, JIM TAYLOR. I CAN'T
10:18:54 REMEMBER THE OTHERS.
10:18:55 Q. LET ME READ OFF A FEW NAMES, ONE YOU
10:19:00 MENTIONED, ENGLISH?
10:19:02 A. TODD ENGLISH.
10:19:10 Q. DO YOU REMEMBER A TODD YANKEE?
10:19:13 A. I'M SORRY, IT'S TODD YANKEE.
10:19:17 Q. DAVID ROBBINS?
10:19:21 A. ANN MARIE ROSE.
10:19:23 Q. MARY O'DONOGHUE, AND /PHREUBG /KEBG KNEE?
10:19:29 A. THAT'S RIGHT.
10:19:29 Q. STEVE CRUSE, JIM TAYLOR, MR. SLATTERY AND
10:19:34 YOURSELF, DO YOU REMEMBER A WOMAN BY THE NAME
10:19:36 OF JANE?
10:19:37 A. THERE WAS ANOTHER WOMAN THERE. I DON'T
10:19:40 REMEMBER HER NAME.
10:19:41 Q. AND MR. FOLEY?
10:19:42 A. RIGHT.
10:19:43 Q. ANYONE ELSE THAT YOU CAN THINK OF WHO WAS ON
10:19:46 BOARD?
10:19:47 A. I CAN'T THINK OF ANY OTHERS.
10:19:49 Q. ON THAT DATE, WHAT WERE MR. SLATTERY'S DUTIES?
10:19:54 A. HE WAS TACTICIAN.
10:19:56 Q. AND WHAT WERE HIS RESPONSIBILITIES DURING THE

10:28:27 A. I DON'T RECALL.
10:28:28 Q. WOULD YOU HAVE RECORDS PERTAINING TO THAT?
10:28:30 A. I THINK I WOULD, YES.
10:28:32 Q. WAS IT BY REGULAR PAYROLL CHECK?
10:28:36 A. I PAID HIM AS A CONTRACT WORKER.
10:28:40 Q. ALL RIGHT, IT WOULD HAVE BEEN A CHECK FROM YOU
10:28:43 THEN DIRECTLY TO HIM?
10:28:44 A. RIGHT.
10:28:53 Q. ALL RIGHT, NOW, BEFORE ENTERING INTO THAT
10:28:58 REGATTA, DID YOU SIGN ANY DOCUMENTS IN
10:29:03 CONJUNCTION WITH THE REGATTA?
10:29:05 A. I ASSUME I DID, YES.
10:29:07 Q. CAN YOU REMEMBER?
10:29:09 A. IT WOULD BE SOME KIND OF CREW -- I WOULD
10:29:13 SIGN A CREW WAIVER, AS OTHERS WOULD.
10:29:21 Q. LET ME JUST SHOW YOU THIS. MAY WE MARK THAT?
10:29:49 (DEFENDANT'S EXHIBIT 1 MARKED)
10:29:49 Q. LET ME SHOW YOU, YOU HAVE ONE. MR. BROWN, LET
10:29:53 ME SHOW YOU THE ONE WITH THE EXHIBIT MARK ON
10:29:56 IT. DO YOU RECOGNIZE THAT?
10:30:04 A. YES, I MEAN, IT'S A WAIVER FORM, ISN'T
10:30:06 IT, OR, NO, IT ISN'T. IT'S AN OFFICIAL ENTRY
10:30:11 FORM.
10:30:12 Q. DOWN ON THE BOTTOM, ON THE LEFT, DOES THAT

10:30:14 CONTAIN YOUR SIGNATURE?
10:30:16 A. YES.
10:30:16 Q. I SHOULD SAY, IS THAT YOUR SIGNATURE ON THE
10:30:20 ENTRY FORM FOR THAT REGATTA?
10:30:23 A. I ASSUME, YES.
10:30:25 Q. DO YOU REMEMBER SIGNING ANY OTHER DOCUMENTS
10:30:28 BESIDES THIS ONE FOR THE REGATTA?
10:30:31 A. I MIGHT HAVE SIGNED A -- ALTHOUGH THIS
10:30:35 SAYS "WAIVER" I MIGHT HAVE SIGNED A WAIVER
10:30:38 FORM AS WELL. I DON'T RECALL.
10:30:42 Q. HAVE YOU KEPT A COPY OF THAT DOCUMENT?
10:30:46 A. NO, I DON'T KEEP --
10:30:48 Q. THIS ENTRY FORM AND THE WAIVER FORM YOU MAY
10:30:52 HAVE SIGNED, WOULD THEY HAVE BEEN TURNED INTO
10:30:54 THE YACHT CLUB PRIOR TO THE RACE?
10:30:57 A. YES, I ASSUME THAT I SIGNED ANY FORMS
10:31:00 THAT THEY REQUIRED.
10:31:02 Q. AND DO YOU KNOW WHETHER OR NOT ANY OF YOUR
10:31:05 CREW MEMBERS SIGNED ANY FORMS?
10:31:06 A. I ASSUME, IF THEY WERE REQUIRED TO SIGN,
10:31:11 THEY DID.
10:31:11 Q. DO YOU KNOW IF THEY DID?
10:31:12 A. I DON'T KNOW.
10:31:13 Q. WHO WOULD HANDLE THAT? WHO IN THE GROUP WOULD

11:14:07 DON'T KNOW HOW TO DESCRIBE THAT.
11:14:09 Q. THAT'S FINE. WAS MR. SLATTERY TELLING YOU
11:14:11 ANYTHING ABOUT SIRENA DURING THAT PERIOD?
11:14:14 A. YES.
11:14:14 Q. WHAT WAS HE TELLING YOU?
11:14:16 A. HE WAS POINTING OUT TO ME WHERE SHE WAS.
11:14:19 Q. NOW, DID YOU EVER SEE -- DID YOU EVER SEE
11:14:23 SIRENA TURN DOWNWIND?
11:14:26 A. YES.
11:14:27 Q. ALL RIGHT, AND AT THAT POINT, WHAT WAS YOUR
11:14:30 BOAT DOING?
11:14:31 A. WE WERE TURNING DOWNWIND.
11:14:34 Q. SO, WHEN YOU SAW SIRENA TURNING DOWNWIND, YOU
11:14:38 WERE TURNING DOWNWIND ALSO?
11:14:40 A. YES.
11:14:41 Q. DO YOU KNOW WHICH BOAT TURNED FIRST?
11:14:52 A. I DON'T.
11:14:55 Q. ONCE YOU TURNED DOWN, DID YOU LOSE SITE OF
11:14:59 SIRENA UP TO THE POINT OF THE COLLISION?
11:15:02 A. NO.
11:15:02 Q. YOU COULD STILL SEE IT?
11:15:04 A. RIGHT.
11:15:05 Q. SO, YOU SAW SIRENA TURNING DOWN, AND YOU
11:15:09 CONTINUED TO TURN DOWN?

11:15:10 A. WE TURNED DOWN MODESTLY. IT WAS A
11:15:14 QUESTION OF FINESSE AT THAT POINT. HAD WE NOT
11:15:19 TURNED, WE WOULD HAVE PROBABLY SUNK HER. HAD
11:15:24 WE TURNED MORE, WE WOULD HAVE THROWN OUR STERN
11:15:27 INTO HER BOW AND SHE PROBABLY WOULD HAVE SUNK
11:15:32 US. SHE TURNED DOWN SOME, AND WE TURNED DOWN
11:15:37 SOME.
11:15:37 Q. DID YOU CONSIDER TACKING OVER TO THE RIGHT?
11:15:40 A. YOU MEAN HEADING UP INTO THE WIND?
11:15:44 Q. YES. ACTUALLY TACKING OVER TO THE RIGHT?
11:15:46 A. IF WE HAD CRASH TACKED, WE PROBABLY WOULD
11:15:51 HAVE SUNK OUR BOAT. SHE WOULD HAVE -- OUR
11:15:54 PORT SIDE WOULD HAVE GONE INTO YOUR BOW.
11:15:57 Q. OKAY. GO AHEAD.
11:16:01 A. AS IT WAS, IT WAS REMARKABLE HOW THE
11:16:05 COLLISION WAS AS BENIGN AS IT WAS. I DON'T
11:16:09 MEAN TO IMPLY THAT IT WAS BENIGN. IT COULD
11:16:14 HAVE BEEN PHYSICALLY MUCH WORSE ON THE BOAT.
11:16:16 I'M NOT TALKING ABOUT PERSONAL INJURIES.
11:16:20 Q. NOW, SO YOU TURNED DOWN WHILE SIRENA WAS
11:16:26 TURNING DOWN, WHAT HAPPENED?
11:16:28 A. WE, THE BOWS CAME CLOSE TOGETHER AND
11:16:34 EVENTUALLY, AS THE BOATS WIDENED GOING AFTER
11:16:38 THE BOAT, WE HIT AND PROBABLY WE SURGED TWO OR

11:16:44 THREE TIMES. AS I SAID, THERE WAS A SWELL IN
11:16:47 RHODE ISLAND SOUND, WHICH IS NOT UNUSUAL, AND
11:16:50 THE BOATS WOULD HIT, AND THEN AS A SWELL CAME
11:16:55 THROUGH, THEN AS THE SWELL DIMINISHED, THEY
11:16:59 WOULD GO APART, AND THEN THEY WOULD MEET
11:17:03 AGAIN.
11:17:03 Q. DO YOU KNOW WHAT PARTS OF THE BOAT CAME IN
11:17:07 CONTACT?
11:17:07 A. HER STARBOARD SIDE HIT OUR STARBOARD
11:17:12 SIDE.
11:17:12 Q. THE --
11:17:13 A. YES, THE PULPITS AND MY FLAGS WERE
11:17:17 SNARLED. THE BOAT SPINNAKER PULLS WERE
11:17:20 BROKEN. I ASSUME HER SPINNAKER PULL WAS ON
11:17:24 THE STARBOARD SIDE. WE HAD BOTH SET UP FOR A
11:17:29 MARK ROUNDING?
11:17:33 Q. WHO HAD SET YOUR BOAT UP FOR THE ROUNDING, WAS
11:17:36 THAT TODD YANKEE?
11:17:38 A. IT WOULD HAVE BEEN HIM, YES.
11:17:40 Q. NOW, THERE WAS THIS YELLING TO THE OTHER BOAT,
11:17:42 TO SIRENA, WAS THERE ANY YELLING TO THE CREW
11:17:46 ABOUT THE CLOSENESS OF SIRENA OR THE POTENTIAL
11:17:51 OR THE IMPENDING COLLISION?
11:17:53 A. EVERYONE KNEW WHERE SIRENA WAS BY THE