# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JACK FOLEY, MARY O'DONOGHUE AND DAVID ROBBINS PLAINTIFF | |
| VS. | C.A. NO. 06-0053 S-LDA |
| STEVEN M. LOEB, BLAD CO., KEVIN DAILEY, WILLIAM TRIPP, INDIVIDUALLY, AND D/B/A TRIPP DESIGN NAVAL ARCHITECTURE DEFENDANT | |

DEPOSITION OF WILLIAM H. TRIPP, III, A DEFENDANT IN THE ABOVE-ENTITLED CASE, TAKEN ON BEHALF OF THE DEFENDANT, BEFORE PATRICIA QUIRK, CSR, NOTARY PUBLIC IN AND FOR THE STATE OF RHODE ISLAND, AT THE OFFICES OF KIERNAN, PLUNKETT & REDIHAN, 91 FRIENDSHIP STREET, PROVIDENCE, RHODE ISLAND ON MARCH 1, 2007, SCHEDULED AT 1:30 P.M.

RHODE ISLAND COURT REPORTING
747 NORTH MAIN STREET
PROVIDENCE, RHODE ISLAND 02904
(401) 437-3366



1ffd3883-4d41-469a-b74a-9e8b787aabbc

02:16:17 Q. ALL RIGHT, DO YOU -- LET'S NOW TURN TO THE DAY
02:16:20 OF THE INCIDENT, DO YOU RECALL SAILING ABOARD
02:16:24 SIRENA ON THE 14TH OF JULY, 2002?
02:16:30 A. THAT'S THE DAY OF THE INCIDENT.
02:16:33 Q. I WILL REPRESENT TO YOU THAT'S THE DAY OF THE
02:16:36 INCIDENT. YOU WERE ABOARD SIRENA AT THE TIME?
02:16:38 A. YES, I WAS.
02:16:39 Q. WHAT WAS YOUR ROLE ON THE BOAT?
02:16:42 A. TACTICIAN.
02:16:43 Q. WHAT DO YOU UNDERSTAND THE DUTIES OF A
02:16:46 TACTICIAN TO BE?
02:16:48 A. TO HELP GUIDE THE OWNER.
02:16:52 Q. GUIDE THE OWNER WITH WHAT?
02:16:55 A. WITH DIALOGUE.
02:16:57 Q. WHAT SORT OF DIALOGUE IS IT, DO YOU BELIEVE IS
02:17:01 YOUR ROLE TO GIVE TO THE OWNER?
02:17:03 A. WELL, IT'S ANYTHING, ANY INFORMATION
02:17:07 THAT'S APPROPRIATE, ANY AND ALL INFORMATION
02:17:10 THAT'S APPROPRIATE.
02:17:11 Q. POSITION OF OTHER BOATS?
02:17:12 A. CERTAINLY.
02:17:13 Q. POTENTIAL WIND SHIFTS?
02:17:15 A. CERTAINLY.
02:17:16 Q. CURRENT?

02:17:17 A. YES.
02:17:18 Q. TACTICAL DECISIONS AS TO WHICH WAY TO GO?
02:17:22 A. CERTAINLY.
02:17:22 Q. OR HOW TO MANEUVER IN THE PRESENCE OF OTHER
02:17:26 BOATS?
02:17:26 A. CERTAINLY.
02:17:28 Q. HOW TO APPROACH THE MARK IN THE MOST EFFICIENT
02:17:32 WAY?
02:17:32 A. YES, IT IS TO ADVISE.
02:17:34 Q. ULTIMATELY WHOSE DECISION IS IT?
02:17:37 A. THE OWNER'S.
02:17:39 Q. HAVE YOU EVER BEEN A TACTICIAN ABOARD SIRENA
02:17:42 BEFORE?
02:17:43 A. YES.
02:17:43 Q. WHAT WAS THE LAST TIME PRIOR TO THIS INCIDENT
02:17:47 WHERE YOU WERE TACTICIAN ABOARD SIRENA?
02:17:55 A. I DON'T KNOW THAT I SAILED ON BOARD THE
02:17:58 BOAT IN 2001. I KNOW THAT I DIDN'T SAIL ON
02:18:02 BOARD THE BOAT IN 2002 PRIOR TO THAT EVENT.
02:18:06 THAT WOULD MAKE IT THE ONE I'M CERTAIN WOULD
02:18:10 HAVE BEEN THE WORLDS, WHICH WAS IN 2000.
02:18:12 Q. LAST YEAR DID YOU RACE ON ANY BOATS AS
02:18:16 TACTICIAN?
02:18:17 A. LAST YEAR, 2006, YOU'LL HAVE TO GIVE ME A

02:28:10 Q. AND HOW FAR ABOVE THE LAY LINE WERE YOU EITHER
02:28:17 IN BOAT LENGTHS, FEET, OR SECONDS?
02:28:19 A. WE WERE A COUPLE OF BOAT LENGTHS ABOVE.
02:28:30 Q. AND ONE MINUTE BEFORE THE INCIDENT, DO YOU
02:28:33 KNOW WHERE SFORZANDO WAS?
02:28:36 A. YES.
02:28:37 Q. WHERE WERE THEY?
02:28:38 A. THEY WERE ON STARBOARD TACK.
02:28:41 Q. DO YOU HAVE ANY UNDERSTANDING AS TO WHETHER
02:28:43 THEY WERE ABOVE, BELOW, OR ON THE STARBOARD
02:28:46 LAY LINE?
02:28:47 A. DO I HAVE ANY UNDERSTANDING NOW OR THEN?
02:28:50 Q. THEN.
02:28:52 A. I KNEW ROUGHLY THEY WERE ON THE LAY LINE.
02:28:55 Q. DID YOU SEE THE POSITION OF THEIR SPINNAKER
02:28:58 POLE AT THE TIME, AT THE ONE MINUTE?
02:29:01 A. NO, NOT THAT I RECALL.
02:29:04 Q. AND ONE MINUTE BEFORE THE INCIDENT, WHO WAS
02:29:08 STEERING SIRENA?
02:29:09 A. STEVE LOEB.
02:29:11 Q. WHERE WAS HE POSITIONED IN THE BOAT?
02:29:13 A. SITTING DOWN, PORT SIDE.
02:29:15 Q. SO, ON THE WINDWARD SIDE?
02:29:17 A. CORRECT.

02:29:18 Q. SITTING ON THE GUNNEL OR THE CO-MAIN?
02:29:22 A. CO-MAIN.
02:29:22 Q. FACING HIS TORSO INTO THE COCKPIT?
02:29:25 A. YES.
02:29:26 Q. AND WHERE WERE YOU?
02:29:28 A. ONE MINUTE I HAD -- ONE MINUTE I WAS
02:29:31 TURNED AROUND FACING MY FEET INSIDE THE
02:29:34 COCKPIT, LOOKING, LOOKING LEEWARD
02:29:38 PARTICULARLY.
02:29:39 Q. WERE YOU ON THE PORT SIDE OF THE BOAT?
02:29:42 A. CORRECT.
02:29:43 Q. BEHIND MR. LOEB?
02:29:44 A. DIRECTLY.
02:29:45 Q. WAS THE BOAT HIGH ENOUGH THAT YOU HAD AN
02:29:50 UPWARD VIEW TO LEEWARD?
02:29:54 A. I PROBABLY HAD TO CROUCH, BUT I CAN SAY
02:29:54 FOR SURE IF I HAD TO CROUCH OR NOT, BUT I
02:29:56 COULD SEE THE BOATS CLEARLY.
02:29:59 Q. HOW FAR FROM YOU PHYSICALLY AT ONE MINUTE
02:30:03 BEFORE THE INCIDENT DO YOU THINK THE CLOSEST
02:30:06 PART OF SFORZANDO WAS?
02:30:09 A. I'M SORRY, HOW FAR?
02:30:12 Q. FROM YOU, NOT SIRENA, BUT FROM WHERE YOU WERE
02:30:16 SITTING ONE MINUTE BEFORE THE COLLISION, HOW



1ffd3883-4d41-469a-b74a-9e8b787aabbc

02:30:19 FAR AWAY WAS SFORZANDO?
02:30:22 A. FROM ME, NOT FROM SIRENA?
02:30:24 Q. RIGHT, FROM WHERE YOU WERE ON SIRENA, THE
02:30:27 PROPER REFERENCE, I'M NOT ASKING ABOUT THE BOW
02:30:29 OF SIRENA, THE MAST OF SIRENA, OR ANYWHERE
02:30:32 ELSE, JUST IN THE GENERAL AREA WHERE YOU WERE,
02:30:35 HOW FAR AWAY WAS SFORZANDO ONE MINUTE BEFORE
02:30:40 THE COLLISION?
02:30:40 A. GIVE ME A MOMENT. WE WERE APPROXIMATELY
02:30:54 34 BOTH LENGTHS APART.
02:30:57 Q. NOW, AM I CORRECT IN ASSUMING THAT YOU DID
02:31:00 THAT MATHEMATICALLY IN YOUR HEAD AS OPPOSED TO
02:31:03 YOUR MEMORY AT THE TIME?
02:31:05 A. I DID IT BY PHYSICS.
02:31:08 Q. YOU DON'T HAVE ANY SPECIFIC RECOLLECTION NOW
02:31:11 AS TO HOW FAR THEY WERE AT THE TIME?
02:31:14 A. WELL, I WOULD NEVER THINK LIKE YOU.
02:31:18 YOU'VE THOUGHT ON THE RACE COURSE AT THAT
02:31:22 POINT IN TIME, IT WOULD BE FRUITLESS.
02:31:25 Q. WELL, WHAT DO YOU REMEMBER THINKING AS TO THE
02:31:28 SEPARATION BETWEEN YOU AND SFORZANDO ONE
02:31:32 MINUTE BEFORE THE INCIDENT?
02:31:33 A. INCOMING?
02:31:35 Q. WHAT ABOUT THE DISTANCE BETWEEN THEM?



1ffd3883-4d41-469a-b74a-9e8b787aabbc

02:31:40 A. THAT WE WERE GOING TO HAVE TO EITHER CROSS OR NOT CROSS.
02:31:46 Q. DID YOU THINK YOU WERE GOING TO CROSS AT THE TIME?
02:31:49 A. WITH ONE MINUTE TO GO, IT WAS TOO EARLY TO TELL.
02:31:54 Q. WERE YOU CLOSE ENOUGH TO SHORE YOU COULD GET A RANGE ACROSS THE BOW OF SFORZANDO AT SOME POINT ON SHORE?
02:32:03 A. YES, I WAS WATCHING THE RANGE, AND I DON'T NEED THE SHORE TO JUDGE THE RANGE, AND AT ONE MINUTE I WAS TALKING AND SAYING SFORZANDO IS THERE. WE HAD BEEN QUITE A BIT AHEAD OF SFORZANDO. WE MAY STILL BE AHEAD. WE HAVE TO SEE.
02:32:23 Q. YOU ARE FAMILIAR WITH THE TERM MAKING BEARING OR LOSING BEARING ON A BOAT?
02:32:28 A. YES.
02:32:29 Q. DO YOU RECALL ONE MINUTE BEFORE THE COLLISION WHETHER YOU WERE MAKING BEARING, LOSING BEARING, OR HOLDING BEARING?
02:32:35 A. AT ONE MINUTE I WOULDN'T BE COMMENTING YET. I DIDN'T COMMENT YET. IT WAS TOO EARLY.
02:32:44 Q. THIRTY SECONDS TO GO TO THE COLLISION, WAS



1ffd3883-4d41-469a-b74a-9e8b787aabbc

02:32:49 SIRENA STILL ON PORT TACK?
02:32:51 A. YES.
02:32:52 Q. WERE YOU STILL SLIGHTLY CRACKED OFF?
02:32:55 A. YES.
02:32:55 Q. WERE YOU STILL ABOVE THE LAY LINE AT THAT
02:32:58 POINT?
02:33:01 A. YES.
02:33:02 Q. WHAT WAS YOUR SPEED AT THAT POINT?
02:33:04 A. SEVEN POINT FIVE.
02:33:10 Q. AT 30 SECONDS BEFORE THE INCIDENT, WAS
02:33:14 SFORZANDO ON PORT OR STARBOARD TACK?
02:33:19 A. STARBOARD.
02:33:20 Q. DO YOU HAVE A SENSE OF THEM RELATIVE TO THE
02:33:26 WIND, DO YOU REMEMBER WHETHER THEY WERE CLOSE
02:33:27 HAULED, ABOVE CLOSE HAULED, OR CRACKED OFF?
02:33:30 A. AT THAT TIME I THOUGHT THEY WERE LAYING
02:33:32 THE MARK.
02:33:33 Q. THE GENOA APPEARED TO BE FULLY TRIMMED, NOT
02:33:37 SHEETED OUT?
02:33:38 A. IT WAS STILL A LITTLE FAR TO SEE THAT.
02:33:41 Q. YOU THOUGHT THEY WERE ON STARBOARD LAY LINE AT
02:33:46 THAT POINT?
02:33:46 A. I WASN'T MAKING THAT ASSUMPTION.
02:33:48 Q. YOU SAID --

02:33:49 A. THE LAY LINE AND MAKING THE MARK ARE TWO
02:33:52 DIFFERENT THINGS.
02:33:53 Q. YOU THOUGHT IF THEY HELD THE COURSE THEY HAD,
02:33:57 THEY WOULD ROUND THE MARK?
02:33:59 A. CORRECT.
02:33:59 Q. WITHOUT HAVING TO ALTER COURSE?
02:34:02 A. CORRECT.
02:34:03 Q. WAS THE SPINNAKER PULLED UP ON THE MAST OR
02:34:06 DOWN ON THE BOW?
02:34:07 A. I DON'T RECALL.
02:34:08 Q. DID YOU OBSERVE WHETHER THEY WERE MAKING
02:34:14 BEARING, HOLDING BEARING OR LOSING BEARING ON
02:34:16 YOU 30 SECONDS BEFORE THE COLLISION?
02:34:18 A. WE WERE MAKING BEARING.
02:34:23 Q. DID YOU THINK YOU WERE GOING TO CROSS AT THAT
02:34:26 POINT?
02:34:26 A. I DIDN'T, BUT I THOUGHT IT WAS CLOSE AND
02:34:28 I TOLD THE SKIPPER SO.
02:34:30 Q. WHAT DID YOU TELL MR. LOEB?
02:34:32 A. I SAID, "WE HAVE A CROSSING SITUATION.
02:34:35 RIGHT NOW WE ARE MAKING BEARING, BUT BE
02:34:39 PREPARED".
02:34:40 Q. DID YOU WARN ANY OF THE CREW THAT IT MIGHT BE
02:34:44 CLOSE?



1ffd3883-4d41-469a-b74a-9e8b787aabbc

02:34:44 A. I WAS LOUD.
02:34:45 Q. WHAT WAS YOUR TACTICAL PLAN? WERE YOU
02:34:49 PLANNING TO GO STRAIGHT INTO THE MARK AND TACK
02:34:52 RIGHT AT THE MARK OR OUTSIDE OF THE TWO-LENGTH
02:34:56 ZONE?
02:34:56 A. MY PLAN THEN WAS TO TACK AROUND THE MARK
02:34:59 IF WE COULD DO THAT WITHOUT FOULING.
02:35:02 Q. AND NOW 20 SECONDS FROM THE COLLISION, WHAT
02:35:10 WAS YOUR COURSE?
02:35:12 A. WE WERE CRACK SHEET, SLIGHTLY CRACK
02:35:17 SHEET, SEVEN POINT FIVE, GAINING BEARING.
02:35:21 Q. DID YOU -- DID THE BOAT ALTER ITS COMPASS
02:35:27 COURSE AT THAT POINT?
02:35:27 A. TWENTY SECONDS, NO.
02:35:35 Q. WAS CRACK SHEET THE SAME AS IT WAS PREVIOUSLY
02:35:35 OR DID THE SHEETS GO OUT A LITTLE BIT?
02:35:37 A. SAME, WE WERE TRIMMING THE BOAT TO SPEED.
02:35:39 Q. THERE WERE NO CHANGES IN THE SET OF YOUR SAILS
02:35:44 BETWEEN 30 SECONDS AND 20 SECONDS?
02:35:46 A. NO.
02:35:49 Q. DID YOU TELL MR. LOEB ANYTHING AT THAT POINT?
02:35:52 A. I SAID, "WE ARE CROSSING BUT IT'S CLOSE".
02:35:56 HE SAID, "BE PREPARED TO HAVE TO DUCK".
02:36:07 Q. OKAY, DO YOU RECALL WHERE SIRENA WAS AT 15



1ffd3883-4d41-469a-b74a-9e8b787aabbc

02:36:12 SECONDS BEFORE THE INCIDENT?
02:36:16 A. YES, I DO. THE SITUATION CHANGED BETWEEN
02:36:20 20 AND 15 SECONDS.
02:36:22 Q. HOW DID IT CHANGE?
02:36:23 A. SFORZANDO PUT THEIR BOW UP.
02:36:29 Q. PUT THEIR BOW WHAT --
02:36:31 A. UP.
02:36:32 Q. HOW FAR UP DO YOU THINK THEY PUT IT?
02:36:34 A. FIVE TO TEN DEGREES.
02:36:44 Q. DID YOU SEE IT ALTER COURSE?
02:36:46 A. I SAW THE BOW MOVE, YES. I WAS
02:36:51 ANTICIPATING IT.
02:36:53 Q. WHY WERE YOU ANTICIPATING IT?
02:36:56 A. BECAUSE IT'S A GOOD MOVE.
02:37:00 Q. WHY IS THAT A GOOD MOVE?
02:37:02 A. IT PREVENTS US FROM CROSSING THEM.
02:37:05 Q. HOW MANY SECONDS BEFORE THE COLLISION DO YOU
02:37:09 THINK SFORZANDO PUT HER BOW UP?
02:37:14 A. BETWEEN 15 AND 20, CLOSER, WELL, RIGHT IN
02:37:17 THE MIDDLE OF 15 TO 20.
02:37:20 Q. 17 TO 18 SECONDS?
02:37:23 A. I'LL GO WITH 17.
02:37:26 Q. WERE YOU STILL MAKING BEARING AT THAT POINT?
02:37:28 A. NO.



1ffd3883-4d41-469a-b74a-9e8b787aabbc

02:37:29 Q. SO, WHAT DID YOU DO?
02:37:31 A. I SAID, "WE HAVE TO DUCK IMMEDIATELY".
02:37:37 Q. DID MR. LOEB RESPOND?
02:37:39 A. HE SAID, "NO".
02:37:42 Q. DID HE SAY WHY?
02:37:43 A. HE SAID, "IT'S TOO LATE".
02:37:52 Q. SO, WHAT HAPPENED NEXT?
02:37:53 A. I TOLD HIM TO TURN DOWN IMMEDIATELY.
02:37:59 Q. AND WHAT DID HE DO OR SAY?
02:38:02 A. HE SAID "NO".
02:38:05 Q. THEN WHAT HAPPENED NEXT?
02:38:07 A. I GRABBED THE WHEEL AND SPUN THE BOAT 45
02:38:12 DEGREES. I SPUN THE BOAT PROBABLY 55 DEGREES.
02:38:20 Q. AT THE TIME YOU GRABBED THE WHEEL, DID YOU ASK
02:38:23 ANY OF THE TRIMMERS TO LET THEIR SAILS OUT TO
02:38:27 ADJUST FOR YOUR CHANGE IN COURSE?
02:38:29 A. NO, IT WAS TOO FAST.
02:38:31 Q. DID THEY LET THEIR SAILS OUT?
02:38:33 A. AFTER WE TURNED DOWN.
02:38:35 Q. DID THE MAIN BEING TRIMMED AS IT WAS IN ANY
02:38:39 WAY INTERFERE WITH YOUR ABILITY TO TURN DOWN?
02:38:42 A. NO, THE BOAT TURNED LIKE THAT. (WITNESS
02:38:45 INDICATING WITH SLAP OF HANDS).
02:38:45 Q. BECAUSE OF THE GOOD DESIGN?

02:38:46 A. YOU GOT IT.

02:38:56 Q. HOW MANY SECONDS FROM THE TIME -- LET'S GO OFF

02:43:39 THE RECORD FOR A MINUTE.

02:43:39 (RECESS TAKEN AT 2:43 P.M.)

02:43:40 Q. MR. TRIPP, YOU EARLIER TESTIFIED THAT YOU

02:43:44 SAID, "WE HAVE TO DUCK," OR SOMETHING TO THAT

02:43:47 EFFECT?

02:43:48 A. YES.

02:43:48 Q. THE FIRST TIME YOU SAID THAT TO MR. LOEB, HOW

02:43:53 LONG BEFORE THE COLLISION WAS THAT?

02:43:56 A. SIXTEEN SECONDS.

02:44:01 Q. SO, A SECOND OR TWO?

02:44:04 A. I WOULD LIKE TO TALK IN BOAT LENGTHS MORE

02:44:08 THAN SECONDS.

02:44:09 Q. HOW MANY BOAT LENGTHS BEFORE -- FROM THE TIME

02:44:13 YOU SAID, "WE HAVE TO DUCK," OR WORDS TO THAT

02:44:16 EFFECT, UNTIL THE TIME OF INITIAL CONTACT, HOW

02:44:21 MANY BOAT LENGTHS DID YOU TRAVEL?

02:44:25 A. FROM?

02:44:26 Q. THE TIME YOU FIRST SAID, "WE HAVE TO DUCK," OR

02:44:29 WORD TO THAT EFFECT, HOW MANY BOAT LENGTHS OR

02:44:33 FEET DID YOU TRAVEL BEFORE THE COLLISION?

02:44:37 A. OKAY, WELL, THAT'S A PARABOLIC CURVE, SO

02:44:42 THAT WOULD BE AN INTERESTING ONE TO DETERMINE,

02:44:46 BUT I CAN GIVE YOU APPROXIMATELY.
02:44:48 Q. PLEASE.
02:44:52 A. FROM WHEN I SAID WE HAD TO TURN,
02:44:54 APPROXIMATELY THREE-AND-A-HALF, BUT IT'S -- I
02:45:05 THINK IT'S A LITTLE ODD DOING THIS VERBALLY.
02:45:11 Q. IF MR. LOEB HAD DUCKED IMMEDIATELY WOULD, IN
02:45:18 YOUR OPINION, A COLLISION HAVE BEEN AVOIDED?
02:45:21 A. ABSOLUTELY.
02:45:24 Q. AND THEN MR. LOEB SAID, "NO, IT'S TOO LATE,"
02:45:28 OR WORDS TO THAT EFFECT?
02:45:31 A. YES.
02:45:31 Q. AND THEN THERE WAS SOME PASSAGE OF TIME AFTER
02:45:34 WHICH YOU SAID AGAIN THAT HE NEEDED TO TURN
02:45:38 DOWN OR WORDS TO THAT EFFECT?
02:45:39 A. THERE WAS NO PASSAGE OF TIME.
02:45:42 Q. SO IMMEDIATELY AFTER HE SAID, "NO, IT'S TOO
02:45:45 LATE," YOU SAID SOMETHING LIKE, "YOU HAVE TO
02:45:47 TURN DOWN"?
02:45:48 A. I SAID, "WE HAVE TO DUCK IMMEDIATELY".
02:45:51 Q. IF HE HAD DONE IT AT THAT POINT, WOULD A
02:45:54 COLLISION HAVE BEEN AVOIDED?
02:45:55 A. YES, DEPENDING ON THE COURSE.
02:45:59 Q. AT THAT POINT, IF YOU HAD TURNED DOWN
02:46:02 IMMEDIATELY?



1ffd3883-4d41-469a-b74a-9e8b787aabbc

02:46:03 A. PROVIDED SFORZANDO STAYED ON HER COURSE.
02:46:10 Q. THE ONE WHERE SHE PUT HER BOW UP FIVE OR TEN
02:46:16 DEGREES, IF SHE HELD THAT COURSE AND MR. LOEB
02:46:19 TURNED DOWN IMMEDIATELY, SIRENA COULD HAVE
02:46:21 AVOIDED THE COLLISION?
02:46:23 A. CORRECT.
02:46:23 Q. THEN YOU GRABBED THE WHEEL?
02:46:26 A. CORRECT.
02:46:26 Q. WAS SIRENA, AT THE TIME YOU GRABBED THE WHEEL,
02:46:29 STILL ON THAT SAME COURSE?
02:46:31 A. CORRECT.
02:46:32 Q. AND YOU TURNED THE WHEEL TO STARBOARD?
02:46:36 A. CORRECT.
02:46:38 Q. WHAT HAPPENED TO MR. LOEB AS YOU TURNED THE
02:46:42 WHEEL?
02:46:44 A. SOME DISCOMFORT. I DIDN'T WATCH WHAT
02:46:49 HAPPENED TO HIM. I HEARD FUMBLING. I THINK
02:46:52 HE MAY HAVE -- HE EITHER STUMBLED OR HE FELL.
02:46:58 Q. DO YOU HAVE A RECOLLECTION OF SEEING HIM ON
02:47:00 THE COCKPIT?
02:47:03 A. THAT WAS THE LAST PLACE I WAS LOOKING.
02:47:06 Q. FAIR ENOUGH. DO YOU EVER REMEMBER SEEING HIM
02:47:11 ON THE COCKPIT SOLE?
02:47:13 A. NO.

02:47:14 Q. YOU TURN THE BOAT DOWN 45 TO 55 DEGREES,
02:47:19 SOMETHING IN THAT RANGE?
02:47:20 A. CORRECT.
02:47:21 Q. WHAT WAS SFORZANDO'S HEADING AT THAT POINT?
02:47:25 A. STILL HEADED ABOVE THE MARK.
02:47:27 Q. AND WERE YOU ABLE, AT THAT POINT, WERE YOU ON
02:47:30 A COLLISION COURSE WITH SFORZANDO?
02:47:33 A. NO, WE WERE NOT.
02:47:35 Q. YOU BELIEVE YOU WOULD HAVE PASSED THE STERN OF
02:47:38 SFORZANDO?
02:47:39 A. WITH CERTAINTY.
02:47:40 Q. AND WHAT DID SFORZANDO DO?
02:47:43 A. STARTED BEARING OFF. THEY STARTED
02:47:46 TURNING TO THEIR LEFT.
02:47:48 Q. HEADING DOWN?
02:47:50 A. YES.
02:47:51 Q. AND HOW FAR APART WERE THE TWO BOATS AT THE
02:47:57 POINT THAT SFORZANDO FIRST HEADED DOWN?
02:48:08 MR. PLUNKETT: I OBJECT TO THE
02:48:09 FORM OF THAT. YOU KNOW WHAT I'M GETTING AT IS
02:48:17 WHAT PARTS OF THE BOAT.
02:48:19 Q. I WAS GOING TO ASK YOU THAT. IF YOU WANT TO
02:48:21 INCLUDE THAT AS PART OF YOUR ANSWER, AT THE
02:48:24 TIME YOU FIRST SAW SFORZANDO HEAD DOWN, HOW



1ffd3883-4d41-469a-b74a-9e8b787aabbc

FAR APART WERE THE TWO BOATS AND THAT DISTANCE. PLEASE TELL US WHAT THE REFERENCES ARE. FOR EXAMPLE, IF IT'S BOW TO BOW OR MAST TO MAST.

A. BOW TO BOW IS THREE TO THREE-AND-A-HALF BOAT LENGTHS.

Q. AND HOW --

A. NOT AIMED AT EACH OTHER AT THAT POINT.

Q. THE STRAIGHT LINE BETWEEN THE BOWS WAS ABOUT THREE-AND-A-HALF BOAT LENGTHS?

A. YES.

Q. DID SFORZANDO KEEP TURNING DOWN SO YOU ARE NOW AIMED BOW TO BOW OR SOMETHING IN THAT FASHION?

A. EVENTUALLY.

Q. AT THAT POINT, HOW FAR APART WERE THE TWO BOWS?

A. ONCE THEIR BOW STARTED TURNING, THEY CONTINUED TO TURN. YOU'D HAVE TO GIVE ME A SNAPSHOT AT WHICH POINT WE TURNED FURTHER DOWN. WHEN THEY STARTED TO TURN DOWN. WE TURNED FURTHER DOWN TO CONTINUE TO AVOID THEM. WE ALTERED COURSE. ONCE WE ALTERED COURSE TWICE TO AVOID THEM.

Q. THE FIRST ALTERATION OF COURSE WAS HOW MANY



1ffd3883-4d41-469a-b74a-9e8b787aabbc

02:49:35 DEGREES?
02:49:35 A. FIFTY.
02:49:37 Q. THE SECOND IS HOW MANY DEGREES?
02:49:40 A. TWENTY.
02:49:41 Q. THE THIRD ALTERATION OF COURSE WAS HOW MANY
02:49:44 DEGREES?
02:49:44 A. THE THIRD ALTERATION OF COURSE WAS UP 30
02:49:50 DEGREES.
02:49:50 Q. WAS THAT 30 DEGREES UP BEFORE OR AFTER THE
02:49:53 COLLISION?
02:49:55 A. THAT WAS -- IT STARTED BEFORE THE
02:49:57 COLLISION.
02:50:06 Q. HOW FAR APART WERE THE TWO BOWS AT THE TIME
02:50:10 SIRENA STARTED ALTERING THAT FIRST 20 DEGREES?
02:50:15 A. TWO BOAT LENGTHS.
02:50:16 Q. AND HOW FAR APART WERE THE TWO BOWS WHEN
02:50:21 SIRENA FIRST STARTED ALTERING COURSE TO
02:50:23 WINDWARD THE 30 DEGREES?
02:50:27 A. HALF A BOAT LENGTH, THREE EIGHTHS OF A
02:50:34 BOAT LENGTH, AND THE BOAT LENGTHS HERE BECOME
02:50:49 A LITTLE BIT GROSS FOR THE TIMING HERE.
02:50:53 Q. WHAT DO YOU MEAN BY A LITTLE BIT GROSS?
02:50:56 A. THAT THINGS WERE HAPPENING SO QUICKLY
02:50:59 THAT ONE BOAT LENGTH WAS FOREVER.

02:51:02 Q. IT APPEARS FOREVER?
02:51:04 A. NO, THE DIFFERENCE BETWEEN, WE HIT BY
02:51:07 INCHES, SO, WHETHER IT WAS SEVEN EIGHTHS OF A
02:51:10 BOAT LENGTH OR A BOAT LENGTH, IN THE END, IS
02:51:14 IMPORTANT, AND I WANT TO BE ON RECORD THAT THE
02:51:17 QUESTIONS YOU ARE ASKING ME RIGHT NOW, THEY
02:51:20 ARE NEAR APPROXIMATIONS.
02:51:21 Q. NOT MY QUESTIONS, YOUR ANSWERS ARE YOUR BEST
02:51:25 APPROXIMATIONS?
02:51:25 A. YOU ASKED ME HOW MANY BOAT LENGTHS.
02:51:28 Q. YOUR ANSWERS WERE YOUR BEST APPROXIMATION?
02:51:30 A. TO THE NEAREST BOAT LENGTH.
02:51:33 Q. OKAY, FAIR ENOUGH. HAVE YOU, SINCE THE TIME
02:51:35 OF THE INCIDENT, PREPARED ANY DRAWINGS OR
02:51:38 COMPUTER SIMULATIONS OR TRIED ON PAPER OR
02:51:44 COMPUTER TO RECREATE THE INCIDENT?
02:51:49 MR. PLUNKETT: ANSWER YES OR NO.
02:51:51 A. YES.
02:51:54 Q. PRIOR TO THE LAWSUIT BEING FILED AGAINST YOU,
02:51:59 DID YOU CREATE ANY DRAWINGS OR COMPUTER
02:52:02 SIMULATIONS OR TRY TO RECREATE THE INCIDENT IN
02:52:08 ANY WAY?
02:52:08 A. YES.
02:52:09 Q. WHEN DID YOU DO THAT?

A. THE DAY OF IT.

Q. AND DID YOU DO IT ON PAPER OR COMPUTER?

A. PAPER.

Q. DO YOU HAVE A COPY OF THAT STILL?

A. NO.

Q. WHAT DID YOU DO WITH IT?

A. I DON'T KNOW.

Q. DID YOU GIVE A COPY OF IT TO ANYONE?

A. NOT TO MY KNOWLEDGE.

Q. FROM THE DAY OF THE INCIDENT UNTIL THE TIME YOU WERE FIRST SUED, DID YOU MAKE ANY OTHER ATTEMPTS TO RECREATE THE INCIDENT, EITHER ON PAPER OR COMPUTER?

A. MENTALLY, MENTALLY IT'S BEEN TICKING AROUND IN MY HEAD.

Q. EVER REDUCE YOUR MENTAL THOUGHTS OR IMPRESSIONS TO WRITING OR ON PAPER IN ANY FASHION?

A. OTHER THAN WHAT WE'VE JUST DISCUSSED, NO.

Q. HAVE YOU EVER WRITTEN ANY NOTES CONCERNING YOUR IMPRESSION OF THE INCIDENT?

A. I DON'T BELIEVE SO, BUT, YOU KNOW, I DON'T BELIEVE SO.

Q. HAVE YOU GIVEN ANY STATEMENT TO ANYBODY