**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| JACK FOLEY, MARY O'DONAGHUE and DAVID ROBBINS | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | **C.A. No.: 06-0053 S-LDA** |
| | : | |
| STEVEN M. LOEB, BLAD CO. KEVIN DAILEY, WILLIAM TRIPP, Individually and D/B/A TRIPP DESIGN NAVAL ARCHITECTURE | : | |
| Defendants | : | |
| | : | |
| v. | | |
| | : | |
| BLAIR BROWN | : | |
| Third Party Defendant | : | |

**DEFENDANT STEVEN LOEB AND BLAD CO'S MEMORANDUM OF LAW**
**OPPOSING THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

*US SAILING prescribes that…**[n]o protest committee** or US SAILING appeal authority shall adjudicate any claim for damages. Such a claim is subject to the **jurisdiction of the courts**."*

Rule 68(b) from the Racing Rules of Sailing, US Prescriptions, (2001-2004) (emphasis added).

## I INTRODUCTION

This Court should deny the Plaintiffs' motion for summary judgment because it is based upon a false premise concerning the binding effect of a protest committee's decision. In their motion, the Plaintiffs argue that all of the legal liability issues in this matter were fully adjudicated in 2002 when a protest committee disqualified the Defendants' boat from a regatta race after it was involved in a collision with the boat that the Plaintiffs were on (the "Protest Committee's Decision"). To support their premise, the Plaintiffs rely upon a 1994 opinion from the First Circuit Court of Appeals which held that a protest committee's decision was binding—as a matter of law—on the parties in a subsequent lawsuit because the International Racing Rules of Sailing (the "Rules") constituted a contractual agreement between the parties that included, according to the court's interpretation of the Rules, a provision binding all parties to any decision issued by the protest committee. *Juno v. S/V Endeveour,* 58 F.3d 1 (1st Cir. 1994). Thus, according to the Plaintiffs' theory, *Juno* prohibits the Defendants from contesting the liability issues in this case based exclusively on the Protest Committee's Decision concerning disqualification.

But the Plaintiffs omit one critical point that destroys the premise of their thoery: the "contract" language under the Rules was amended **after** *Juno* to eliminate the protest committee's binding effect on legal liability. Under the amended Rules, which were not applicable to the parties in *Juno*, "[n]o protest committee…shall adjudicate any claim for damages. Such a claim is subject to the jurisdiction of the courts." Rule 68(b). According to Clay Mock, the 1997 Chair of the U.S. Sailing Association Legal Committee, the amended Rules "[were] intended to clarify that the U.S.

Sailing judges were not to determine liability."[1] Therefore, because neither the Rules nor the *Juno* decision support the Plaintiffs' premise concerning the binding effect of the Protest Committee's Decision, this Court must deny the Plaintiffs' motion for summary judgment.[2]

## II. LEGAL ISSUES

A. **PROTEST COMMITTEE NOT BINDING**: Under federal law in the First Circuit, the provisions under the Rules are contractually binding on the parties. Here, the Rules explicitly state that the protest committee shall **not** adjudicate any claim for damages, leaving such claims to the jurisdiction of the courts. Does the Protest Committee's Decision in this case constitute, as a matter of law, a full adjudication of the claims made by the Plaintiffs?

B. **RES JUDICATA**: Under the *Res Judicata* Doctrine, a party cannot establish a final judgment in an earlier suit with an arbitration award unless that arbitration award was confirmed in federal court. Here, the Plaintiffs have presented no evidence to show that the Protest Committee's Decision was confirmed in federal court under the Federal Arbitration Act. Without this confirmation, can the Protest Committee's Decision be considered a "judgment" for the purposes of establishing *Res Judicata* effect?

C. **RES JUDICATA**: Under the *Res Judicata* Doctrine, a party must demonstrate that there is a "sufficient identicality" between the causes of action asserted in the earlier and later suits." In this case, while the protest committee considered the moot point about whether the Defendants' inoperable yacht was "disqualified" from the race, this action deals with the complex issues concerning negligence and comparative negligence in competitive sailing races. Are these causes of action sufficiently identical to bar any further litigation on the issue of liability?

D. **DEFENDANTS NOT NEGLIGENT**: Although the issue is unsettled in the First Circuit for competitive sailing cases, plaintiffs seeking to recover for injuries related to a sporting event have to demonstrate that the defendant's actions were either reckless or intentional. In their motion, the Plaintiffs have not presented sufficient evidence (or even argued the point) that the Defendants actions rose to the level of recklessness or intentional. Indeed, the Defendants contend that their decision to "duck-in" behind the Plaintiffs' Boat would have been sufficient to avoid a collision had the Plaintiffs remained on course in accord with the Rules. Given the dispute among the parties over fault, can the Plaintiffs show that there is no genuine issue of material fact concerning the negligence issue?

---

[1] *Halloway v. Bashara*, 176 F.R.D. 207, 212 (E.D. Vir. 1997) (relying on Mock's statements to distinguish the *Juno* holding concerning races held in U.S. waters and thus subject to the U.S. Prescriptions).

[2] This memorandum will also incorporate Co-Defendant's William Tripp's arguments set forth in his memorandum of law.

## III. FACTUAL AND PROCEDURAL BACKGROUND

On July 14, 2002, two sailing yachts—the *Sirena* and the *Sforzando*—collided during a regatta race held off the coast of Rhode Island (the "Regatta").[3] One of the Defendants, Blad Co., owned the *Sirena*, while another Defendant, Steven M. Loeb, skippered the *Sirena* on the day of the collision.[4] The other Defendant, William Tripp, was a crew member of *Sirena* on the day of the collision.[5] (*Sirena* will be referenced hereafter as the "Defendants' Boat.") As for *Sforzando*, this yacht was owed and skippered by Third-Party Defendant Blair Brown, and the three Plaintiffs, Jack Foley, Mary O'Donoghue, and David Robbins, were crew members.[6] (*Sforzando* will be referenced hereafter as the "Plaintiffs' Boat.")[7]

The Regatta was organized by the New York Yacht Club and subject to the International Sailing Federation's Rules, *The Racing Rules of Sailing* (the "Rules"). Because it was a U.S. race, the New York Yacht Club applied the U.S. Prescriptions to the Rules, which operated as a supplement to the general rules applied to all international races.[8] While it is sometimes required that crew members sign liability waivers for these races, there is a question of fact about whether such a waiver was signed by the crew members of this race. For instance, one crew member on the Plaintiffs' Boat, Jack Slattery, indicated that he probably signed a waiver for this race: "[m]ost crew members have to sign a waiver to participate in the event and I probably would have signed one for [this race]."[9] Slattery also testified that it was the general rule that crew members would sign waivers.[10]

---

3 Statement of Undisputed Facts.
4 Statement of Undisputed Facts.
5 Statement of Undisputed Facts.
6 Statement of Undisputed Facts.
7 Although the Plaintiffs did not owe the *Sforzando*, this memorandum will refer to this boat as the Plaintiffs' Boat in order to avoid confusion given that the names of the boats are similar.
8 Loeb Affidavit (Exhibit 1).
9 Slattery Deposition, p.11 (Exhibit 4 ).
10 The following testimony demonstrates Slattery's understanding of the waiver requirements for most regatta races.

> Q. And how would that [the waiver] taken place? Is it something that you would have done at the beginning of the that day or before the week, the race week began?

The parties dispute what happened before the collision and who was ultimately responsible for the collision.[11] The parties agree that the collision occurred somewhere close to a "marker" that each boat had to pass as part of its racing route.[12] In layman's terms, the Plaintiffs' Boat was approaching the marker from East to West, while the Defendants' boat was approaching the marker from South to North.[13] The parties also agree that the Plaintiffs' Boat had the right of way under the Rules at the time of the collision.[14]

According to the Defendants, Third-Party Defendant Brown caused the collision when he unexpectedly turned off course while the Defendants were maneuvering to "duck-in" behind the Plaintiffs' Boat.[15] While both boats were racing toward the marker, the Defendants originally thought that their boat would beat the Plaintiffs' Boat to the marker.[16] As the boats got closer to the marker, however, the Defendants realized that they did not have enough room to reach the marker before the Plaintiffs.[17] Because the Plaintiffs' Boat had the right of way under the Rules, the Defendants changed course to "duck-in" behind the Plaintiffs' Boat.[18] However, after the Defendants' Boat changed course, Brown changed his course to "duck-in" behind the Defendants.[19] According to Defendant Tripp, Brown caused the collision because the Defendants' maneuver to "duck-in" behind the Plaintiffs' boat would have been successful had Brown not changed his course.[20]

---

A. Generally, in the regatta package that's passed out after you've registered, there's a waiver notice that included in the package. That has to be passed around to the crew members and each one of them has to sign it and it has to be passed back in to the Race Committee office before the start of racing that very first day of racing. Slatterly Deposition, p. 11-12 (Exhibit 4).

11 Compare Tripp Deposition, p. 61 (Exhibit 3) with Slattery Deposition, p. 90 ("There would have been a collision had we held our course, yes, that's correct. There would have been a collision.") (Exhibit 4).

12 Statement of Undisputed Facts, § 6.

13 Statement of Undisputed Facts, § 6.

14 Statement of Undisputed Facts, § 6..

15 Tripp Deposition, p. 61 (Exhibit 3); Loeb Deposition, p. 99-100 (Exhibit 2).

16 Tripp Deposition, p. 54 (Exhibit 3).

17 Tripp Deposition, p. 60-61 (Exhibit 3).

18 Tripp Deposition, p. 59-61 (Exhibit 3).

19 Tripp Deposition, p. 61-62 (Exhibit 3).

20 Tripp Deposition, p. 61 (Exhibit 3); Loeb Deposition, p. 99-100 (Exhibit 2).

The Plaintiffs and Third-Party Defendant Brown dispute the Defendant's account of the collision, arguing that the Defendants caused the collision when they failed to turn off course sooner than they did.[21] The Plaintiffs also contest the Defendants' claim that the Plaintiffs' Boat made a turn greater than 10°.[22]

After the collision, a crew member from the Plaintiffs' Boat, Jack Slattery, filed a petition with the New York Yacht Club's protest committee (the "Protest Committee").[23] Slattery drafted the narrative for the protest that delineated his version of events.[24] He neglected to include Brown in the process even though Brown was responsible for the decision to change course, which, according to the Defendants, caused the collision.[25] According to Slattery, he didn't want Brown at the hearing to provide conflicting testimony: "I always find that when more than one party on a boat goes into a protest meeting, the stories get confused. So, I always do it by myself."[26] In fact, Slattery controlled the protest for Brown entirely, testifying that: "[p]retty much whenever I do a protest, I do it all completely on my own."[27] In addition to his narrative, Slattery drew a diagram for the protest committee that illustrated the positions of the boats at the time of the collision.[28] But Slattery acknowledged at his deposition that his diagram was "not completely accurate" because it did not include Brown's course change.[29]

After the hearing, which last less than an hour, the protest committee issued a decision that disqualified the Defendants' Boat from the race for violating the Rules. Although Loeb and Tripp disagreed with the Protest Committee's decision, Loeb did not appeal the decision because he

21 Brown Deposition, p.41, 43-44 (Exhibit 5); Slattery Deposition, p. 90 (Exhibit 4).
22 Compare Tripp Deposition, p. 61 (Exhibit 3) with Slattery Deposition, p.34 (Exhibit 4).
23 Slattery Deposition, p.41 (Exhibit 4).
24 Slattery Deposition, p.41 (Exhibit 4).
25 Slattery Deposition, p.41 (Exhibit 4).
26 Slattery Deposition, p.41.
27 Slattery Deposition, p. 41.
28 Slattery Deposition, p. 49.
29 Slattery Deposition, p. 84 (Exhibit 4).

considered it to be a moot point because both boats were already out of the race.[30] As a result, Loeb did not fully litigate the effect of Slattery's inaccurate diagram or the absence of Brown from the hearing. Loeb never anticipated that this decision would someday be used against him as the basis for establishing legal liability for personal injuries.[31]

## IV. LAW AND ARGUMENT

### A. PROTEST COMMITTEE'S DECISION IS NOT BINDING ON THIS COURT

The Defendants can show that the Protest Committee's Decision is not binding on the parties to this litigation for three reasons. First, the express provisions of the Rules hold that a protest committee's decision will not adjudicate the legal liability issues. Second, the doctrine of *Res Judicata* does not apply to the Protest Committee's Decision because it is not a "final judgment" given that it was not confirmed in federal court. Third, even if this Court recognizes the Protest Committee's Decision as a final judgment, the doctrine of *Res Judicata* does not apply because the causes of action addressed by the Protest Committee and this lawsuit do not have "sufficient identicality."

#### 1. The Rules Provide that the Protest Committee will not Adjudicate Legal Liability Issues

The Protest Committee's Decision does not bind the parties in this action on the issues concerning legal liability because the Rules specifically hold that a protest committee's decision will not adjudicate the legal liability issues related to collisions. *See Halloway v. Bashara*, 176 F.R.D. 207, 212 (E.D. Vir. 1997) (court found genuine issue of material fact because the Rules were clarified after *Juno* to hold that "U.S. Sailing judges were not to determine liability"). Despite the holding in *Halloway*, the Plaintiffs argue that the *Juno* decision binds the parties as a matter of law to the Protest Committee's Decision. However, the Plaintiffs' theory fails because it does not recognize that *Juno's*

---

30 Loeb's Affidavit (Exhibit 1).

31 Loeb Affidavit (Exhibit 1).

holding has been altered as a result of a change in the U.S. Prescriptions to the Rules, which were designed to negate *Juno's* interpretation of the protest committee's function.

Under the U.S. Prescriptions to Rule 68, a protest committee does not adjudicate the legal liability issues related to a collision and a boat owner will not "admit liability for damages" by accepting a penalty issued by the committee. These points derive from the specific language in Rule 68, highlighted below:

"US SAILING prescribes that:

> (a) A boat that retires from a race or accepts a penalty does not, by that action alone, ***admit liability for damages***.
>
> (b) A protest committee shall find facts and make decisions only in compliance with the rules. ***No protest committee*** or US SAILING appeal authority ***shall adjudicate any claim for damages***. Such a claim is subject to the jurisdiction of the courts.
>
> (c) A basic purpose of the rules is to prevent contact between the boats. By participating in an event governed by the rules, a boat agrees that responsibility for damages arising from any breach of the rules shall be based on fault as determined by application of the rules, and that she shall not be governed by the legal doctrine of 'assumption of risk' for monetary damaged resulting from contact with other boats." (emphasis added)

While the Plaintiffs argue that Rule 68(c) binds the parties to the Protest Committee's Decision, its analysis ignores the other two sections under Rule 68. It is inexplicable that the Plaintiffs will argue that the Protest Committee's Decision is a binding adjudication of this matter under Rule 68(c) when Rule 68(b) states that "no protest committee…**shall** adjudicate any claims for damages." Rule 68(b).

More important, Rule 68 provides the contractual framework that will guide the protest committee in its arbitration of disputes between boat owners concerning boat damages. It does not provide the framework for adjudicating liability concerning personal injury claims. Rules 68 aims to prevent contact between boats during the race. In cases where contact does occur, Rule 68 holds that the responsibility for the damages related to the contact will be determined by applying the

Rules. In effect, Rule 68 precludes a boat owner from arguing that some other conflicting set of rules, such as the COLREGS, applies to the determination of fault at a protest hearing. Rule 68 also prevents a boat owner from defending his actions in front of the protest committee based on an argument that the other boat owner assumed the risk of his or her damages.

There are two primary reasons why Rule 68 does not apply to disputes concerning personal injury claims. First, Rule 68 does not include the term injury within its scope. Because other sections of the Rules distinguish the term "damages" from the term "injury," the Plaintiffs cannot assert that the definition of the term "damages" in Rule 68 includes the concept of injuries. 17A Am. Jur. 2d Contracts § 377 ("law of contract interpretation militates against interpreting a contract in a way that renders a provision superfluous.").[32] For instance, Rule 60.4, the Rule that the Protest Committee relied upon to issue its decision, holds that a boat can be protested if the "protest committee receives a report of an incident that may have resulted in serious ***damages*** or serious ***injury***." Rule 60.4 (emphasis added) (Exhibit 1). If the Rules had incorporated injuries into the term damages, as the Plaintiffs' argue, then Rule 60.4 does not require a distinction between damage and injury. *Id.*

Second, Rule 68 does not contain language that precludes a boat owner from utilizing the Assumption of Risk Doctrine in a personal injury lawsuit. Indeed, if Rule 68(c) operated to eliminate the doctrine of assumption of risk for personal injury matters, why would competitors involved in U.S. races have to sign waiver agreements?

Instead of addressing the explicit provision in Rule 68(b), the Plaintiffs confuse the issue with the *Juno* decision. *Juno v. S/V Endeveour*, 58 F.3d 1 (1st Cir. 1994). In *Juno*, the plaintiff sued the defendant for the damages related to a collision between the parties during a competitive yacht race held off the coast of France. *Id.* at 2-3. After the collision, the plaintiff filed a petition with the

---

[32] See also *North American Const. Corp. v. U.S.,* 56 Fed. Cl. 73 (2003); *Estate of Fisher v. Fisher*, 2002 SD 62, 645 N.W.2d 841 (S.D. 2002).

protest committee where an "international jury" heard evidence and argument presented by the parties concerning the events surrounding the collision. *Id.* at 3. At the close of the evidence, the protest committee found that the defendant "was at fault for failing to meet its burden [under the Rules]." *Id.* Based on this finding, the protest committee disqualified the defendant's yacht from the race.

When the defendant failed to compensate the plaintiff for the damages, the plaintiff had the defendant's yacht "arrested" and then filed an action in the United States District Court for the District of Maine to recover damages related to the collision. *Juno*, 58 F.3d at 2-3. Despite the finding issued by the protest committee, the trial judge found that the **plaintiff** was 60% liable for the damages, while the defendant was 40% liable for the damages. *Id.* at 4. The trial court avoided the protest committee's decision by analyzing the matter under the COLREGS[33], as opposed to the Rules. Because there was a conflict between the two sets of rules, the trial court set aside the protest committee's decision because the "rules of a private racing organization…do not and cannot preempt the application of the COLREGS which have been adopted by treaty to govern worldwide." *Id.* at 3.

On appeal, the First Circuit reversed the trial court's decision, holding that the decision rendered by the protest committee contractually bound the parties to the adjudication made by the protest committee. *Juno*, 58 F.3d at 7-8. The appellate court argued that is was improper for the trial court to apply the international rules under COLREGS when the parties explicitly agreed to be bound by the Rules. *Id.* at 6. For the First Circuit, this agreement to follow the Rules established a contractual agreement that bound the parties to the Rules' various provisions. Using this contractual

[33] The Convention on the International Regulation for the Prevention of Collisions at Sea

framework, the First Circuit found that the provisions under the Rules contractually bound the parties to the decisions issued by the protest committee.[34]

In response to the *Juno* decision, the U.S. Sailing Association amended the U.S. Prescriptions to the Rules, which applied to the races within the United States, to include language that negated *Juno's* interpretation of the Rules concerning the protest committee's function. *See Halloway v. Bashara*, 176 F.R.D. 207, 212 (E.D. Vir. 1997). As noted in *Halloway*, the 1997 Chair of the U.S. Sailing Association Legal Committee, Clay Mock, stated in a letter that the "new U.S. Prescription to the [Rules] regarding liability, which became effective on July 14, 1994…was intended to 'clarify that the U.S. Sailing judges **were not to determine liability**." *Halloway*, 176 F.R.D. at 212. Once the U.S. Sailing Association changed the Rules, the *Juno* decision lost its value as a precedent for the proposition that parties subject to the Rules are bound by the decisions rendered by the protest committee in subsequent legal proceedings.

**2. Res Judicata does not Apply Because there is no Final Judgment**

The *Res Judicata* Doctrine does not bind the parties in this matter to the decisions rendered by the protest committee because the Protest Committee's Decision is not a final judgment from a prior lawsuit. "Under the federal law of *Res Judicata*, a final judgment on the merits of an action precludes the parties or their privies from relitigating claims that were raised or could have been raised in that action." *Apparel Art Intern., Inc. v. Amertex Enterprises Ltd.*, 48 F.3d 576, 583 (1st Cir. 1995). The rationale for this doctrine is to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Id.* at 583.

Parties in litigation often use this doctrine as a defensive measure to prevent a party from taking a second bite at the apple in a different forum. However, when it is used offensively, as it is

---

[34] The *Juno* Court did not rely upon the *Res Judicata* doctrine.

being used in this case, federal courts have applied the doctrine with more caution, noting in some cases that a "party asserting offensive collateral estoppel bears a heavier burden than a party who asserts defensive collateral estoppel." *Cobin v. Rice*, 823 F.Supp. 1419, 1433 (N.D.Ind. 1993).[35] To determine whether *Res Judicata* precludes the litigation of a party's claims, the First Circuit applies a three-part test:: "(1) a final judgment on the merits in an earlier suit; (2) sufficient identicality between the causes of action asserted in the earlier and later suits; and (3) sufficient identicality between the parties in the two suits." *Apparel*, 48 F.3d at 583.

For the first element concerning a final judgment, federal courts allow an arbitration decision to constitute a "judgment" so long as the arbitration decision was properly confirmed in federal court. *Apparel,* 48 F.3d at 585. According to the First Circuit, a "judgment by a federal court **confirming** an arbitration award under the Federal Arbitration Act has the same for and effect, in all respects, as, and is subject to all the provisions of law relating to, a judgment in an action." *Id.* (emphasis added). Courts require this confirmation element for establishing a prior judgment because "an adjudication implies judicial activity." Business and Commercial Litigation in Federal Courts § 12.6, Fn.11 (Robert Haig ed.) (West Group & ABA 1998).[36]

Here, the Protest Committee's Decision should not have *Res Judicata* effect because it was not confirmed in federal court under the provisions of the Federal Arbitration Act. *Apparel,* 48 F.3d at 585; *see also Norris v. Grosvenor Marketing Ltd.*, 803 F.2d 1281, 1285, Fn4 (2nd Cir. 1986) (parties "concede that collateral estoppel applies to issues adjudicated in arbitration where the arbitration award has been entered as a judgment"). If the Protest Committee's Decision had been submitted for confirmation, this action would have notified the Defendants that the decision may extend

---

35 *See generally*, 50 C.J.S. Judgments § 834 (*citing Buckingham v. Federal Land Bank Ass'n***,** 398 N.W.2d 873 ("Although offensive use of issue preclusion is allowed…it is more restrictively and cautiously applied than defensive issue preclusion").

36 In supporting this point, this legal treatise on federal law cites *McDonald v. City of West Branch*, 466 U.S. 284 (1984) for the proposition that an "unreviewed award from arbitration of police officer's claim under collective bargaining agreement has no claim preclusion affect on later action under 42 U.S.C. § 1983." Business and Commercial Litigation in Federal Courts § 12.6, Fn.11 (Robert Haig ed.) (West Group & ABA 1998).

beyond the issue of disqualification. Without this confirmation, the Protest Committee's Decision loses its status as a potential "judgment" sufficient to establish Res Judicata. Moreover, the Plaintiffs cannot cure this defect because the FAA has a one-year statute of limitations on confirming arbitration awards.

**3. Res Judicata is not applicable because the causes of actions in the two matters do not have sufficient identicality**

As for the second element, the Plaintiffs cannot demonstrate that there is a "sufficient identicality between the causes of action asserted in the earlier and later suits." *Apparel*, 48 F.3d at 584. To analyze this issue, the First Circuit has adopted a "transactional approach" that seeks to determine whether the cause of action "is a transaction that is identified by a common nucleus of operative facts." Among other things, the First Circuit has considered three things: "(1) whether the facts are related in time, space, origin, or motivation; (2) whether the facts form a convenient trial unit; and (3) whether treating the facts as a unit conforms to the parties expectations." *Id.*

In this case, the Defendants did not anticipate that the issues being litigated before the Protest Committee would have been adjudicated of all legal liability issues. As noted above, the express provisions under the Rules hold that the protest committee shall not "adjudicate any claim for damages." Rule 68. The only issue before the Protest Committee was whether the Defendants' boat should have been disqualified for violating the Rules, which was a moot point given that both damaged boats were, in effect, disqualified after the collision.

In addition to the expectations among the parties, the Plaintiffs cannot show that there was a common nucleus of operative facts. While the protest committee considered the technical facts concerning the parties' positions and maneuvers, this Court and the factfinder must consider a whole array of facts that go beyond the technical application of the Rules. In short, the facts necessary to determine whether the Defendants violated the Rules is different from the facts

necessary to determine whether the Defendants were negligent, or to determine whether the Plaintiffs' action contributed to the negligence.

Finally, as an equitable matter, this Court should reject the Protest Committee's Decision because it was based on inaccurate and incomplete information provided by Jack Slattery, the representative from the Plaintiffs' Boat responsible for filing the protest. During his deposition, Slattery acknowledges that he submitted an inaccurate diagram to the Protest Committee that failed to detail Third-Party Defendant Brown's change of course before the collision, an important point for the Defendants' theory that Brown was the cause of the accident. Also, Slattery testified that he did not include Brown in the process because he was concerned that Brown would only confuse the matter with his side of the story. That is, Slattery didn't want anyone from the Plaintiffs' Boat to affect his version of what happened before the collision. Given the incomplete and inaccurate "facts" submitted to the protest committee, the Plaintiffs cannot demonstrate sufficient identicality.

### B. DEFENDANTS ACTIONS WERE NOT NEGLIGENCE

The Defendants are not liable for the damages and personal injuries incurred by the Plaintiffs because the Defendants actions were neither reckless nor intentional. Under federal maritime law on negligence, the plaintiff has the burden of proving that the defendant breached a duty of care owed to the plaintiff. *Galantine v. Estate of Stekervetz*, 273 F. Supp.2d 538, 544 (D.Del. 2003), *citing Leathers v. Blessing*, 105 U.S. 626 (1882). The standard of care imposed by the courts will hinge on what is the "reasonable care under the circumstances." *Naglieri v. Bay*, 93 F. Supp.2d 170, 175 (D. Conn. 1999). "In some instances reasonable care under the circumstances may be a very high degree of care; in other instances, it may be something less." *Id.* To "determine how high a degree of care is reasonable in each case," federal courts will analyze the "extent to which the circumstances surrounding maritime travel are different from those encountered in daily life and

involve more danger to the passenger." *Id. (quoting Rainey v. Paquet Cruises, Inc.,* 709 F.2d 169, 170 (2nd Cir. 1983).

For cases involving competitive sports, the "general rule is that a participant in active sports breaches a legal duty of care to other participants only if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside range of ordinary activity involved in sport" (the "Reckless Standard").[37] 65 C.J.S. Negligence § 76 (Updated February of 2007); *see also Kiley v. Patterson*, 763 A.2d 583 (R.I. 2000) ("[T]he duty of care owed by participants in team athletic events to each other is measured not by ordinary negligence standards, but by willfulness or recklessness standards"). Courts have adopted the reckless standard for two primary reasons: "One is the promotion of vigorous participation in athletic events [and] [t]he other reason is to avoid a flood of litigation." *Kiley* at 586; *see generally* Stanley L. Grazis, *Liability of participant in team athletic competition for injury to or death of another participant*, 55 A.L.R.5th 529 (originally published in 1998 and updated weekly) (collecting cases).

While competitive sailing is not considered as rough as some other contact sports like football or hockey, it is, in some respects, much more dangerous because people die each year during competitive boating races, including 10 such fatalities reported by the Coast Guard in its 2004 and 2005 reports.[38] The Reckless Standard has also been applied to non-contact sports like golf, tennis, and even "slow dancing," as well as to incidents where the defendants breached one of the game's rules of conduct. *Spangler v. Kehres,* 107 Ohio App.3d 1, (Ohio App. 5 Dist. 1995), *rev'd on other grounds*, 75 Ohio St. 3d 1218 (1996) (reckless standard for "slow danacing"); *see generally*, 65 C.J.S. Negligence § 76. Based on the normal expectations of participants in all sporting events, which

---

37 Although this standard includes both reckless and intentional conduct, this memorandum will refer to it as the "Reckless Standard."

38 United States Coast Guard, Boating Statistics for 2005 (http://www.uscgboating.org/statistics/Boating_Statistics_2005.pdf); Statistics for other years (http://www.uscgboating.org/statistics/accident_stats.htm)

include the potential for injuries resulting from conduct that violates the sport's rules, courts will apply a reckless standard of care because such conduct is a foreseeable and customary part of sport participation. 65 C.J.S. Negligence § 76 (*citing Ohio-Pressler v. U*, 70 Ohio App.3d 204 (Ohio App 1990)).[39] In short, if courts will apply the Reckless Standard to "slow dancing," it should be applied to competitive sailing.

While there is no First Circuit opinion directly on point for sailing cases, the reckless standard of care has been applied to the sport of sailing in other jurisdictions. *Stimpson v. Carlson*, 11 Cal.App.4th 1201 (Cal. 1993) (reckless standard applied to sailing on San Francisco Bay); *Pressler v. U*, 70 Ohio App.3d 204 (Ohio App 1990) (reckless standard applied to a competitive sailing race); *but see Gleason v. Adelman*, 2000 Mass.App.Div. 305, 2000 WL 1724471 (Mass.App.Div. Nov 14, 2000) (rejecting reckless standard in yacht race). In *Stimpson*, the California Appeals Court held that "defendants have no duty to protect plaintiffs against risks inherent in an active sport." Because "a swinging boom is a risk inherent in the sport of sailing," the *Stimpson* Court found that the defendant "owed no legal duty to eliminate or protect [plaintiff] against this inherent risk." According to *Stimpson*, "[w]hen an inherent sports risk is involved, the defendant is liable only if he or she **intentionally** injures another player or engages in conduct that is so **reckless** that it is totally outside the range of the ordinary activity involved in an active sport." *Id.*

More on point with the facts in this case, the Ohio Appeals Court applied the reckless standard of care to the parties involved in a yacht race where the issue of liability hinged on whether a the defendant's maneuvering during a race caused a collision. *Pressler v. U*, 70 Ohio App.3d 204

---

39 The reckless standard of care is very appropriate in the context of competitive racing. *See Gehling v. St. George's Univ. School of Medicine, Ltd.,* 705 F.Supp. 761, 766-767 (E.D.N.Y.1989) *affirmed by* 891 F.2d 277 (2d Cir.1989) (table) (foot racing); *Knowles v. Roberts-At-The-Beach Co.,* 115 Cal.App.2d 196, 251 P.2d 389 (1953) (hobbyhorse racing); **1184 Clark v. State,* 195 Misc. 581, 89 N.Y.S.2d 132, 139 (Ct.Cl.1949) *affirmed by* 276 A.D. 10, 93 N.Y.S.2d 28 (1949) (bobsled racing); *Santiago v. Clark,* 444 F.Supp. 1077 (N.D.W.Va.1978) (horse racing); *Provence v. Doolin,* 91 Ill.App.3d 271, 46 Ill.Dec. 733, 414 N.E.2d 786, 795 (1980) (auto racing); *Mayer v. Howard,* 220 Neb. 328, 370 N.W.2d 93 (1985) (motorcycle racing); *Dunion v. Kaiser,* 124 F.Supp. 41 (E.D.Pa.1954) (motorboat racing); *Pressler v. Peter U,* 1990 WL 161974, 1990 Ohio App. LEXIS 4617 (Ohio Ct.App.1990) (yacht racing).

(Ohio App 1990). According to *Pressler*, "where individuals engage in recreational or sports activities, they assume the ordinary risks of the activity and cannot recover for any injury unless it can be shown that the other participants were either 'reckless' or 'intentional.'" *Pressler*, 70 Ohio App.3d at 2006. In applying the reckless standard of care, the *Pressler* Court dismissed the plaintiffs claim because "the collision occurred during an ordinary risk: passing and maneuvering during a [yacht] race."

Although the underlying rationale for this heightened standard is couched in terms of "inherent risks" or "assumed risks," courts maintain this high standard of care even in jurisdictions where the Assumption of Risk Doctrine has been abolished. *See, e.g., Gauvin v. Clark*, 404 Mass. 450 (Mass. 1989); (*citing Blair v. Mt. Hood Meadows Dev. Corp.* 291 Or. 293 (1981) and *Kuehener v. Green*, 436 So. 2d 78, 81 (Fla. 1983); *Turcott v. Fell*, 68 N.Y.2d 432 (1986) (even though assumption of risk is no longer applicable, the defendant's duty to the plaintiff had to consider the risks assumed by the plaintiff).

In *Gauvin*, for instance, the plaintiff, a college hockey player, sued the defendant, a player from an opposing team, after the defendant ruptured the plaintiff's spleen by "butt-ending" him with the end of the hockey stick. *Gauvin*, 404 Mass. 450, 452 (Mass. 1989). Despite violating a so-called "safety rule" with his "butt-ending," which was a major penalty subject to disqualification, the jury found that the defendant's actions were not reckless and, as a result, not actionable under the reckless standard of care. *Id.* The plaintiff appealed, arguing that Massachusetts' abolishment of the Assumption of Risk Doctrine functioned as an abolishment of the recklessness standard in sports cases because this standard derived from the Assumption of Risk doctrine. *Id.* at 451, 454.

Following decisions issued in Oregon, Florida, and New York, the Massachusetts Supreme Judicial Court (SJC) rejected this argument, holding that the public policy reasons for promoting athletic participation was more significant than the underlying rationale concerning assumption of

risk. *Gauvin*, 404 Mass. 450, 451 (Mass. 1989). According to the SJC, "[b]ecause the [Assumption of Risk] doctrine has been abolished, the focus of the analysis in sports cases has shifted entirely to the defendant's duty under the circumstances and should no longer be discussed in terms of the plaintiff's assumption of risk." *Id.* at 454, F.5. Using this new framework focused on duty of care, the SJC held that the circumstances surrounding a sporting event created a reckless standard of care because this standard "furthers the policy that vigorous and active participation in sporting events should not be chilled by the threat of litigation." *Id.* at 454.

Another Massachusetts case involving an errant golf swing confirmed the importance of maintaining the reckless standard of care for all sports cases:

> Society has little interest in imposing liability on a tennis player who negligently overswings his racquet and hits another player or a sailor whose attention wanders from the luffing sail and carelessly allows the boom to swing and hit another."). "Sports allows us freedom of uninhibited movement and respite from society's confining strictures concerning carelessness while not allowing us to engage in deliberate conduct that is willful, wanton, and reckless.

*Mangone v. Pickering*, 6 Mass. L. Rptr 677 (Mass. Super 1997), 1997 WL 197232 (Mass. Super. 1997) (golf was incorporated into the reckless standard because it involved a "physical, athletic sport involving some danger of physical contact.") (Welch, J.).

The *Gauvin* line of cases demonstrates that the Reckless Standard should be applied even if this Court agrees that the assumption of risk doctrine is inapplicable to maritime law. *See e.g., DeSole v. United States*, 947 F.2d 1169 (4th Cir. 1991) (implying, in dicta, that the assumption of risk doctrine is not an applicable defense to maritime cases involving sailing races); *Manning v. Gordon*, 853 F.Supp. 1187 (N.D.Cal. 1994) (assumption of risk is not a defense under maritime law); *Barber v. Marina Sailing, Inc.*, 36 Cal.App.4th 558 (Cal.App. 2 Dist. 1995) (same). While these cases address the issue of whether maritime law allows an assumption of risk defense, they do not necessarily address the issue of whether the **duty of care standard** should be raised to a reckless standard. That is, while it may be important to abolish the assumption of risk doctrine for general maritime activity, the critical

issue in this case is whether that abolishment should negate the public policy reasons outlined in the *Gauvin* line of cases for establishing a reckless duty of care in a competitive sport regardless of whether the assumption of risk doctrine is available. As the dissent in *DeSol* points out, "[a]lthough we have noted the 'general inapplicability of the assumption of risk doctrine in maritime law',…[yacht racing] is not a case of 'general inapplicability'" because "[y]acht racing is not without very real dangers." *DeSol*, 947 F.2d 1169, 1183-84 (Winters, J., dissenting).

Finally, as a practical matter, this Court's adoption of the Reckless Standard would not conflict with the expectations of many experienced racing sailors who regularly sign "waiver" agreement. While there is an issue of fact about whether the Plaintiffs in this matter signed waiver agreements, the testimony from Jack Slattery supports the general notion that waiver agreements are common for competitive racing events. Thus, by adopting the Reckless Standard for competitive sailing, this Court will adopt a standard that many experiences sailors have already been willing to adopt when they signed a waiver agreement.

Regardless of whether this Court applies the Reckless Standard or some other heightened standard that accounts for the circumstances surrounding a competitive sailing race, the Defendants actions were reasonable under the situation and thus not actionable. In the heat of competition, the Defendants had originally made the decision that it would beat the Plaintiffs to the marker. When it realized that it would not beat the Plaintiffs to the marker, it made the right decision when it changed course to "duck-in" behind the Plaintiffs. If the Plaintiffs' Boat had stayed its course, which was the correct course under the Rules, the collision would have been avoided. According to the Defendants, Third-Party Defendant Brown caused the collision when he decided to change course.

Of course, the Plaintiffs have a different story to tell, which explains why this motion for summary judgment is inappropriate and should be denied.

## V. CONCLUSION

This Court should deny the Plaintiffs' motion for summary judgment and Third-Party Defendant Brown's motion for summary judgment because both motions are based on a false premise concerning the binding effect of the Protest Committee's Decision. Once this premise is displaced, this Court must deny the motions for summary judgment because there is a genuine issue of material fact about whether the Plaintiffs can recover for their personal injuries.

Respectfully submitted,

By their attorneys
STEVEN M. LOEB and BLAD CO.

**s/ John P. Walsh**

William E. O'Gara (#4257)
John P. Walsh (#6709)
Pannone Lopes & Devereaux LLC
1800 One Financial Plaza
Providence, RI 02903
(401) 824-5100 (telephone)
(401) 824-5123 (fax)

**CERTIFICATION**

The undersigned hereby certifies that a true copy of the within was sent on the 24th day of April, 2007 to:

Brian P. Heermance, Esq.
Morrison Mahoney, LLP
17 State Street
New York, NY 10004

Benjamin V. White, Esq.
Vetter & White
20 Washington Place
Providence, RI 02903-1358

Thomas C. Plunkett, Esq.
Kiernan, Plunkett & Redihan
91 Friendship Street
Providence, RI 02903

John K. Fulweiler, Esq.
DeOrchis & Partners, LLP
61 Broadway
New York, NY 10006

Charles A. Cook, Esq.
Morrison Mahoney Miller, LLP
250 Summer Street
Boston, MA 02210-1134

Seth Holbrook, Esq.
Holbrook & Murphy
15 Broad Street
Suite 900
Boston, MA 02109

**/s/ John P. Walsh**