# EXHIBIT 2

COPY

VOLUME I
PAGES 1-121
EXHIBITS 7

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND
C.A. NO. 06-CV-00053-S-LDA

*****************************)
**JACK FOLEY, MARY O'DONOGHUE )**
**AND DAVID ROBBINS, )**
**Plaintiffs, )**
)
**v. )**
)
**STEVEN M. LOEB, BLAD CO. )**
**AND WILLIAM TRIPP, )**
**Individually and d/b/a TRIPP )**
**DESIGN NAVAL ARCHITECTURE, )**
**Defendants, )**
**And )**
**BLAIR BROWN, )**
**Third-Party Defendant. )**
*****************************)

**DEPOSITION OF STEVEN M. LOEB**, a witness called on behalf of the plaintiffs, taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Shaunna L. O'Connell, Registered Professional Reporter and Commissioner in and for the State of Rhode Island, at the offices of Morrison Mahoney, LLP, 121 South Main Street, Providence, Rhode Island, on Tuesday, **February 27, 2007**, commencing at 10:05 a.m.

specifically.
Q. Did you continue in the race?
A. I did not.
Q. Why?
A. Because the boat was broken.
Q. Were you aware immediately after the incident that there were any injuries aboard *Sforzando*?
A. I was not.
Q. Did you ask anyone aboard *Sforzando* immediately after the incident if there were any injuries?
A. I did not.
Q. Did you call the Coast Guard on the radio to report the incident?
A. I did not, but *Sforzando* did.
Q. How do you know that?
A. I heard it on the radio.
Q. And what did you hear on the radio?
A. I heard that there were injuries.
Q. How soon after the incident did you hear that?
A. I don't recall.
Q. Was it a matter of a few minutes, a half

hour?

A. A few minutes.

Q. Do you remember what radio channel that was on?

A. I assume 16, but I don't have a specific recollection.

Q. Once you heard that, did *Sirena* come alongside *Sforzando* and offer any assistance?

A. We did.

Q. What assistance did you offer?

A. Anything we could do for them.

Q. And how did they respond?

A. No.

Q. Did you say anything else to anybody aboard *Sforzando* at the time?

A. We did not.

Q. So after the incident, what did *Sirena* do?

A. Returned to the marina.

Q. And what marina was that?

A. At Goat Island.

Q. Is that where *Sforzando* was tied up as well?

A. No.

Q. Where was *Sforzando* tied up?
A. Somewhere in Newport. I'm not sure which marina.
Q. But you went over --
A. I knew at the time.
Q. But you went over to wherever *Sforzando* was tied up?
A. Yes.
Q. Why did you do that?
A. To see Blair, see the boat, see what had happened.
Q. Was Blair there at the time?
A. He was.
Q. And by Blair, you mean Blair Brown?
A. Yes.
Q. Who you understood to be the owner of *Sforzando*?
A. Yes.
Q. What did you tell Blair at the time?
A. We were sorry.
Q. What were you sorry for?
A. That we had this accident.
Q. Did you acknowledge or do or say anything that would suggest that you understood

that it was *Sirena*'s fault?

MR. O'GARA: Objection. You can answer.

A. We did not.

Q. Did you believe that *Sirena* was obligated to keep clear at the time?

A. Yes.

Q. Did you see any of the injured crew members at the time you went to speak to Blair at the dock?

A. Mary might have been there. I'm not sure. But the other two had already left.

Q. Do you understand where the other two went?

A. Yes.

Q. Where did they go?

A. Newport Hospital.

Q. Did you go to Newport Hospital?

A. I did.

Q. Did anyone accompany you to Newport Hospital?

A. Yes.

Q. Who accompanied you?

A. Bill Tripp.

Q. Did you see anyone from *Sforzando* when you were at the hospital?
A. I did.
Q. Who did you see?
A. I saw Jack.
Q. By Jack you mean Jack Foley?
A. Jack Foley. I saw Blair and I saw Jack Slattery.
Q. Did you have any discussion with Jack Foley?
A. Yes.
Q. What do you recall of that discussion?
A. I asked him how he was feeling.
Q. Did you say anything else to him?
A. Just typical regrets and pleasantries.
Q. Do you recall saying anything to the effect that it was Bill Tripp two took the wheel or who did anything that caused the incident?
A. I don't recall.
Q. Do you recall anything else of your discussion with Jack Foley?
A. I don't.
Q. Now, what do you recall of any of your

discussion with Jack Slattery at the hospital?

A. Same -- regrets.

Q. Do you recall any discussion regarding Bill Tripp's involvement?

A. No.

Q. And did you have a discussion with Blair Brown at the hospital?

A. Yes.

Q. What do you recall of that discussion?

A. Same -- regrets.

Q. At some point did you learn that *Sirena* was being protested by *Sforzando*?

A. Yes.

Q. When and how did you learn of that?

A. At the yacht club later that day.

Q. By yacht club you mean New York Yacht Club?

A. Yes.

Q. Who informed you?

A. I don't recall.

Q. Did you attend a protest hearing?

A. I did.

Q. Were you *Sirena*'s representative

throughout the hearing?
A. I was not.
Q. Who was?
A. Bill Tripp.
Q. So was he in the hearing from start to finish?
A. Yes.
Q. Were you in the hearing from start to finish?
A. I don't recall.
Q. Did you provide testimony at the hearing?
A. Yes.
Q. Were you questioned by anyone after you provided testimony?
A. I don't recall.
Q. Do you recall if Bill Tripp asked any questions?
A. I don't recall.
Q. Do you recall Bill Tripp being told that he couldn't ask any questions?
A. I do not.
Q. Do you recall who represented *Sforzando*?
A. Jack Slattery.
Q. Did he ask you any questions?

A. I don't recall.
Q. Do you recall him being denied the opportunity to ask any questions?
A. I do not.
Q. Do you know who the Protest Committee -- do you know the names of the Protest Committee members?
A. I think so.
Q. Who do you believe were the members of the committee?
A. John Osmond. I can't remember the others. I did review it on the decision, and I know all three of them.
Q. Were you there when the decision was announced?
A. I was.
Q. And was Bill Tripp there when the decision was announced?
A. He was.
Q. Was Jack Slattery there when the decision was announced?
A. I don't recall.
Q. Were you or Bill Tripp denied the right to call any witness that you wanted to call?

A. We were not.
Q. So if you had wanted to, you could have brought in -- as far as you know, you could have brought in anyone you wanted to appear as a witness?
A. Right.
Q. On behalf of *Sirena*?
A. Yes. But there was little point at that point.
Q. And why was that?
A. Because both boats were already out of the regatta, so the results of the hearing were really of no importance to us.
Q. But you had no objection as to how the hearing was conducted?
A. I did not.
Q. As you sit here today, do you believe the hearing was conducted in accordance with the racing rules and procedures for Protest Committees?
A. Yes.
Q. You have no quarrel as to how the hearing was conducted?
A. I do not.

Q. Have you ever been involved in any other protests?
A. Yes.
Q. Apart from the protest involving this incident, what other protests do you recall?
A. I really don't recall specific ones.
Q. Well, over the course of your racing career, do you have an estimate as to how many protest hearings you've been in?
A. I don't.
Q. At least several?
A. Several, yes.
Q. And you've read the racing rules of sailing from time to time while you were racing?
A. I have, yes.
Q. And so you're familiar with the function and procedures of a Protest Committee?
A. I am.
Q. And as best you know, the procedures the Protest Committee in this incident followed were consistent with what you understood was required in the racing

rules; is that correct?
A. Yes.
Q. Mr. Loeb, I'll represent to you that in some requests for admissions, you admitted that the decision of the Protest Committee -- and I didn't bring that with me, but I'll represent to you that the names were John Osmond, Bob Conner and John Bonds. Do you know -- one second.
MR. COOK: Why don't we have this marked. Mr. Plunkett has been kind enough to give me a copy of the Protest Form and decision.
(Exhibit No. 5, Four-page Protest Form with Protest Committee decision attached; so marked.)
MR. COOK: Exhibit 5 will be the protest form of four pages and then a typewritten sheet with the names Robert Conner, John Osmond, and John Bonds at the bottom of that.
Q. I'll represent to you, Mr. Loeb, that you've previously, in your admissions, acknowledged that this was the protest

decision, the final page of what we just marked.
A. Correct.
Q. Do you see the names -- Robert Conner, Chair; John Osmond; and John Bonds?
A. Right.
Q. Are you acquainted with Mr. Conner?
A. Yes.
Q. What experience do you understand him to have in the hearing of protests and serving as a judge in racing?
A. Significant.
Q. And are you acquainted with John Osmond?
A. I am.
Q. Do you have any knowledge as to his level of experience?
A. Significant.
Q. Do you happen to know where he is?
A. I don't.
Q. And are you familiar with the name John Bonds?
A. I am.
Q. What do you understand to be Mr. Bonds' experience?

A. Significant.
Q. Are you aware that he was a principal race officer at the 1996 Olympics?
A. I am not.
Q. Do you have any reason to question that?
A. No.
Q. Are you aware that he was, at one time, executive director for U.S. Sailing?
A. Yes.
Q. And are you aware that at one time he was a captain in the United States Navy?
A. Yes.
Q. Are you aware that Mr. Conner has served on the jury for a number of world championships?
A. I'm not aware of that, but it doesn't surprise me.
Q. Are you aware that he served on the jury for several America's Cup and challenger selection trials?
A. Yes.
Q. So you have no quarrel with the abilities of Mr. Conner, Doctor Osmond or Mr. Bonds to serve as Protest Committee members?

A. No quarrel with them.
Q. Did *Sirena* or anyone on *Sirena*'s behalf file a protest against *Sforzando*?
A. We did not.
Q. Now, when you received this protest decision of the final page of what we've just -- strike that.
When did you receive this written decision that's the final page of Exhibit 5?
A. I don't recall.
Q. Did you get it the day of the incident?
A. I don't recall.
Q. Do you remember disagreeing with the decision when it was reported to you?
A. I agree with the facts found. I'm not in total agreement with the conclusion, but it didn't make any difference.
Q. So you agree that at some point *Sirena* believed that she could cross ahead?
A. Yes.
Q. And then at some point it became clear that she could not?
A. Most likely, yes.

Q. And then *Sirena* bore away to pass the stern of *Sforzando*?
A. Yes.
Q. And then, as you testified earlier, *Sforzando* bore away anticipating a close crossing?
A. Yes.
Q. And your testimony earlier was that *Sirena* was the first to alter course; is that correct?
A. Yes.
MR. COOK: I think this is a good time to take another ten-minute break.
(Discussion off the record.)
MR. COOK: Back on the record.
Q. Mr. Loeb, apart from you and Bill Tripp and the main sheet trimmer, how were the other crew sitting on your boat 30 seconds before the incident?
A. All hiked out.
Q. What do you mean by "hiked out"?
A. Sitting on the rail leaning to windward.
Q. Does your boat have single or double

lifelines?
A. Double.
Q. Were their torsos between the upper and the lower lifelines?
A. Probably.
Q. Is that a normal way for them to hike out?
A. (Witness nods.)
Q. Were their legs under the lower lifeline and then draped on the side of the boat?
A. Yes.
Q. Is that a normal way for them to sit upwind in these conditions?
A. Yes.
Q. And you've instructed them to sit in that fashion as you were beating to windward?
A. Yes.
Q. At some point was the crew advised that a collision was likely to occur?
A. No.
Q. Did you ever provide any written statements concerning this incident to the Coast Guard?
A. Not that I recall.
Q. Did your insurance company?

A. I don't recall.
Q. Other than to Mr. O'Gara or the other lawyers who have represented you in this action, have you provided a written statement to anyone?
A. I don't recall.
Q. Do you think Jack Foley, Mary O'Donoghue or Dave Robbins were negligent in any way?
A. I do not.
MR. O'GARA: Objection.
Q. You do not think they were negligent?
A. NO.
MR. O'GARA: Objection.
MR. PLUNKETT: I object.
Q. Is there anything that Dave Robbins, Mary O'Donoghue or Jack Foley could have done to avoid the incident?
MR. O'GARA: Objection.
A. Not to avoid the incident. They could have diminished their injuries by getting out faster.
Q. Do you have any reason to believe that they delayed in getting out from the lifelines?

A. I don't know.
Q. You have no reason to believe that?
A. No.
Q. Are you familiar with the doctrine "assumption of the risk"?
MR. O'GARA: Objection.
MR. PLUNKETT: Objection.
A. Generally.
Q. And what do you understand the doctrine assumption of the risk to be?
MR. O'GARA: Objection.
MR. PLUNKETT: Objection.
A. If you enter into a sport that whatever happens, you assume the risk and you're not supposed to sue about it.
Q. Do you believe that the doctrine of assumption of the risk applies in sailboat racing?
MR. O'GARA: Objection.
MR. PLUNKETT: I object.
A. I don't know.
MR. COOK: Can we mark this as Exhibit 6.
(Exhibit No. 6, 2001-2004 U.S.

Sailing Prescription; so marked.)
Q. Mr. Loeb, I've asked the reporter to mark as Exhibit 6 a document of eight pages titled 2001-2004 U.S. Sailing Prescriptions. Do you have that in front of you?
A. I do.
Q. And I'll represent to you that this is an exact copy of what you've admitted in your response to admissions constitute U.S. Sailing Prescriptions in effect at the time of the incident.
I'd ask you to turn to page 2. Do you see the prescription for Rule 68 in the middle of the page?
A. Yes.
Q. Do you see subsection 6 of that prescription, a paragraph of 6 lines?
A. I don't.
Q. If you look in the middle of the page, I'm pointing to paragraph C in parenthesis.
A. Did you say subsection 6?
Q. I meant to say C. I slurred my words. C, a paragraph of approximately 6 lines, do

you see in the last several lines that "she shall not be governed by the legal doctrine of assumption of risk"?

A. I see that.

Q. You understood that this paragraph agreeing not to be governed by the doctrine of assumption of risk was a rule in effect for this race; is that correct?

MR. O'GARA: Objection.

MR. PLUNKETT: I object.

A. I see it now, yes.

Q. You have no reason to believe that it was not a rule in effect for the race; is that accurate?

A. No, I have no reason to believe, although one needs to refer to the sailing instructions.

Q. Well, let's refer to what was previously marked as Exhibit 3. You agreed in that to be bound by the U.S. Sailing Prescriptions, did you not? You see the last paragraph that's immediately above your signature?

A. I see something that says -- there's a

hole there.

MR. PLUNKETT: Excuse me. I object to that question. I'm sorry.

MR. O'GARA: Objection.

Q. Do you have any reason to believe that it is not the U.S. Sailing Prescriptions?

A. I have no reason to believe that, but I don't know what it says under there.

Q. So assuming that the prescriptions marked Exhibit 6 were in effect for this race, you agree that the doctrine of assumption of risk does not apply, do you not?

MR. O'GARA: Objection.

MR. PLUNKETT: Objection.

A. I don't know.

Q. Do you allege that the plaintiffs, Jack Foley, Mary O'Donoghue, and David Robbins, could have mitigated their damages in some fashion?

MR. O'GARA: Objection.

MR. PLUNKETT: I object.

Q. You can answer.

A. They could have mitigated their damages by getting up faster.

Q. But you have no evidence to suggest that they didn't get out as quickly as they could?
A. I have no such evidence.
Q. And you have no evidence that after the incident, there were things that they could have done to mitigate their damages, do you?
MR. O'GARA: Objection.
A. I don't know.
Q. You don't know of any evidence?
A. I do not know of any evidence.
MR. COOK: If we could mark this as Exhibit 7, please.
(Exhibit No. 7, Amended Answer to Amended Complaint; so marked.)
Q. I've asked the reporter to put in front of you what's captioned Amended Answer to Amended Complaint, and it was signed by Joseph E. Donat, D-o-n-a-t, as your attorney when the action was pending in New York. At the time did you understand Mr. Donat to be providing a defense on your behalf?

A. I did.
Q. I'd ask you to turn to page 19. These are the affirmative defenses Mr. Donat raised in your behalf.
The third affirmative defense asserts negligence and culpable conduct against Foley, O'Donoghue, and Robbins. Do you see that?
A. Yes.
Q. And you've testified that, in fact, they were not negligent; is that correct?
A. To my knowledge.
MR. O'GARA: Objection.
MR. PLUNKETT: I object.
Q. Now, the fourth affirmative defense is assumption of risk. Do you see that?
A. Yes.
Q. And we've reviewed the U.S. Sailing Prescriptions regarding the assumption of risk, have we not?
A. We have.
Q. The fifth affirmative defense asserts that the injuries of Foley, O'Donoghue, and Robbins were caused by a sudden and

unforeseen emergency situation in marine peril. What was the emergency situation in marine peril?

MR. O'GARA: Objection.

MR. PLUNKETT: I object.

THE WITNESS: Should I answer?

MR. O'GARA: You can answer, Steve, if you know.

A. I assume it is the alteration of course by *Sforzando*.

Q. Is it your assertion that the alteration of course by *Sforzando* created an emergency?

MR. O'GARA: Objection. You can answer.

MR. PLUNKETT: I object.

A. Created an accident.

Q. Your testimony earlier was you thought they were altering course to duck behind you, did you not?

A. That's what I thought was in their mind, yes.

Q. And your testimony was that Bill Tripp took the wheel and bore off sharply because he thought you weren't going to

cross *Sforzando;* is that correct?

A. Correct.

Q. So how is *Sforzando*'s alteration of course creating an emergency?

MR. O'GARA: Objection.

A. They altered course --

MR. PLUNKETT: Excuse me. I object. I apologize for interrupting.

A. They altered course more than they needed to do, which caused the collision.

Q. Do you remember raising that issue with the Protest Committee, the alteration of course by *Sforzando*?

A. Yes.

Q. And what did the Protest Committee decide?

MR. O'GARA: Objection.

A. That they altered course.

Q. And did they conclude why they altered course?

A. They did not.

Q. They concluded that Rule 14 did not apply, did they not?

MR. O'GARA: Objection.

A. I'd have to refer to the --

Q. I'll put back in front of you the last page of Exhibit 5. Do you see that the Protest Committee found that *Sforzando* complied with the Rule 14?

A. I don't see that.

Q. Do you see any reference to Rule 14 in that paragraph?

A. I do.

Q. Why don't you read that for the record, please.

A. "Despite both boats attempted to avoid contact in accordance with Rule 14, the two boats collided."

Q. Do you understand that to be a conclusion that *Sforzando* attempted to avoid a collision by altering course?

MR. O'GARA: Objection.

A. I do.

MR. PLUNKETT: I object.

Q. Now, if we turn to the next page, eighth defense, paragraph 103, do you see that the affirmative defense is that loss of earnings and other economic loss will be replaced by collateral sources?

A. I see the sentence.
Q. What collateral sources do you understand to be available?
MR. O'GARA: Objection.
A. I don't know.
Q. Now, if we could turn to page 21, are you aware that you're asserting a claim against Bill Tripp?
A. I am.
Q. Would you please describe all of the facts that you know of that support your claim against Mr. Tripp?
MR. PLUNKETT: I object.
MR. O'GARA: In addition to his testimony earlier today, Charley?
MR. COOK: Fair enough. Thank you.
Q. In addition to anything you've testified to earlier today, do you know of any other facts?
A. I do not.
MR. COOK: I think I'm done, if other people have questions.
(Discussion off the record.)

EXAMINATION BY MR. HOLBROOK:

Q. Mr. Loeb, just before the collision took place, on your vessel, do you remember whether there was anyone up at the bow of your vessel?

A. I don't recall.

Q. Do you know if your bowman, who I believe you identified earlier in the deposition as a Mr. Dempsey, do you know where he was at the time?

A. I do not.

Q. On board your vessel just before the incident took place, was there any activity on the bow with regards to the spinnaker preparations?

A. Most likely, although I don't recall.

Q. Now, before the impact, before the collision itself, did you have any communication with anybody on board *Sforzando*?

A. I did not.

Q. Do you know if anybody on your vessel had any communication with anybody on board *Sforzando*?

A. I don't recall any.
Q. Do you know if anybody on your vessel ever sounded any signals before the impact?
A. I don't think so.
Q. Did you hear any signals being sounded before the impact?
A. I don't recall.
Q. Did you hear any kind of radio traffic at all with *Sforzando* before the impact?
A. I did not.
Q. In response to Mr. Cook's questions about the Protest Committee and the hearing that took place, I believe that your testimony was that you agreed with the facts but not with the conclusions. And feel free to reference that part of --
MR. COOK: Off the record.
(Discussion off the record.)
Q. Okay. I'm putting in front of you Exhibit 5, and I've turned it to the page that I believe is what Mr. Cook was referring to, and you have that now in front of you.
What is it as far as the conclusions that you don't agree with?

A. I think both boats should have been disqualified.

Q. Anything else?

A. That's it.

Q. When you found out that only *Sirena* was disqualified, did you talk to anybody about that?

A. I don't recall.

Q. Did you take any steps as the owner of the *Sirena* to address the issue of your disagreement?

A. I didn't because it was of no import.

Q. Did you talk to anyone from the yacht club from the Race Committee about the Protest Committee decision afterwards?

A. I did not.

Q. I believe that when you were asked questions by Mr. Cook about where you were just before the impact with *Sforzando* that you had gone to the deck of the vessel, correct?

A. I fell to the deck, yes.

Q. Were you still on the port side?

A. No.

Q. Where on the stern of the vessel were you?
A. At what point?
Q. Tell me if I'm wrong. You started out, you were standing towards the port rail with both hands on the wheel?
A. Correct. I was actually sitting. I was crouched.
Q. And then after the wheel was taken from you, you went to the deck?
A. Yes. Fell.
Q. Which I take it is the deck of the area where you were standing?
A. Right.
Q. And where were you on that deck?
A. Down towards the starboard side.
Q. In front of the wheel?
A. Behind the wheel.
Q. So I take it the vessel was healing?
A. Correct.
Q. To starboard at that point?
A. Correct.
Q. And you went down to the starboard side?
A. Right. With gravity.
Q. After you fell to the deck by the wheel,

did you then move yourself back to the port rail or did you stay towards the starboard side of the vessel?

A. I stood up, and I think I was in the middle of the boat at this point.

Q. Now, while Mr. Tripp had the wheel at this point in time, was he on the starboard side?

A. He was on the port side at that point.

Q. And I'm trying to remember what you said earlier in the deposition. Coming up to when you were, say, a minute from the mark, he was on the starboard side, wasn't he?

A. No. Port side behind me.

Q. So basically when he took the wheel, he maintained the same position that he had had before?

A. Except moved up.

Q. He moved up closer to the wheel?

A. Yes.

Q. But basically he stayed on the same side of the vessel?

A. Right.

Q. So there was a period of time when you went towards the starboard side but then moved back more to the center line of the vessel?
A. Correct.
Q. Do you know the names of anybody on your boat that saw any kind of course change by *Sforzando*?
A. I don't.
Q. How do you know as you sit here today that there was any change by *Sforzando*?
A. Because when I got up, I saw that. They were still turning.
Q. Turning where?
A. They were still turning towards my right, and that's why I turned the wheel to the left. That's why he hit starboard to starboard.
Q. What if you hadn't turned the wheel to the left?
A. We would have hit stem to stem probably, right around there.
Q. And what if they didn't make any course change? What do you think would have

happened?

A. We would have ducked behind them.

Q. And this was even though there had been a course change by your vessel?

A. Yes.

Q. Now, you took the wheel back from Mr. Tripp?

A. Momentarily, yes.

Q. And I believe your testimony is you turned the wheel to, at that point, to port?

A. Correct.

Q. Did your vessel jibe at all?

A. I don't recall.

Q. Now, you've testified, I believe, that you reviewed the deposition testimony of Jack Slattery before coming here today?

A. Yes, I did.

~~Q. Did you disagree with anything he said?~~

MR. O'GARA: Objection. You can answer.

A. Yes.

Q. What did you disagree with?

A. He stated that *Sforzando* made a 10-degree alteration in course and that was it.

Q. And what's the nature of your disagreement

with that?
A. *Sforzando* made a much larger alteration in course.
Q. What's your estimate as to the alteration of course?
A. Probably in the area of 40 to 45 degrees.
Q. Anything else?
A. I don't recall.
Q. So you can't recall disagreeing with anything else that he said?
A. Right.
MR. O'GARA: Objection.
A. Correct.
MR. PLUNKETT: I'm sorry. I object too.
A. Actually, I'm sure there was other disagreements, but that was the major one.
Q. With regards to the actual incident, as you sit here today, can you recall any other disagreements that you have with what Jack Slattery said in his deposition?
MR. PLUNKETT: I object.
MR. O'GARA: Objection.
A. I don't recall them, but there may be.

Q. Were you present when he gave his statement?
A. I think so, but I'm not sure.
Q. Now, did both you and Mr. Tripp leave the room at the same time?
A. Ultimately, yes.
Q. And did you leave the room after a decision was rendered or before?
A. Before.
Q. And where did you go after leaving the room? Where did both of you go after leaving the room?
A. I don't recall. My guess is the bar.
Q. And do you remember about how long afterwards the decision was rendered?
A. I think my recollection is fairly quickly, but I'm not sure how much time.
Q. Was it that you went back into the room to hear the decision or was it handed to you in writing?
A. We went back into the room to hear the decision.
Q. And who went back into the room?
A. All three of us.