# EXHIBIT 5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

-----------------------------)
JACK FOLEY, MARY )
O'DONOGHUE AND DAVID )
ROBBINS )
PLAINTIFF )
)
VS. )
) C.A. NO. 06-0053
STEVEN M. LOEB, BLAD ) S-LDA
CO., KEVIN DAILEY, )
WILLIAM TRIPP, )
INDIVIDUALLY, AND D/B/A )
TRIPP DESIGN NAVAL )
ARCHITECTURE
DEFENDANT
-----------------------------)

DEPOSITION OF BLAIR BROWN, A WITNESS IN THE ABOVE-ENTITLED CASE, TAKEN ON BEHALF OF THE DEFENDANT, BEFORE PATRICIA QUIRK, CSR, NOTARY PUBLIC IN AND FOR THE STATE OF RHODE ISLAND, AT THE OFFICES OF KIERNAN, PLUNKETT & REDIHAN, 91 FRIENDSHIP STREET, PROVIDENCE, RHODE ISLAND ON MARCH 1, 2007, SCHEDULED AT 9:30 A.M.



PRESENT:
FOR THE PLAINTIFF......MORRISON MAHONEY LLP
(MARY O'DONOGHUE) BY: CHARLES A. COOK, ESQUIRE

FOR THE DEFENDANT......KIERNAN, PLUNKETT & REDIHAN
(WILLIAM TRIPP) BY: THOMAS C. PLUNKETT, ESQUIRE

FOR THE DEFENDANT......WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
BY: LAWRENCE BRENNAN, ESQUIRE

FOR THE DEFENDANT......DEORCHIS WIENER & PARTNERS
BY: CARY R. WIENER, ESQUIRE

FOR THE DEFENDANT......OFFICE OF WILLIAM O'GARA
(LOEB, BLAD CO.) BY: WILLIAM O'GARA, ESQUIRE

FOR THE DEFENDANT......HOLBROOK & MURPHY
(BLAIR BROWN) BY: SETH S. HOLBROOK, ESQUIRE

RHODE ISLAND COURT REPORTING
747 NORTH MAIN STREET
PROVIDENCE, RHODE ISLAND 02904
(401) 437-3366



INDEX


WITNESS
PAGE

BLAIR BROWN

EXAMINATION BY MR. PLUNKETT 04
EXAMINATION BY MR. O'GARA 57
EXAMINATION BY MR. PLUNKETT 62
EXAMINATION BY MR. COOK 62


EXHIBITS


NO. DESCRIPTION PAGE

01 OFFICIAL ENTRY FORM, 01PP 15

02 PROTEST FORM 51


(EXHIBITS INCLUDED WITH ORIGINAL TRANSCRIPT ONLY)



(DEPOSITION COMMENCED AT 10:12 A.M.)

BLAIR BROWN

BEING DULY SWORN, DEPOSES AND TESTIFIES AS FOLLOWS:

THE REPORTER: WOULD YOU STATE YOUR FULL NAME FOR THE RECORD, PLEASE.

THE WITNESS: BLAIR BROWN.

EXAMINATION BY MR. PLUNKETT

IT IS HEREBY STIPULATED AND AGREED, BY AND BETWEEN COUNSEL FOR THE RESPECTIVE PARTIES, THAT THE WITNESS WILL READ AND SIGN THE DEPOSITION TRANSCRIPT UNDER THE PAINS AND PENALTIES OF PERJURY; THAT THE READING AND SIGNING IS DEEMED WAIVED IF NOT ACCOMPLISHED WITHIN THIRTY (30) DAYS OF TRANSCRIPT DELIVERY; AND THAT THE SEALING, FILING, AND CERTIFICATION OF DEPOSITION TRANSCRIPT ARE WAIVED.

IT IS FURTHER STIPULATED AND AGREED THAT ALL OBJECTIONS, EXCEPT OBJECTIONS TO THE FORM OF THE QUESTION AND MOTIONS TO STRIKE, WILL BE RESERVED UNTIL THE TIME OF TRIAL OR PRE-TRIAL HEARING.

**Q. MR. BROWN, WHERE DO YOU LIVE?**





COPY

RACE AND OTHER RACES THAT WE HAD BEEN ON. WE, WHEN WE CHANGED TACTICIANS FROM RACE TO RACE, AND EACH TACTICIAN HAS HIS OR HER OWN STYLE, AND THE TACTICIANS CUSTOMARILY ORGANIZE TRAINING FOR PRACTICE RUNS FOR GETTING UP AND DOWN SAILS AND VARIOUS MANEUVERS BEFORE THE RACES, SO THAT JACK PROBABLY DID THIS THE FRIDAY OR SATURDAY BEFORE THIS REGATTA BEGAN. WE DO THAT KIND OF TRAINING.

**Q. CAN YOU REMEMBER ANY TRAINING IN REGARD TO SAFETY, THAT IS USE OF FLOTATION DEVICES OR WHERE TO SIT ON THE BOAT? SPECIFICALLY WHAT I'M GETTING AT IS A PERSON SITTING ON THE RAIL AND THE POTENTIAL FOR COLLISION ON BOATS?**

MR. COOK: OBJECTION.

**Q. YOU MAY ANSWER.**

A. I CAN'T RECALL.

**Q. NOW, HOW DO YOU KNOW THAT THE CREW MEMBERS HAD BEEN TRAINED FOR THE BERMUDA RACE?**

A. WELL, MANY OF THE PEOPLE WERE THE SAME PEOPLE AND WE -- I MEAN, MANY OF THE CREW MEMBERS ON THE BOAT THAT DAY WERE PEOPLE WHO HAD RACED TO BERMUDA WITH ME.

**Q. OKAY, AND WHAT HAD THE TRAINING FOR THE**



**BERMUDA RACE CONSISTED OF?**

A. IT CONSISTED OF CHALKBOARD TALKS, LECTURES, HANDS-ON DEMONSTRATIONS OF SAFETY DEVICES, ET CETERA. ALSO, THERE WAS A, DURING THIS TIME, IN THE LATE '90S AND EARLY PART OF THE CENTURY, THERE WAS AN ADDED AWARENESS OF IMPORTANCE OF PFD'S, AND WE WERE REQUIRED TO WEAR THEM AT THE START AND FINISH OF THE RACES. I BELIEVE THAT THAT WAS THE CASE. THIS HAS BEEN A MOVEMENT.

**Q. WHO PROVIDED THAT INSTRUCTION?**

A. WELL, I WOULD OR JACK WOULD.

**Q. YOU WOULD ACTUALLY LECTURE THE CREW?**

A. WE WOULD DISPENSE THE PFD'S AND LECTURED, YES.

**Q. THAT'S WHAT YOU MEAN BY THE TRAINING FOR THE BERMUDA RACE, THAT WAS TRAINING PROVIDED DIRECTLY BY YOU OR MR. SLATTERY?**

A. NO, I'M TALKING ABOUT JACK FOLEY.

**Q. I'M SORRY, JACK FOLEY?**

A. I CAN'T RECALL EXACTLY WHAT WE DID.

**Q. DO YOU REMEMBER PROVIDING ANY INSTRUCTION TO THESE CREW MEMBERS PRIOR TO THIS RACE ABOUT SAFETY IN REGARD TO SITTING ON THE WINDWARD**



**RAIL OF A BOAT AND THE POTENTIAL FOR COLLISION BETWEEN BOATS?**

MR. COOK: OBJECTION.

A. I DON'T RECALL.

**Q. DO YOU KNOW IF MR. SLATTERY DID OR MR. FOLEY DID?**

A. I CAN'T SAY.

**Q. ON THAT DAY, FOR THAT REGATTA, WERE ANY OF THE CREW MEMBERS PAID?**

A. I THINK JACK FOLEY WAS.

**Q. ANYONE ELSE?**

A. I CAN'T RECALL WHETHER SLATTERY WAS OR NOT. SOMETIMES I PAID HIM, SOMETIMES I DIDN'T.

**Q. WAS MR. FOLEY PAID REGULARLY BY YOU FOR PARTICIPATING IN THE RACES?**

A. I WAS ESSENTIALLY THE BOAT SKIPPER AND THE BOAT GUIDE.

**Q. OKAY.**

A. WHO MADE SURE THE BOAT APPEARED AND IT WAS EQUIPPED, ET CETERA, FOR VARIOUS EVENTS.

**Q. AND WAS HE PAID WEEKLY IN 2002?**

A. HE WOULD HAVE BEEN PAID WEEKLY, YES.

**Q. DO YOU REMEMBER HOW MUCH HE WAS PAID, WEEKLY?**



A. I DON'T RECALL.

**Q. WOULD YOU HAVE RECORDS PERTAINING TO THAT?**

A. I THINK I WOULD, YES.

**Q. WAS IT BY REGULAR PAYROLL CHECK?**

A. I PAID HIM AS A CONTRACT WORKER.

**Q. ALL RIGHT, IT WOULD HAVE BEEN A CHECK FROM YOU THEN DIRECTLY TO HIM?**

A. RIGHT.

**Q. ALL RIGHT, NOW, BEFORE ENTERING INTO THAT REGATTA, DID YOU SIGN ANY DOCUMENTS IN CONJUNCTION WITH THE REGATTA?**

A. I ASSUME I DID, YES.

**Q. CAN YOU REMEMBER?**

A. IT WOULD BE SOME KIND OF CREW -- I WOULD SIGN A CREW WAIVER, AS OTHERS WOULD.

**Q. LET ME JUST SHOW YOU THIS. MAY WE MARK THAT?**

**(DEFENDANT'S EXHIBIT 1 MARKED)**

**Q. LET ME SHOW YOU, YOU HAVE ONE. MR. BROWN, LET ME SHOW YOU THE ONE WITH THE EXHIBIT MARK ON IT. DO YOU RECOGNIZE THAT?**

A. YES, I MEAN, IT'S A WAIVER FORM, ISN'T IT, OR, NO, IT ISN'T. IT'S AN OFFICIAL ENTRY FORM.

**Q. DOWN ON THE BOTTOM, ON THE LEFT, DOES THAT**

CONTAIN YOUR SIGNATURE?
A. YES.
Q. I SHOULD SAY, IS THAT YOUR SIGNATURE ON THE ENTRY FORM FOR THAT REGATTA?
A. I ASSUME, YES.
Q. DO YOU REMEMBER SIGNING ANY OTHER DOCUMENTS BESIDES THIS ONE FOR THE REGATTA?
A. I MIGHT HAVE SIGNED A -- ALTHOUGH THIS SAYS "WAIVER" I MIGHT HAVE SIGNED A WAIVER FORM AS WELL. I DON'T RECALL.
Q. HAVE YOU KEPT A COPY OF THAT DOCUMENT?
A. NO, I DON'T KEEP --
Q. THIS ENTRY FORM AND THE WAIVER FORM YOU MAY HAVE SIGNED, WOULD THEY HAVE BEEN TURNED INTO THE YACHT CLUB PRIOR TO THE RACE?
A. YES, I ASSUME THAT I SIGNED ANY FORMS THAT THEY REQUIRED.
Q. AND DO YOU KNOW WHETHER OR NOT ANY OF YOUR CREW MEMBERS SIGNED ANY FORMS?
A. I ASSUME, IF THEY WERE REQUIRED TO SIGN, THEY DID.
Q. DO YOU KNOW IF THEY DID?
A. I DON'T KNOW.
Q. WHO WOULD HANDLE THAT? WHO IN THE GROUP WOULD



HANDLE THAT?
A. ORDINARILY JACK FOLEY WOULD HANDLE THAT.
Q. OKAY. ALL RIGHT. IN OTHER RACES INVOLVING THE NEW YORK YACHT CLUB, WOULD THE CREW MEMBERS HAVE SIGNED WAIVERS?
A. IF REQUIRED, YES.
Q. WERE WAIVERS REQUIRED FOR CREW MEMBERS FOR ALL NEW YORK YACHT CLUB RACES, TO YOUR KNOWLEDGE?
A. I DON'T RECALL.
Q. BUT ANY SUCH FORMS, THE EXECUTION OF ANY SUCH FORMS WOULD HAVE BEEN HANDLED BY MR. FOLEY, NOT YOU PERSONALLY?
A. NO.
Q. WOULD HE EVER REPORT TO YOU THAT THAT HAD BEEN DONE?
A. YES, I WOULD ASSUME.
Q. CAN YOU REMEMBER?
A. NO.
Q. IN THIS CASE, CAN YOU REMEMBER IF HE TOLD YOU OR ARE YOU, AGAIN, MAKING AN ASSUMPTION?
A. I DON'T KNOW IN THIS RACE.
Q. NOW, ON THE DATE OF THIS INCIDENT, JULY 14, 2002 -- LET ME ASK THIS; ON THE DATE OF THIS INCIDENT, DURING THE FIRST LICK OF A RACE,



WHAT WAS THE APPROXIMATE WIND SPEED. STRIKE THAT. DURING THE LEG OF THE RACE, JUST BEFORE THIS COLLISION, WHAT WAS THE WIND SPEED?
A. 12 TO 14 KNOTS.
Q. AND YOU WERE SKIPPERING?
A. RIGHT.
Q. AND HOW ABOUT THE WATER CONDITIONS?
A. THEY WERE TYPICAL RHODE ISLAND SOUND SEA CONDITIONS WITH A GENTLE SWELL.
Q. AND WE COULD GO TO THE POINT OF ONE MINUTE BEFORE REACHING THE MARK THAT'S IN QUESTION HERE, THE MARK THAT BOTH BOATS WERE GOING TO, ALL RIGHT, AT THAT POINT YOUR BOAT WAS ON STARBOARD TACK?
A. WELL, DEPENDING ON HOW -- I MEAN, IT'S AT SOME POINT BEFORE GETTING TO THE MARK WE WERE ON PORT TACK AND CROSSED BEHIND SIRENA, AND WHETHER THAT WAS ONE MINUTE BEFORE GETTING TO OUR MARK OR NOT, I'M NOT SURE, BUT SOME PERIOD OF TIME NOT VASTLY DIFFERENT FROM ONE MINUTE WE WERE ON PORT AND THEY WERE ON STARBOARD. THEY CROSSED US AND THEN WE BOTH TACKED.
Q. SO THEN YOU TACKED OVER TO STARBOARD?
A. RIGHT.



Q. AND THAT WOULD HAVE BEEN, I'M REPEATING MYSELF, IT'S ABOUT ONE MINUTE OR SO BEFORE THE MARK?
A. RIGHT.
Q. AND ONCE YOU WERE ON STARBOARD TACK, SIRENA WAS ON PORT TACK?
A. SHE WAS ON PORT TACK.
Q. BOTH OF YOU TACKED?
A. WE CROSSED AND WENT -- WE CONTINUED ON PORT TACK. SHE CONTINUED ON STARBOARD TACK. AT SOME POINT AFTER THAT, WE EACH TACKED AND WERE CONVERGING CLOSE TO THE MARK. WE TACKED ON THE STARBOARD TACK LAY LINE.
Q. ONCE YOU TACKED, YOU CONTINUED TOWARDS THE MARK?
A. RIGHT.
Q. NOW, ONCE YOU TACKED ONTO STARBOARD TACK, DID YOU SEE -- DID YOU WATCH SIRENA AT ALL?
A. I PERSONALLY PROBABLY DID NOT SEE HER. JACK SLATTERY WOULD HAVE SEEN HER AND OTHER BOATS ON THE COURSE.
Q. JUST TO GO BACK AGAIN, AND AGAIN I UNDERSTAND I'M REPEATING, BUT ONCE YOU TACKED ONTO STARBOARD TACK, BEFORE THE MARK, YOU WERE

A. I WAS STANDING BEHIND THE WHEEL. I PROBABLY WAS STANDING. I DON'T RECALL WHETHER I WAS STANDING OR SITTING. I WAS BEHIND THE WHEEL.
**Q. AND YOU SAW SIRENA?**
A. RIGHT.
**Q. FROM THAT POINT ON, TO THE POINT OF THE COLLISION, DID YOU CONTINUOUSLY WATCH SIRENA?**
A. I KNEW WHERE SHE WAS.
**Q. DID YOU CONTINUOUSLY WATCH SIRENA?**
A. YES, NOT CONTINUOUSLY, INTERMITTENTLY.
**Q. NOW, SO YOU SAW IT AT FIVE BOAT LENGTHS BEFORE?**
A. RIGHT, AND I LOOKED AT THE -- AT THE -- OVER TO MY RIGHT, THEN I SAW HER AGAIN AND LOOKED OVER TO MY LEFT. I HAD TO OBSERVE OTHER BOATS.
**Q. ALL RIGHT, THERE WERE BOATS OVER TO YOUR RIGHT?**
A. I BELIEVE THERE WAS A BOAT AHEAD OF US ON STARBOARD TACK.
**Q. TO YOUR RIGHT?**
A. IT WAS TO MY RIGHT, YES, I BELIEVE.
**Q. DO YOU KNOW WHICH BOAT THAT WAS?**



A. NO.
**Q. WAS IT BETWEEN YOUR BOAT AND THE MARK?**
A. IT WAS AT THE MARK.
**Q. SO IT WAS NOT DIRECTLY TO YOUR RIGHT; IT WAS AHEAD OF YOU?**
A. RIGHT.
**Q. TO YOUR RIGHT WAS CLEAR, WAS IT NOT?**
A. I DON'T RECALL.
**Q. THE -- SO YOU LOOKED TO YOUR RIGHT, THEN YOU LOOKED BACK TO THE LEFT, HOW FAR DID THE BOAT TRAVEL IN THAT PERIOD?**
A. WELL, HOW FAST IS THE BOAT AT SEVEN KNOTS. THE BOAT IS TRAVELING AT SO MANY FEET PER MINUTE. I CAN'T TELL YOU.
**Q. DID IT TRAVEL A BOAT LENGTH, HALF A BOAT LENGTH?**
A. PROBABLY, I DON'T KNOW.
**Q. HOW MUCH TIME ELAPSED BEFORE YOU LOOKED BACK TO YOUR LEFT?**
A. I WOULD SAY HALF A SECOND.
**Q. ALL RIGHT, AND WHEN YOU LOOKED BACK TO YOUR LEFT, DID YOU SEE SIRENA?**
A. I SAW SIRENA AHEAD OF US.
**Q. AHEAD OF YOU?**



A. YES, AND TO THE LEFT.
**Q. AND TO THE LEFT, AND THEN FROM THAT POINT DID YOU WATCH IT CONTINUOUSLY UNTIL THE POINT OF THE COLLISION?**
A. I WATCHED IT INTERMITTENTLY UNTIL THAT TIME.
**Q. SO, YOU LOOKED TO YOUR RIGHT, YOU LOOKED TO YOUR LEFT, WHERE DID YOU LOOK AFTER THAT?**
A. I LOOKED ELSEWHERE, THEN LOOKED BACK AT SIRENA.
**Q. SO, YOU DID NOT WATCH SIRENA CONTINUOUSLY FROM THAT POINT OF FIVE BOAT LENGTHS FROM THE MARK, UP TO THE POINT OF THE COLLISION?**
A. I'M NOT SURE OF YOUR MEANING OF CONTINUOUS.
**Q. YOU WATCHED IT FROM THE POINT OF FIVE BOAT LENGTHS BEFORE THE COLLISION. YOU KEPT LOOKING AT IT RIGHT UP TO THE POINT OF THE COLLISION, YOU DID NOT DO THAT?**
A. MY LEXICON FAILS ME. I DON'T UNDERSTAND IF YOU WANT ME TO SAY THAT I LOOKED, NEVER TOOK MY EYES OFF OR SIRENA FROM THAT TIME. THAT'S NOT TRUE. ON THE OTHER HAND, I WAS LOOKING AT HER TWICE A SECOND. I MEAN, I



DON'T KNOW HOW TO DESCRIBE THAT.
**Q. THAT'S FINE. WAS MR. SLATTERY TELLING YOU ANYTHING ABOUT SIRENA DURING THAT PERIOD?**
A. YES.
**Q. WHAT WAS HE TELLING YOU?**
A. HE WAS POINTING OUT TO ME WHERE SHE WAS.
**Q. NOW, DID YOU EVER SEE -- DID YOU EVER SEE SIRENA TURN DOWNWIND?**
A. YES.
**Q. ALL RIGHT, AND AT THAT POINT, WHAT WAS YOUR BOAT DOING?**
A. WE WERE TURNING DOWNWIND.
**Q. SO, WHEN YOU SAW SIRENA TURNING DOWNWIND, YOU WERE TURNING DOWNWIND ALSO?**
A. YES.
**Q. DO YOU KNOW WHICH BOAT TURNED FIRST?**
A. I DON'T.
**Q. ONCE YOU TURNED DOWN, DID YOU LOSE SITE OF SIRENA UP TO THE POINT OF THE COLLISION?**
A. NO.
**Q. YOU COULD STILL SEE IT?**
A. RIGHT.
**Q. SO, YOU SAW SIRENA TURNING DOWN, AND YOU CONTINUED TO TURN DOWN?**

41

A. WE TURNED DOWN MODESTLY. IT WAS A QUESTION OF FINESSE AT THAT POINT. HAD WE NOT TURNED, WE WOULD HAVE PROBABLY SUNK HER. HAD WE TURNED MORE, WE WOULD HAVE THROWN OUR STERN INTO HER BOW AND SHE PROBABLY WOULD HAVE SUNK US. SHE TURNED DOWN SOME, AND WE TURNED DOWN SOME.
**Q. DID YOU CONSIDER TACKING OVER TO THE RIGHT?**
A. YOU MEAN HEADING UP INTO THE WIND?
**Q. YES. ACTUALLY TACKING OVER TO THE RIGHT?**
A. IF WE HAD CRASH TACKED, WE PROBABLY WOULD HAVE SUNK OUR BOAT. SHE WOULD HAVE -- OUR PORT SIDE WOULD HAVE GONE INTO YOUR BOW.
**Q. OKAY. GO AHEAD.**
A. AS IT WAS, IT WAS REMARKABLE HOW THE COLLISION WAS AS BENIGN AS IT WAS. I DON'T MEAN TO IMPLY THAT IT WAS BENIGN. IT COULD HAVE BEEN PHYSICALLY MUCH WORSE ON THE BOAT. I'M NOT TALKING ABOUT PERSONAL INJURIES.
**Q. NOW, SO YOU TURNED DOWN WHILE SIRENA WAS TURNING DOWN, WHAT HAPPENED?**
A. WE, THE BOWS CAME CLOSE TOGETHER AND EVENTUALLY, AS THE BOATS WIDENED GOING AFTER THE BOAT, WE HIT AND PROBABLY WE SURGED TWO OR

42

THREE TIMES. AS I SAID, THERE WAS A SWELL IN RHODE ISLAND SOUND, WHICH IS NOT UNUSUAL, AND THE BOATS WOULD HIT, AND THEN AS A SWELL CAME THROUGH, THEN AS THE SWELL DIMINISHED, THEY WOULD GO APART, AND THEN THEY WOULD MEET AGAIN.
**Q. DO YOU KNOW WHAT PARTS OF THE BOAT CAME IN CONTACT?**
A. HER STARBOARD SIDE HIT OUR STARBOARD SIDE.
**Q. THE --**
A. YES, THE PULPITS AND MY FLAGS WERE SNARLED. THE BOAT SPINNAKER PULLS WERE BROKEN. I ASSUME HER SPINNAKER PULL WAS ON THE STARBOARD SIDE. WE HAD BOTH SET UP FOR A MARK ROUNDING?
**Q. WHO HAD SET YOUR BOAT UP FOR THE ROUNDING, WAS THAT TODD YANKEE?**
A. IT WOULD HAVE BEEN HIM, YES.
**Q. NOW, THERE WAS THIS YELLING TO THE OTHER BOAT, TO SIRENA, WAS THERE ANY YELLING TO THE CREW ABOUT THE CLOSENESS OF SIRENA OR THE POTENTIAL OR THE IMPENDING COLLISION?**
A. EVERYONE KNEW WHERE SIRENA WAS BY THE

43

TIME THE YELLING STARTED. THEY COULD SEE THE BOATS.
**Q. EVEN THE CREW MEMBERS UP ON THE WINDWARD RAIL?**
A. EVEN THE ONES ON THE STARBOARD RAIL, BECAUSE SHE HAD -- WE HAD TURNED DOWN, AND AT THE LAST SECOND OR SPLIT SECOND THEY COULD SEE WHAT WAS GOING ON.
**Q. THEY COULD SEE SIRENA EVEN AS THE BOW WAS COMING ACROSS YOURS?**
A. YES.
**Q. OKAY.**
A. IT SEEMS TO ME THAT SIRENA MIGHT HAVE HEADED UP INTO THE WIND, WHICH MIGHT HAVE AVERTED SOME OF THE DAMAGE.
**Q. EXPLAIN THAT. YOU MEAN THAT'S A MANEUVER IT COULD HAVE MADE? IS THAT WHAT YOU ARE SAYING, IF IT HEADED UP?**
A. RIGHT, RIGHT. AT THE VERY END THAT NO LONGER -- THAT OPTION WAS CLOSED OFF.
**Q. HAD YOUR BOAT HELD ITS COURSE, THAT IS STAYED, HEADED TOWARD THE MARK, WOULD SIRENA HAVE DIPPED UNDERNEATH YOU?**
A. SHE HAD A CHANCE AT SOME POINT, I THINK, FIVE OR SIX BOAT LENGTHS FROM THE MARK TO DO

44

SO, BUT AS TIME WENT ON, SHE LOST THAT OPTION.
**Q. AT FIVE OR SIX BOAT LENGTHS, YOU DID NOT OBSERVE SIRENA TURNING DOWNWIND? I'M NOT ASKING IT THE RIGHT WAY. HOW FAR WAS SIRENA FROM THE MARK WHEN YOU NOTICED IT TURNING DOWNWIND?**
A. I CAN'T TELL YOU EXACTLY.
**Q. WAS IT WITHIN FIVE BOAT LENGTHS?**
A. I WOULD SAY IT WAS WITHIN FIVE OR SIX BOAT LENGTHS.
**Q. WAS IT WITHIN THREE BOAT LENGTHS OF THE MARK?**
A. I DON'T THINK SO.
**Q. ALL RIGHT. AFTER THE BOATS COLLIDED, WHAT HAPPENED?**
A. WE DROPPED SAIL. WE TRIED TO GET THE CREW GATHERED. I CALLED THE RACE COMMITTEE. I TALKED TO THE COAST GUARD, AND WHATEVER IT IS, BRANFORD POINT (SIC), OR WHATEVER IT IS. WE WERE ABOUT FOUR TO FIVE MILES FROM SHORE. WE STARTED OUR ENGINE AND POUNDED INTO SHORE AS FAST AS WE COULD. THE RACE COMMITTEE FELT, AND I AGREED, THAT THE BEST THING TO DO WAS TO GET ASHORE TO THE HOSPITAL AND NOT TRY TO TRANSFER PEOPLE WHO WERE BLEEDING AND HAD

INJURIES, TRY NOT TO TRANSFER THEM ON THE WATER. IT TOOK US ABOUT 45 MINUTES TO AN HOUR TO GET INTO THE YACHTING CENTER. WE WERE MET BY EMT'S FROM NEWPORT. THEY PICKED UP THE CREW AND TOOK THEM TO THE NEWPORT HOSPITAL.
**Q. BACK OUT ON THE COURSE, DID YOU ACTUALLY SEE ANY CONTACT WITH THE THREE PLAINTIFFS HERE, SEE ANY CONTACT WITH THE BOATS AND WITH THE THREE PLAINTIFFS HERE, WHERE THEY RECEIVED THE INJURIES?**
A. YES.
**Q. YOU SAW ALL THREE OF THEM RECEIVE THE INJURIES?**
A. RIGHT, TO THE EXTENT THAT I COULD FROM INSIDE THE BOAT. I'M NOT LOOKING -- I CAN'T SEE THE OUTSIDE OF MY BOAT.
**Q. DO YOU KNOW IF ANY CREW MEMBERS WERE ABLE TO GET OFF THE RAIL BEFORE THE COLLISION?**
A. I THINK, YES. I THINK THREE OR FOUR OR FIVE OF THEM DID.
**Q. NOW, YOU GOT INTO THE YACHTING CENTER. THE RESCUE CAME, WHO WENT IN THE RESCUE TO THE HOSPITAL?**
A. I BELIEVE DAVE ROBBINS AND JACK FOLEY AND



I WENT.
**Q. WITH THEM?**
A. YES.
**Q. AT THAT POINT, ONCE YOU GOT BACK INTO THE DOCK, WHAT INJURIES DID YOU OBSERVE AS TO MR. FOLEY?**
A. WELL, I SAW A LOT OF BLOOD.
**Q. WHERE?**
A. ON HIS LEG, AND OTHER THAN THAT, I DON'T -- I MEAN, I DON'T KNOW THE SPECIFIC INJURIES. I KNEW HE HAD DIFFICULTY STANDING UP.
**Q. DID HE COMPLAIN TO YOU ABOUT INJURIES?**
A. HE SAID THERE WERE INJURIES.
**Q. HIS LEG?**
A. YES.
**Q. ANYTHING ELSE?**
A. I CAN'T RECALL.
**Q. HOW ABOUT MR. ROBBINS, DID YOU SEE ANY INJURIES?**
A. HE ALSO HAD A LEG PROBLEM.
**Q. DID HE COMPLAIN TO YOU ABOUT THAT?**
A. WELL, I ASKED, AND HE TOLD ME.
**Q. HIS LEG?**



A. RIGHT.
**Q. AND HOW ABOUT MARY O'DONOGHUE?**
A. SHE ALSO HAD A PROBLEM, BUT SHE WAS RETICENT ABOUT GOING TO THE HOSPITAL.
**Q. DO YOU KNOW WHAT PROBLEMS SHE HAD?**
A. NO, I DON'T.
**Q. DID YOU SEE ANY INJURIES AS TO MARY O'DONOGHUE?**
A. I COULD TELL SHE WAS INJURED.
**Q. HOW COULD YOU TELL?**
A. SHE WAS LIMPING AND SHE WAS GRIMACING.
**Q. WHERE DID MARY O'DONOGHUE GO, IF YOU KNOW, AFTER THE THREE OF YOU LEFT FOR THE HOSPITAL?**
A. I DON'T KNOW.
**Q. DID YOU SEE HER AGAIN THAT EVENING?**
A. I BELIEVE SHE WENT -- I DID SEE HER BEFORE SHE WENT, I BELIEVE BACK TO BOSTON, WITH ONE OF THE CREW MEMBERS.
**Q. WAS THERE ANY DISCUSSION ON THE WAY IN OR WHILE WERE YOU AT THE DOCK ABOUT HOW THIS COLLISION OCCURRED?**
A. THAT'S A HARD QUESTION TO ANSWER. I ASSUME WE -- I MEAN, WE TALKED ABOUT IT. I WOULD HAVE TO SAY YES THERE WAS SOME



DISCUSSION.
**Q. CAN YOU REMEMBER WHAT WAS SAID?**
A. NO.
**Q. DID IT INVOLVE JUST THE THREE PLAINTIFFS AND YOURSELF AND MR. SLATTERY OR OTHERS?**
A. I THINK IT INVOLVED OTHERS.
**Q. DO YOU KNOW WHOM?**
A. WELL, I ASSUME IT INVOLVED WARWICK OLNEY AND STEVE CRUSE AND TODD YANKEE.
**Q. CAN YOU REMEMBER THE SUBSTANCE OF WHAT THEY TOLD YOU ABOUT THE INCIDENT?**
A. NO.
**Q. AT THE HOSPITAL, DID YOU SPEAK WITH ANYBODY ABOUT WHAT HAD HAPPENED?**
A. YES.
**Q. WHO DID YOU SPEAK WITH?**
A. I SPOKE WITH A GUY NAMED RICHARD SHULMAN. HE'S A CARDIOLOGIST AT NEWPORT.
**Q. AND WHAT WAS THE DISCUSSION?**
A. WE TALKED ABOUT THE FACT THAT THERE HAD BEEN THIS ACCIDENT.
**Q. DID YOU TELL HIM HOW IT HAD OCCURRED?**
A. I DON'T THINK WE GOT INTO A DISCUSSION OF THE SUBSTANCE OF HOW IT HAPPENED.