# EXHIBIT 3

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

-----------------------------)
JACK FOLEY, MARY )
O'DONOGHUE AND DAVID )
ROBBINS )
PLAINTIFF )
)
VS. )
) C.A. NO. 06-0053
STEVEN M. LOEB, BLAD ) S-LDA
CO., KEVIN DAILEY, )
WILLIAM TRIPP, )
INDIVIDUALLY, AND D/B/A )
TRIPP DESIGN NAVAL )
ARCHITECTURE
DEFENDANT
-----------------------------)

DEPOSITION OF WILLIAM H. TRIPP, III, A DEFENDANT IN THE ABOVE-ENTITLED CASE, TAKEN ON BEHALF OF THE DEFENDANT, BEFORE PATRICIA QUIRK, CSR, NOTARY PUBLIC IN AND FOR THE STATE OF RHODE ISLAND, AT THE OFFICES OF KIERNAN, PLUNKETT & REDIHAN, 91 FRIENDSHIP STREET, PROVIDENCE, RHODE ISLAND ON MARCH 1, 2007, SCHEDULED AT 1:30 P.M.

RHODE ISLAND COURT REPORTING
747 NORTH MAIN STREET
PROVIDENCE, RHODE ISLAND 02904
(401) 437-3366

2

PRESENT:
FOR THE PLAINTIFF......MORRISON MAHONEY LLP
(MARY O'DONOGHUE) BY: CHARLES A. COOK, ESQUIRE

FOR THE DEFENDANT......KIERNAN, PLUNKETT & REDIHAN
(WILLIAM TRIPP) BY: THOMAS C. PLUNKETT, ESQUIRE

FOR THE DEFENDANT......WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
BY: LAWRENCE BRENNAN, ESQUIRE

FOR THE DEFENDANT.......DEORCHIS WIENER & PARTNERS
BY: CARY R. WIENER, ESQUIRE

FOR THE DEFENDANT....OFFICE OF WILLIAM O'GARA
(LOEB, BLAD CO.) BY: WILLIAM O'GARA, ESQUIRE
FOR THE DEFENDANT....HOLBROOK & MURPHY
(BLAIR BROWN) BY: SETH S. HOLBROOK, ESQUIRE

RHODE ISLAND COURT REPORTING
747 NORTH MAIN STREET
PROVIDENCE, RHODE ISLAND 02904
(401) 437-3366

3

INDEX


| WITNESS | PAGE |
| --- | --- |
| WILLIAM H. TRIPP, III | |
| EXAMINATION BY MR. COOK | 07 |
| EXAMINATION BY MR. HOLBROOK | 107 |
| EXAMINATION BY MR. COOK | 153 |
| EXAMINATION BY MR. PLUNKETT | 168 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| 01 | NOTICE OF RACE | 94 |
| 02 | SAILING INSTRUCTIONS | 94 |
| 03 | U.S. SAILING PRESCRIPTIONS | 94 |
| 04 | INTERNATIONAL SAILING FEDERATION RULES | 94 |
| 05 | (NO EXHIBIT 5 MARKED) | |
| 06 | PROTEST FORM | 119 |


(EXHIBITS WERE RETAINED BY MR. COOK)

4

(DEPOSITION COMMENCED AT 10:12 A.M.)
WILLIAM TRIPP, III
BEING DULY SWORN, DEPOSES AND TESTIFIES AS FOLLOWS:

THE REPORTER: WOULD YOU STATE YOUR FULL NAME FOR THE RECORD, PLEASE.

THE WITNESS: WILLIAM HENRY TRIPP, III.

IT IS HEREBY STIPULATED AND AGREED, BY AND BETWEEN COUNSEL FOR THE RESPECTIVE PARTIES, THAT THE WITNESS WILL READ AND SIGN THE DEPOSITION TRANSCRIPT UNDER THE PAINS AND PENALTIES OF PERJURY; THAT THE READING AND SIGNING IS DEEMED WAIVED IF NOT ACCOMPLISHED WITHIN THIRTY (30) DAYS OF TRANSCRIPT DELIVERY; AND THAT THE SEALING, FILING, AND CERTIFICATION OF DEPOSITION TRANSCRIPT ARE WAIVED.

IT IS FURTHER STIPULATED AND AGREED THAT ALL OBJECTIONS, EXCEPT OBJECTIONS TO THE FORM OF THE QUESTION AND MOTIONS TO STRIKE, WILL BE RESERVED UNTIL THE TIME OF TRIAL OR PRE-TRIAL HEARING.

MR. COOK: TOM, WE'VE GOT FOUR





COPY

SIRENA STILL ON PORT TACK?
A. YES.
Q. WERE YOU STILL SLIGHTLY CRACKED OFF?
A. YES.
Q. WERE YOU STILL ABOVE THE LAY LINE AT THAT POINT?
A. YES.
Q. WHAT WAS YOUR SPEED AT THAT POINT?
A. SEVEN POINT FIVE.
Q. AT 30 SECONDS BEFORE THE INCIDENT, WAS SFORZANDO ON PORT OR STARBOARD TACK?
A. STARBOARD.
Q. DO YOU HAVE A SENSE OF THEM RELATIVE TO THE WIND, DO YOU REMEMBER WHETHER THEY WERE CLOSE HAULED, ABOVE CLOSE HAULED, OR CRACKED OFF?
A. AT THAT TIME I THOUGHT THEY WERE LAYING THE MARK.
Q. THE GENOA APPEARED TO BE FULLY TRIMMED, NOT SHEETED OUT?
A. IT WAS STILL A LITTLE FAR TO SEE THAT.
Q. YOU THOUGHT THEY WERE ON STARBOARD LAY LINE AT THAT POINT?
A. I WASN'T MAKING THAT ASSUMPTION.
Q. YOU SAID --



A. THE LAY LINE AND MAKING THE MARK ARE TWO DIFFERENT THINGS.
Q. YOU THOUGHT IF THEY HELD THE COURSE THEY HAD, THEY WOULD ROUND THE MARK?
A. CORRECT.
Q. WITHOUT HAVING TO ALTER COURSE?
A. CORRECT.
Q. WAS THE SPINNAKER PULLED UP ON THE MAST OR DOWN ON THE BOW?
A. I DON'T RECALL.
Q. DID YOU OBSERVE WHETHER THEY WERE MAKING BEARING, HOLDING BEARING OR LOSING BEARING ON YOU 30 SECONDS BEFORE THE COLLISION?
A. WE WERE MAKING BEARING.
Q. DID YOU THINK YOU WERE GOING TO CROSS AT THAT POINT?
A. I DIDN'T, BUT I THOUGHT IT WAS CLOSE AND I TOLD THE SKIPPER SO.
Q. WHAT DID YOU TELL MR. LOEB?
A. I SAID, "WE HAVE A CROSSING SITUATION. RIGHT NOW WE ARE MAKING BEARING, BUT BE PREPARED".
Q. DID YOU WARN ANY OF THE CREW THAT IT MIGHT BE CLOSE?



A. I WAS LOUD.
Q. WHAT WAS YOUR TACTICAL PLAN? WERE YOU PLANNING TO GO STRAIGHT INTO THE MARK AND TACK RIGHT AT THE MARK OR OUTSIDE OF THE TWO-LENGTH ZONE?
A. MY PLAN THEN WAS TO TACK AROUND THE MARK IF WE COULD DO THAT WITHOUT FOULING.
Q. AND NOW 20 SECONDS FROM THE COLLISION, WHAT WAS YOUR COURSE?
A. WE WERE CRACK SHEET, SLIGHTLY CRACK SHEET, SEVEN POINT FIVE, GAINING BEARING.
Q. DID YOU -- DID THE BOAT ALTER ITS COMPASS COURSE AT THAT POINT?
A. TWENTY SECONDS, NO.
Q. WAS CRACK SHEET THE SAME AS IT WAS PREVIOUSLY OR DID THE SHEETS GO OUT A LITTLE BIT?
A. SAME, WE WERE TRIMMING THE BOAT TO SPEED.
Q. THERE WERE NO CHANGES IN THE SET OF YOUR SAILS BETWEEN 30 SECONDS AND 20 SECONDS?
A. NO.
Q. DID YOU TELL MR. LOEB ANYTHING AT THAT POINT?
A. I SAID, "WE ARE CROSSING BUT IT'S CLOSE". HE SAID, "BE PREPARED TO HAVE TO DUCK".
Q. OKAY, DO YOU RECALL WHERE SIRENA WAS AT 15



SECONDS BEFORE THE INCIDENT?
A. YES, I DO. THE SITUATION CHANGED BETWEEN 20 AND 15 SECONDS.
Q. HOW DID IT CHANGE?
A. SFORZANDO PUT THEIR BOW UP.
Q. PUT THEIR BOW WHAT --
A. UP.
Q. HOW FAR UP DO YOU THINK THEY PUT IT?
A. FIVE TO TEN DEGREES.
Q. DID YOU SEE IT ALTER COURSE?
A. I SAW THE BOW MOVE, YES. I WAS ANTICIPATING IT.
Q. WHY WERE YOU ANTICIPATING IT?
A. BECAUSE IT'S A GOOD MOVE.
Q. WHY IS THAT A GOOD MOVE?
A. IT PREVENTS US FROM CROSSING THEM.
Q. HOW MANY SECONDS BEFORE THE COLLISION DO YOU THINK SFORZANDO PUT HER BOW UP?
A. BETWEEN 15 AND 20, CLOSER, WELL, RIGHT IN THE MIDDLE OF 15 TO 20.
Q. 17 TO 18 SECONDS?
A. I'LL GO WITH 17.
Q. WERE YOU STILL MAKING BEARING AT THAT POINT?
A. NO.

Q. SO, WHAT DID YOU DO?
A. I SAID, "WE HAVE TO DUCK IMMEDIATELY".
Q. DID MR. LOEB RESPOND?
A. HE SAID, "NO".
Q. DID HE SAY WHY?
A. HE SAID, "IT'S TOO LATE".
Q. SO, WHAT HAPPENED NEXT?
A. I TOLD HIM TO TURN DOWN IMMEDIATELY.
Q. AND WHAT DID HE DO OR SAY?
A. HE SAID "NO".
Q. THEN WHAT HAPPENED NEXT?
A. I GRABBED THE WHEEL AND SPUN THE BOAT 45 DEGREES. I SPUN THE BOAT PROBABLY 55 DEGREES.
Q. AT THE TIME YOU GRABBED THE WHEEL, DID YOU ASK ANY OF THE TRIMMERS TO LET THEIR SAILS OUT TO ADJUST FOR YOUR CHANGE IN COURSE?
A. NO, IT WAS TOO FAST.
Q. DID THEY LET THEIR SAILS OUT?
A. AFTER WE TURNED DOWN.
Q. DID THE MAIN BEING TRIMMED AS IT WAS IN ANY WAY INTERFERE WITH YOUR ABILITY TO TURN DOWN?
A. NO, THE BOAT TURNED LIKE THAT. (WITNESS INDICATING WITH SLAP OF HANDS).
Q. BECAUSE OF THE GOOD DESIGN?



A. YOU GOT IT.
Q. HOW MANY SECONDS FROM THE TIME -- LET'S GO OFF THE RECORD FOR A MINUTE.
(RECESS TAKEN AT 2:43 P.M.)
Q. MR. TRIPP, YOU EARLIER TESTIFIED THAT YOU SAID, "WE HAVE TO DUCK," OR SOMETHING TO THAT EFFECT?
A. YES.
Q. THE FIRST TIME YOU SAID THAT TO MR. LOEB, HOW LONG BEFORE THE COLLISION WAS THAT?
A. SIXTEEN SECONDS.
Q. SO, A SECOND OR TWO?
A. I WOULD LIKE TO TALK IN BOAT LENGTHS MORE THAN SECONDS.
Q. HOW MANY BOAT LENGTHS BEFORE -- FROM THE TIME YOU SAID, "WE HAVE TO DUCK," OR WORDS TO THAT EFFECT, UNTIL THE TIME OF INITIAL CONTACT, HOW MANY BOAT LENGTHS DID YOU TRAVEL?
A. FROM?
Q. THE TIME YOU FIRST SAID, "WE HAVE TO DUCK," OR WORD TO THAT EFFECT, HOW MANY BOAT LENGTHS OR FEET DID YOU TRAVEL BEFORE THE COLLISION?
A. OKAY, WELL, THAT'S A PARABOLIC CURVE, SO THAT WOULD BE AN INTERESTING ONE TO DETERMINE,



BUT I CAN GIVE YOU APPROXIMATELY.
Q. PLEASE.
A. FROM WHEN I SAID WE HAD TO TURN, APPROXIMATELY THREE-AND-A-HALF, BUT IT'S -- I THINK IT'S A LITTLE ODD DOING THIS VERBALLY.
Q. IF MR. LOEB HAD DUCKED IMMEDIATELY WOULD, IN YOUR OPINION, A COLLISION HAVE BEEN AVOIDED?
A. ABSOLUTELY.
Q. AND THEN MR. LOEB SAID, "NO, IT'S TOO LATE," OR WORDS TO THAT EFFECT?
A. YES.
Q. AND THEN THERE WAS SOME PASSAGE OF TIME AFTER WHICH YOU SAID AGAIN THAT HE NEEDED TO TURN DOWN OR WORDS TO THAT EFFECT?
A. THERE WAS NO PASSAGE OF TIME.
Q. SO IMMEDIATELY AFTER HE SAID, "NO, IT'S TOO LATE," YOU SAID SOMETHING LIKE, "YOU HAVE TO TURN DOWN"?
A. I SAID, "WE HAVE TO DUCK IMMEDIATELY".
Q. IF HE HAD DONE IT AT THAT POINT, WOULD A COLLISION HAVE BEEN AVOIDED?
A. YES, DEPENDING ON THE COURSE.
Q. AT THAT POINT, IF YOU HAD TURNED DOWN IMMEDIATELY?



A. PROVIDED SFORZANDO STAYED ON HER COURSE.
Q. THE ONE WHERE SHE PUT HER BOW UP FIVE OR TEN DEGREES, IF SHE HELD THAT COURSE AND MR. LOEB TURNED DOWN IMMEDIATELY, SIRENA COULD HAVE AVOIDED THE COLLISION?
A. CORRECT.
Q. THEN YOU GRABBED THE WHEEL?
A. CORRECT.
Q. WAS SIRENA, AT THE TIME YOU GRABBED THE WHEEL, STILL ON THAT SAME COURSE?
A. CORRECT.
Q. AND YOU TURNED THE WHEEL TO STARBOARD?
A. CORRECT.
Q. WHAT HAPPENED TO MR. LOEB AS YOU TURNED THE WHEEL?
A. SOME DISCOMFORT. I DIDN'T WATCH WHAT HAPPENED TO HIM. I HEARD FUMBLING. I THINK HE MAY HAVE -- HE EITHER STUMBLED OR HE FELL.
Q. DO YOU HAVE A RECOLLECTION OF SEEING HIM ON THE COCKPIT?
A. THAT WAS THE LAST PLACE I WAS LOOKING.
Q. FAIR ENOUGH. DO YOU EVER REMEMBER SEEING HIM ON THE COCKPIT SOLE?
A. NO.

Q. YOU TURN THE BOAT DOWN 45 TO 55 DEGREES, SOMETHING IN THAT RANGE?
A. CORRECT.
Q. WHAT WAS SFORZANDO'S HEADING AT THAT POINT?
A. STILL HEADED ABOVE THE MARK.
Q. AND WERE YOU ABLE, AT THAT POINT, WERE YOU ON A COLLISION COURSE WITH SFORZANDO?
A. NO, WE WERE NOT.
Q. YOU BELIEVE YOU WOULD HAVE PASSED THE STERN OF SFORZANDO?
A. WITH CERTAINTY.
Q. AND WHAT DID SFORZANDO DO?
A. STARTED BEARING OFF. THEY STARTED TURNING TO THEIR LEFT.
Q. HEADING DOWN?
A. YES.
Q. AND HOW FAR APART WERE THE TWO BOATS AT THE POINT THAT SFORZANDO FIRST HEADED DOWN?
MR. PLUNKETT: I OBJECT TO THE FORM OF THAT. YOU KNOW WHAT I'M GETTING AT IS WHAT PARTS OF THE BOAT.
Q. I WAS GOING TO ASK YOU THAT. IF YOU WANT TO INCLUDE THAT AS PART OF YOUR ANSWER, AT THE TIME YOU FIRST SAW SFORZANDO HEAD DOWN, HOW



FAR APART WERE THE TWO BOATS AND THAT DISTANCE. PLEASE TELL US WHAT THE REFERENCES ARE. FOR EXAMPLE, IF IT'S BOW TO BOW OR MAST TO MAST.
A. BOW TO BOW IS THREE TO THREE-AND-A-HALF BOAT LENGTHS.
Q. AND HOW --
A. NOT AIMED AT EACH OTHER AT THAT POINT.
Q. THE STRAIGHT LINE BETWEEN THE BOWS WAS ABOUT THREE-AND-A-HALF BOAT LENGTHS?
A. YES.
Q. DID SFORZANDO KEEP TURNING DOWN SO YOU ARE NOW AIMED BOW TO BOW OR SOMETHING IN THAT FASHION?
A. EVENTUALLY.
Q. AT THAT POINT, HOW FAR APART WERE THE TWO BOWS?
A. ONCE THEIR BOW STARTED TURNING, THEY CONTINUED TO TURN. YOU'D HAVE TO GIVE ME A SNAPSHOT AT WHICH POINT WE TURNED FURTHER DOWN. WHEN THEY STARTED TO TURN DOWN. WE TURNED FURTHER DOWN TO CONTINUE TO AVOID THEM. WE ALTERED COURSE. ONCE WE ALTERED COURSE TWICE TO AVOID THEM.
Q. THE FIRST ALTERATION OF COURSE WAS HOW MANY



DEGREES?
A. FIFTY.
Q. THE SECOND IS HOW MANY DEGREES?
A. TWENTY.
Q. THE THIRD ALTERATION OF COURSE WAS HOW MANY DEGREES?
A. THE THIRD ALTERATION OF COURSE WAS UP 30 DEGREES.
Q. WAS THAT 30 DEGREES UP BEFORE OR AFTER THE COLLISION?
A. THAT WAS -- IT STARTED BEFORE THE COLLISION.
Q. HOW FAR APART WERE THE TWO BOWS AT THE TIME SIRENA STARTED ALTERING THAT FIRST 20 DEGREES?
A. TWO BOAT LENGTHS.
Q. AND HOW FAR APART WERE THE TWO BOWS WHEN SIRENA FIRST STARTED ALTERING COURSE TO WINDWARD THE 30 DEGREES?
A. HALF A BOAT LENGTH, THREE EIGHTHS OF A BOAT LENGTH, AND THE BOAT LENGTHS HERE BECOME A LITTLE BIT GROSS FOR THE TIMING HERE.
Q. WHAT DO YOU MEAN BY A LITTLE BIT GROSS?
A. THAT THINGS WERE HAPPENING SO QUICKLY THAT ONE BOAT LENGTH WAS FOREVER.



Q. IT APPEARS FOREVER?
A. NO, THE DIFFERENCE BETWEEN, WE HIT BY INCHES, SO, WHETHER IT WAS SEVEN EIGHTHS OF A BOAT LENGTH OR A BOAT LENGTH, IN THE END, IS IMPORTANT, AND I WANT TO BE ON RECORD THAT THE QUESTIONS YOU ARE ASKING ME RIGHT NOW, THEY ARE NEAR APPROXIMATIONS.
Q. NOT MY QUESTIONS, YOUR ANSWERS ARE YOUR BEST APPROXIMATIONS?
A. YOU ASKED ME HOW MANY BOAT LENGTHS.
Q. YOUR ANSWERS WERE YOUR BEST APPROXIMATION?
A. TO THE NEAREST BOAT LENGTH.
Q. OKAY, FAIR ENOUGH. HAVE YOU, SINCE THE TIME OF THE INCIDENT, PREPARED ANY DRAWINGS OR COMPUTER SIMULATIONS OR TRIED ON PAPER OR COMPUTER TO RECREATE THE INCIDENT?
MR. PLUNKETT: ANSWER YES OR NO.
A. YES.
Q. PRIOR TO THE LAWSUIT BEING FILED AGAINST YOU, DID YOU CREATE ANY DRAWINGS OR COMPUTER SIMULATIONS OR TRY TO RECREATE THE INCIDENT IN ANY WAY?
A. YES.
Q. WHEN DID YOU DO THAT?

A. THE DAY OF IT.
Q. AND DID YOU DO IT ON PAPER OR COMPUTER?
A. PAPER.
Q. DO YOU HAVE A COPY OF THAT STILL?
A. NO.
Q. WHAT DID YOU DO WITH IT?
A. I DON'T KNOW.
Q. DID YOU GIVE A COPY OF IT TO ANYONE?
A. NOT TO MY KNOWLEDGE.
Q. FROM THE DAY OF THE INCIDENT UNTIL THE TIME YOU WERE FIRST SUED, DID YOU MAKE ANY OTHER ATTEMPTS TO RECREATE THE INCIDENT, EITHER ON PAPER OR COMPUTER?
A. MENTALLY, MENTALLY IT'S BEEN TICKING AROUND IN MY HEAD.
Q. EVER REDUCE YOUR MENTAL THOUGHTS OR IMPRESSIONS TO WRITING OR ON PAPER IN ANY FASHION?
A. OTHER THAN WHAT WE'VE JUST DISCUSSED, NO.
Q. HAVE YOU EVER WRITTEN ANY NOTES CONCERNING YOUR IMPRESSION OF THE INCIDENT?
A. I DON'T BELIEVE SO, BUT, YOU KNOW, I DON'T BELIEVE SO.
Q. HAVE YOU GIVEN ANY STATEMENT TO ANYBODY



CONCERNING THE INCIDENT?
A. WHAT DO YOU MEAN BY STATEMENT?
Q. HAVE YOU EVER MADE A STATEMENT THAT WAS TAPE RECORDED BY AN INSURANCE ADJUSTER OR MARINE SURVEYOR?
A. I'M UNAWARE OF BEING TAPED.
Q. DO YOU RECALL EVER WRITING A STATEMENT FOR AN INSURANCE ADJUSTER OR MARINE SURVEYOR OR ANYONE ELSE REGARDING THE INCIDENT?
A. I DON'T KNOW IF I DID OR NOT.
Q. NOW, BACK TO THE INCIDENT. YOU TOOK THE WHEEL AND MADE THE INITIAL 50 DEGREE ALTERATION TO LEEWARD; IS THAT CORRECT?
A. CORRECT.
Q. THE ADDITIONAL 20 DEGREES TO LEEWARD, DID YOU MAKE THAT OR MR. LOEB?
A. I DID.
Q. AT SOME POINT, DID MR. LOEB TAKE THE HELM BACK FROM YOU?
A. I WOULD SAY WE COOPERATED.
Q. I DIDN'T MEAN TO IMPLY ANYTHING BY THE WORD "TAKE". AT SOME POINT DID MR. LOEB RESUME HOLDING THE WHEEL AND STEERING?
A. YES, HE WAS SPINNING THE WHEEL BACK TO



TURN THE BOAT UP.
Q. SO, HE'S THE ONE WHO MADE THE ALTERATION TO WINDWARD?
A. WE DID IT TOGETHER.
Q. AT THE TIME YOU FIRST STARTED MAKING THE ALTERATION TO WINDWARD, WAS SFORZANDO'S BOW AIMED AT, ABOVE OR BELOW SIRENA'S BOW?
A. ASK THAT QUESTION AGAIN, PLEASE.
Q. AT THE TIME YOU FIRST STARTED, YOU MEANING THE BOAT, NOT NECESSARILY YOU PERSONALLY, FIRST STARTED ALTERING TO WINDWARD THAT 30 DEGREES, WAS SFORZANDO'S BOW AIMED AT SIRENA'S BOW, WAS IT AIMED BELOW SIRENA'S BOW, OR AIMED ABOVE SIRENA'S BOW?
A. ASK IT ONE MORE TIME, PLEASE.
MR. COOK: READ IT BACK.
(QUESTION READ BACK)
MR. O'GARA: OBJECTION.
A. SFORZANDO'S BOW WAS ROTATING DOWN. IT WAS ACTIVELY CONTINUING TO MOVE IN A COUNTER-CLOCKWISE DIRECTION.
Q. DO YOU HAVE ANY SPECIFIC RECOLLECTION AS TO THAT INSTANT WHEN SIRENA FIRST BEGAN ALTERING COURSE TO WINDWARD WHERE SFORZANDO'S BOW WAS



AIMED RELATIVE TO SIRENA?
A. SFORZANDO'S BOW WAS AIMED AT OUR BOW, AND SHE WAS SLIGHTLY TO OUR -- WAS STILL SLIGHTLY TO -- WHICH WAY WOULD IT BE? LET ME BACKTRACK HERE. AT THE TIME WE STARTED TO TURN OUR BOW, SFORZANDO WAS GOING TO HIT US JUST ABOUT DEAD ON.
Q. WHEN YOU SAY TURNED YOUR BOW, YOU MEAN BACK TO WINDWARD?
A. WHEN SIRENA'S BOW TURNED BACK TO WEATHER, WE WERE ABOUT TO HIT DEAD ON.
Q. WHAT PARTS OF THE BOAT, THE TWO BOATS MADE CONTACT?
A. OUR SPINNAKER PULL HIT THEIR STEM DEAD ON. OUR SPINNAKER POLE WAS LAYING ALONG -- WAS ON THE DECK, STILL LAYING ALONG THE HEAD STAY OR JUST OUTBOARD OF THE HEAD STAY ENCAPSULATED BY THE PULPIT.
Q. ON THE STARBOARD SIDE OF THE HEAD STAY?
A. YES.
Q. HOW FAR BEYOND THE STEM WAS THE POLE EXTENDED?
A. THE POLE WAS NOT BEYOND THE STEM. THE POLE WAS RIGHT ABOUT EVEN WITH THE STEM, BUT OFF TO STARBOARD.

69

Q. WAS EXTENDING SLIGHTLY BEYOND THE RAIL THEN IF IT WAS TO STARBOARD, SLIGHTLY OFF OF THE STEM. IF YOU ARE TELLING ME IT WAS EVEN WITH THE STEM, THEN IT WAS PROTRUDING A LITTLE BIT OFF THE STARBOARD RAIL?
A. IT WAS OFF, RIGHT, A BIT. THE BOW IS VERY FINE, BEING A LITTLE BIT OFF THERE IS QUITE A BIT PROTRUDING.
Q. DID YOU, AT THAT POINT, SEE WHERE SFORZANDO'S SPINNAKER WAS?
A. NO, I DON'T RECALL. I BELIEVE IT WAS UP, BUT I'M NOT POSITIVE.
Q. SO, THE POLE ON SIRENA HIT SFORZANDO. DID ANY OTHER PARTS OF THE BOAT IMPACT?
A. OUR SPINNAKER PULL CENTER PUNCHED THEIR STEM. OUR STEMS DID NOT HIT, OUR BOW RAILS HIT, AND WE SWEPT DOWN THEIR SIDE, AND TO MY KNOWLEDGE, THE TOP SIDES DID NOT TOUCH.
Q. WAS THERE ANY DAMAGE TO THE LIFELINES ON YOUR BOAT?
A. YES.
Q. DO YOU HAVE ANY UNDERSTANDING AS TO HOW THE LIFELINES WERE DAMAGED?
A. SPINNAKER POLE EXPLODED.

70

Q. YOUR SPINNAKER POLE OR THEIRS?
A. OUR SPINNAKER POLE.
Q. DID YOUR SPINNAKER POLE DAMAGE THE LIFELINES ON YOUR STARBOARD SIDE OF YOUR BOAT?
A. I'M NOT REALLY SURE. I THINK OUR LIFE LINES MAY HAVE HIT THE STANCHIONS.
Q. THE STANCHIONS ON YOUR BOAT AND SFORZANDO?
A. THEY MAY HAVE CONNECTED, THE BOW RAILS MAY HAVE CONNECTED.
Q. WERE THE STANCHIONS BROKEN ON SIRENA?
A. I BELIEVE SO.
Q. WAS THE PULPIT DAMAGED?
A. I BELIEVE SO, BUT I'M NOT POSITIVE.
MR. WIENER: ON WHICH VESSEL?
Q. WAS THE PULPIT ON SIRENA DAMAGED?
A. I BELIEVE IT WAS BENT, BUT I'M NOT POSITIVE.
Q. DID YOU SURVEY THE DAMAGES ON SIRENA AFTER THE INCIDENT?
A. I'M NOT A SURVEYOR.
Q. DID YOU DO A SUMMARY OF THE DAMAGES OR APPRAISAL OR ESTIMATE?
A. NO, I DID NOT DO ANY OF THOSE. I LOOKED TO SEE WHETHER THERE WAS ANY STRUCTURAL

71

DAMAGE.
Q. WHEN DID YOU DO THAT?
A. I BELIEVE THE NEXT DAY.
Q. DID YOU PREPARE A REPORT ON THAT?
A. I DON'T REMEMBER. IF I DID, I HAVE IT.
Q. AND WHAT STRUCTURAL DAMAGE DID YOU SEE?
A. THERE WAS PAINT DAMAGE FROM THE SPINNAKER POLE BREAKING, I BELIEVE IT WAS FROM THE SPINNAKER POLE BREAKING. AS I SAID, I BELIEVE THE BOW RAIL WAS BENT, BUT I'M NOT POSITIVE.
Q. WAS THERE ANY DAMAGE TO THE LAMINATIONS OF THE HULL?
A. I DON'T THINK THERE WAS.
Q. DO YOU KNOW HOW MUCH THE COST -- DO YOU KNOW THE COST TO REPAIR SIRENA BY ANY CHANCE?
A. NO.
Q. DID YOU, AT ANY TIME, HAVE AN OPPORTUNITY TO SEE THE DAMAGE TO SFORZANDO?
A. NO.
Q. IMMEDIATELY AFTER THE INCIDENT, WHAT DID SIRENA DO?
A. WE WENT BY THEN, AND WE TURNED HEAD TO WIND AND STOPPED, I BELIEVE.
Q. DID YOU HAVE ANY UNDERSTANDING THAT PEOPLE

72

WERE INJURED ABOARD SFORZANDO?
A. YES.
Q. HOW DID YOU LEARN OF THAT?
A. THERE WAS BLOOD ON THE END OF THE SPINNAKER POLE.
Q. ON THE END OF SIRENA'S SPINNAKER POLE?
A. YES.
Q. WAS THERE ANYONE INJURED ABOARD SIRENA?
A. NO.
Q. YOUR UNDERSTANDING IS THAT BLOOD WAS SOMEONE ABOARD SFORZANDO?
A. YES.
Q. DID YOU DROP SAILS?
A. YES.
Q. WHAT DID YOU DO AFTER DROPPING SAILS?
A. WE GOT ON THE RADIO TO THEM. THEY WERE ALREADY POWERING FOR NEWPORT.
Q. ARE YOU THE ONE WHO SPOKE ON THE RADIO?
A. NO, I DON'T KNOW WHO SPOKE.
Q. DO YOU RECALL WHAT WAS SAID ON THE RADIO?
A. WE ASKED AFTER THE CONDITION OF THE PEOPLE.
Q. AND WHAT DID SIRENA DO AT THAT POINT? DID IT HEAD IN, CONTINUE RACING?

A. NO, WE ABANDONED THE RACE AND FOLLOWED IN PURSUIT.
Q. WHERE DID SIRENA GO WHEN SHE GOT TO NEWPORT?
A. WE WENT TO THE DOCK.
Q. WHAT MARINA?
A. I DON'T REMEMBER.
Q. WHEN YOU CAME TO THE MARINA, WHAT DID YOU DO?
A. WE WENT TO THE HOSPITAL.
Q. DO YOU REMEMBER WHAT HOSPITAL?
A. RHODE ISLAND, NO, NOT RHODE ISLAND, NEWPORT.
Q. WHO WENT TO THE HOSPITAL?
A. I FLOW STEVE WENT. I -- I THINK THERE WAS A GIRL THAT WAS A CREW MEMBER WHO WENT ALSO.
Q. A CREW MEMBER ABOARD SIRENA?
A. YES.
Q. WAS THAT ELLEN FETTERMAN?
A. YES.
Q. DO YOU HAVE ELLEN FETTERMAN'S ADDRESS OR PHONE NUMBER AT YOUR OFFICE BY ANY CHANCE?
A. NO.
Q. DO YOU KNOW WHERE SHE LIVES OR WORKS?
A. NO.



Q. WHEN YOU GOT TO THE HOSPITAL, DID YOU SEE ANYBODY THAT HAD BEEN ABOARD SFORZANDO?
A. YES.
Q. WHO DID YOU SEE?
A. WELL, IN TOTAL I SAW ALL THREE OF THE PLAINTIFFS, AND THERE WERE SOME OTHER CREW MEMBERS THERE, WHO I DON'T KNOW WHO THEY ARE.
Q. WHO DO YOU UNDERSTAND TO BE THE THREE PLAINTIFFS?
A. CAN I READ THEM?
Q. DAVID ROBBINS?
A. YES.
Q. YOU SAW HIM AT THE HOSPITAL?
A. YES.
Q. JACK FOLEY?
A. YES.
Q. YOU SAW HIM AT THE HOSPITAL?
A. YES.
Q. AND MARY O'DONOGHUE?
A. YES.
Q. YOU SAW HER AT THE HOSPITAL?
A. I DON'T REMEMBER SEEING MARY. I REMEMBER DEFINITELY SEEING THE OTHER TWO.
Q. DID YOU SPEAK WITH JACK FOLEY WHILE HE WAS AT



THE HOSPITAL?
A. NOT DIRECTLY. I LISTENED MORE THAN I SPOKE.
Q. DID YOU SEE SOMEONE SPEAKING TO THEM?
A. YES, LOTS OF PEOPLE.
Q. DID YOU OBSERVE MR. LOEB SPEAK TO JACK FOLEY?
A. NOT THAT I CAN GO ON RECORD OF.
Q. DO YOU RECALL THE TWO OF THEM SPEAKING AT ALL?
A. I BELIEVE THEY DID, BUT I CAN'T SAY -- I CAN'T TESTIFY AS TO THE RECORD THAT THEY DID.
Q. DID YOU SPEAK WITH DAVID ROBBINS DIRECTLY?
A. I CAN'T TESTIFY TO THE RECORD THAT I DID.
Q. DO YOU RECALL HAVING ANY DISCUSSION WITH MR. ROBBINS?
A. NO, I DON'T RECALL HAVING DIRECT DISCUSSIONS WITH HIM.
Q. DO YOU RECALL SEEING MR. LOEB SPEAK WITH MR. ROBBINS?
A. NOT THAT I CAN GO ON RECORD AND TESTIFY TO.
Q. DID YOU SEE MR. BROWN AT THE HOSPITAL?
A. I DON'T KNOW IF I SAW MR. BROWN AT THE HOSPITAL OR NOT.
Q. MR. LOEB WAS WITH YOU AT THE TIME?



A. YES.
Q. DO YOU RECALL ANYONE WITH WHOM HE SPOKE -- STRIKE THAT. THAT WAS AN AWFUL QUESTION. DO YOU RECALL HIM SPEAKING TO ANYONE AT THE HOSPITAL?
A. WELL, I KNOW, HE WAS -- YES, HE TALKED TO PEOPLE THERE THAT HE KNEW. HE KNEW SOME CREW ON SFORZANDO. HE TALKED TO THEM IN GENERAL. I CAN'T SAY SPECIFICALLY WHICH PERSON HE SPOKE TO.
Q. DO YOU RECALL ANYTHING THAT HE SAID?
A. NO.
Q. DO YOU RECALL SEEING JACK SLATTERY AT THE HOSPITAL?
A. NOT THAT I CAN GO ON RECORD.
Q. DO YOU KNOW WHO JACK SLATTERY IS?
A. YES.
Q. WHAT DO YOU UNDERSTAND TO BE HIS PROFESSION?
A. SAIL MAKER.
MR. PLUNKETT: I'M SORRY, WHAT WAS THAT?
THE WITNESS: SAIL MAKER.
Q. DO YOU UNDERSTAND HIM TO HAVE BEEN ABOARD SFORZANDO AT THE TIME OF THE INCIDENT?

A. CERTAINLY.
Q. WHAT DO YOU UNDERSTAND HIS ROLE TO HAVE BEEN ON SFORZANDO?
A. TACTICIAN.
Q. DID YOU EVER HAVE ANY DISCUSSIONS WITH JACK SLATTERY REGARDING THE INCIDENT?
A. YES.
Q. AND WHEN HAVE YOU HAD DISCUSSIONS WITH JACK SLATTERY REGARDING THE INCIDENT?
A. AFTER THE PROTEST HEARING.
Q. WHERE WERE YOU WHEN YOU HAD THOSE DISCUSSIONS?
A. IN THE COURTYARD AT HARBOR COURT OUTSIDE THE PROTEST OFFICE.
Q. OUTSIDE THE SAILING OFFICE?
A. YUP.
Q. WAS ANYONE ELSE PRESENT?
A. I DON'T RECALL. I DON'T BELIEVE SO.
Q. DO YOU RECALL ANYTHING OF THE DISCUSSION?
A. YES.
Q. TELL ME WHAT YOU REMEMBER?
A. JACK THANKED ME FOR TELLING HIM THAT WE DID NOT BEAR OFF THE SECOND THEIR BOW WENT UP. JACK AND I TALKED ABOUT THE FACT THAT THEIR BOW WENT UP, AND HE SAID, "YES, WE DID," AND I



ASKED JACK ABOUT WHERE HE WAS AND WHAT HE SAW, AND HE SAID, "I TOLD BROWN TO GO UP, BUT I WAS SITTING ON THE RAIL WITH MY LEGS OUTBOARD, AND I DIDN'T KNOW," AND I TOLD HIM THAT BLAIR BORE OFF, AND HE SAID, "I DON'T KNOW WHAT BLAIR DID. I DIDN'T TELL HIM TO BEAR OFF".
Q. AND WHAT DID JACK SAY?
A. THAT'S WHAT JACK SAID.
Q. DID YOU RESPOND AT ALL TO THAT?
A. I TOLD HIM THAT THEY BORE OFF. THEY DEFINITELY BORE OFF, AND HE SAID HE WASN'T REALLY AWARE OF WHAT THEY DID.
Q. DID YOU REPRESENT SIRENA AT THE PROTEST HEARING?
A. NO.
Q. WERE YOU IN THE PROTEST HEARING?
A. I WENT IN AS A WITNESS.
Q. DID SOMEONE, TO YOUR KNOWLEDGE, REPRESENT SIRENA AT THE PROTEST HEARING?
A. YES.
Q. WHO WAS THAT?
A. STEVE LOEB.
Q. TO YOUR KNOWLEDGE, HE WAS THERE THROUGHOUT THE HEARING?



A. TO MY KNOWLEDGE.
THE WITNESS: CAN I GET SOME WATER?
(BRIEF PAUSE)
Q. SO, IS IT YOUR RECOLLECTION THAT MR. LOEB WAS IN THE PROTEST HEARING FOR SOME PERIOD OF TIME WHILE YOU WEREN'T IN THE HEARING?
A. YES, THAT'S MY RECOLLECTION.
Q. DO YOU RECALL PRESENTING ANY TESTIMONY AT THE PROTEST HEARING?
A. YES.
Q. WERE YOU QUESTIONED BY ANYONE AFTER YOU PRESENTED YOUR TESTIMONY?
A. I MAY HAVE BEEN.
Q. YOU DON'T RECALL?
A. I MAY HAVE BEEN.
Q. DO YOU RECALL ANYONE ATTEMPTING TO QUESTION YOU AND BEING TOLD THAT THEY WEREN'T PERMITTED TO?
A. NO.
Q. IS THIS THE FIRST PROTEST YOU'VE EVER BEEN IN EITHER AS A WITNESS OR A PARTY?
A. NO.
Q. DO YOU HAVE ANY RECOLLECTION OF THE HEARING



BEING CONDUCTED INAPPROPRIATELY OR ANY DIFFERENTLY THAN YOUR UNDERSTANDING OF PROTEST PROCEDURE?
A. ARE YOU LOOKING FOR A SPECIFIC?
Q. WELL, DID ANYTHING STICK OUT IN YOUR MIND AS BEING AN INAPPROPRIATE PROCEDURE, BASED ON YOUR EXPERIENCE IN OTHER PROTESTS?
MR. WIENER: OF THE TIME THAT HE WAS IN THE ROOM?
Q. YOU CAN'T TESTIFY TO ANYTHING DURING THE TIME YOU WEREN'T THERE. DURING THE TIME YOU WERE THERE, DID ANYTHING STICK OUT IN YOUR MIND AS BEING DIFFERENT OR INAPPROPRIATE IN THE WAY THE HEARING WAS BEING CONDUCTED?
A. NO.
Q. DO YOU KNOW WHO THE THREE PROTEST COMMITTEE MEMBERS WERE?
A. NO.
Q. IF I TOLD YOU THEY WERE BOB CONNOR, JOHN OSMOND AND JOHN BONDS, WOULD THAT REFRESH YOUR RECOLLECTION AT ALL?
A. NO, I KNOW BOB GARRON WAS THERE, AND I KNOW THE OTHER TWO GENTLEMEN.
Q. DO YOU HAVE ANY OPINION AS TO BOB CONNORS