# EXHIBIT 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

C.A. NO. 06-CV-00053-S-LDA

JACK FOLEY, MARY O'DONOGHUE and :
DAVID ROBBINS, :
Plaintiffs, :
:
vs. :
:
STEVEN M. LOEB, BLAD CO. and :
WILLIAM TRIPP, Individually :
and d/b/a TRIPP DESIGN NAVAL :
ARCHITECTURE, :
Defendants. :
:
v. :
:
BLAIR BROWN, :
Third-Party :
Defendant. :

DEPOSITION of JOHN J. SLATTERY, taken on behalf of the Defendant, William Tripp, Individually and d/b/a Tripp Design Naval Architecture, pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before Barbara M. Montijo, a Registered Professional Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the offices of Morrison Mahoney, LLP, 250 Summer street, Boston, Massachusetts, on January 16, 2007, commencing at 2:00 p.m.

RHODE ISLAND COURT REPORTING, INC.
747 North Main Street
Providence, RI 02904
(401) 437-3366



APPEARANCES:
CHARLES A. COOK, ESQUIRE
MORRISON MAHONEY, LLP
250 SUMMER STREET
BOSTON, MA 02210
TELEPHONE NO. (617) 439-7500
FOR: JACK FOLEY, MARY O'DONOGHUE and DAVID ROBBINS
THOMAS C. PLUNKETT, ESQUIRE
KIERNAN, PLUNKETT & REDIHAN
91 FRIENDSHIP STREET
PROVIDENCE, RI 02903
TELEPHONE NO. (401) 831-2900
FOR: WILLIAM TRIPP, Individually and d/b/a TRIPP DESIGN NAVAL ARCHITECTURE
CARY R. WIENER, ESQUIRE
DeORCHIS, WIENER & PARTNERS, LLP
61 BROADWAY, 26TH FLOOR
NEW YORK, NY 10006-2802
TELEPHONE NO. (212) 334-4700
FOR: WILLIAM TRIPP, Individually and d/b/a TRIPP NAVAL DESIGN ARCHITECTURE
WILLIAM E. O'GARA, ESQUIRE
PANNONE, LOPES & DEVEREAUX, LLC
1800 FINANCIAL PLAZA
PROVIDENCE, RI 02903
TELEPHONE NO. (401) 751-8500
FOR: STEVEN M. LOEB and BLAD CO.

SETH S. HOLBROOK, ESQUIRE
HOLBROOK & MURPHY
150 FEDERAL STREET
BOSTON, MA 02110
TELEPHONE NO. (617) 428-1151
FOR: BLAIR BROWN

ALSO PRESENT:

PATRICK COUGHLIN



I N D E X


| WITNESS | PAGE |
| --- | --- |
| JOHN J. SLATTERY | |
| Examination by Mr. Plunkett . . . . . . | 4 |
| Examination by Mr. O'Gara . . . . . . . | 58 |
| Examination by Mr. Cook . . . . . . . . | 75 |
| Re-Examination by Mr. Plunkett . . . . | 78 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| | (Defendant, William Tripp, Individually and d/b/a Tripp Design Naval Architecture) | |
| 1 | Diagram (1P) . . . . . . . . . . . . . | 43 |
| 2 | Protest Form (4PP) . . . . . . . . . . | 45 |
| 3 | Decision of the Protest Committee (1P) | 58 |




(DEPOSITION COMMENCED AT 2:00 P.M.)

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the respective parties that the Witness will read and sign the deposition transcript under the pains and penalties of perjury; that the reading and signing is deemed waived if not accomplished within 30 days of transcript delivery; and that the sealing, filing, and certification of the deposition transcript are waived.

It is further stipulated and agreed that all objections, except objections to the form of the questions, and motions to strike will be reserved until the time of trial or pretrial hearing.

**********************

JOHN J. SLATTERY

The deponent, having been satisfactorily identified and duly sworn by the Notary Public, deposes and testifies as follows:

EXAMINATION BY MR. PLUNKETT

**Q. Would you state your full name, please?**





COPY

most of the races that he's involved with.
**Q. Have you ever raced with Mr. Loeb before this?**
A. No, I haven't.
**Q. Do you know who he is?**
A. Yes.
**Q. Now, what led up to your racing with Mr. Brown for this particular regatta? How did that come about?**
A. I'm on his list of tacticians and I get contacted in the fall, usually, by my various clients. And we organize -- we looked at his schedule and saw when I might be able to do tactics for him and made those arrangements well before the season.
**Q. Would they have been made in the fall of 2001?**
A. Most likely.
**Q. Had you raced in 2002 with him before this regatta?**
THE WITNESS: What was the date of this event?
MR. PLUNKETT: This particular race was July 14th of 2002.
A. I don't recall, but it's quite likely I would have raced with him once in June that year,



most likely.
**Q. On the times that you have raced with him, have you received any compensation?**
A. Yes.
**Q. Did you receive compensation for this race?**
A. Yes.
**Q. What did that consist of?**
A. It's a per diem fee that I collect. Usually, about 5 or $600.
**Q. Would you say you received that fee -- strike that. Would you say you received that fee every time you raced with him?**
A. Not every time I've raced with him, no.
**Q. But certainly, for the one or two races that you were involved in in 2002?**
A. Most often I do collect my money from him.
**Q. Now, on the date of this incident -- strike that. Once you knew you were going to be his tactician for this race, what did you do in preparation for this regatta?**
A. I would have looked at the notice of race, which describes the schedule of events. And I would have looked at the sailing instructions, gone over the sailing instructions to see if there



was anything unusual.
**Q. Did you see anything unusual?**
A. Not really. It was pretty straightforward.
**Q. And that was all done prior to the beginning of that race week? I think it began July 12th. Everything was done before then?**
A. Yes.
**Q. Did you take care of registering his boat for that regatta or did he do that?**
A. He or one of his representatives would have done that.
**Q. Did you yourself sign any documents for that regatta?**
A. No. Except maybe a waiver. Most crew members have to sign a waiver to participate in the event and I probably would have signed one for that.
**Q. Can you remember specifically?**
A. I can't remember specifically. Because all events are different and some don't actually require a waiver.
**Q. Do you know if anybody else on board the boat that day signed a waiver?**
A. I can't remember specifically. If I did, then



everybody else would have.
**Q. And how would that have taken place? Is it something you would have done at the beginning of that day or before the week, the race week began?**
MR. COOK: Objection. You can answer. I just need to get an objection on the record.
A. Generally, in the regatta package that's passed out after you've registered, there's a waiver notice that's included in the package. That has to be passed around to the crew members and each one of them has to sign it and it has to be passed back in to the Race Committee office before the start of racing that very first day of racing.
So, generally, we would do that. Generally, almost always we would do that. With a weekend regatta, we'd probably do it the morning of the race most likely, but I can't say that for sure in this circumstance.
**Q. Do you know who would have taken on that responsibility, to have those documents executed for this regatta?**

MR. COOK: Objection.
A. Jack Foley, most likely.
**Q. Now, do you remember who was on board Mr. Brown's boat on July 14th for that race?**
A. I couldn't go through the entire crew list, no.
**Q. Can you remember any of the names?**
A. Well, obviously, I would know the three people that brought us here. We would have Jack Foley, Mary O'Donoghue, and then Dave. I can't think of what Dave's last name is.
**Q. David Robbins?**
A. David Robbins. Jack Foley would have been on board. Blair Brown would have been there. And I'm not sure who else was on board.
**Q. You were on board that day as the tactician?**
A. As the tactician.
**Q. Were you scheduled the entire race week as the tactician for Mr. Brown?**
A. For the part of the race week that we would have been sailing, yes, I would have been.
**Q. What were your duties and responsibilities as tactician?**
A. A tactician makes sure that the boat is properly aligned for the start, gets the boat started



properly, keeps the crew organized so that they can do the maneuvers that are required around the race course, watches for wind shifts, watches for other boats and helps the helmsman and the crew get the boat around the course all the way to the finish line.
**Q. How do you help get the boat around the course?**
A. Well, I watch the wind. I watch the wind velocity. I watch the currents. I discuss maneuvers with the crew. I drill the crew before the race. We put up spinnakers. We take down spinnakers. We check head sails. We check all the settings, all the gyb leads, the main sheet leads, all the sail adjustments. We go through all that. We try different sails and we sort out the wind and we decide which sail we're going to use. And I do that. I'm the one who decides that.
I communicate with the helmsman of the boat. In this case, the helmsman being the owner, Blair Brown, with what we're going to do before the start. I help call tacks and gybes and direction of the boat toward or away from the wind. And Blair steers the boat.



He generally is looking for that advice and he tries -- his job is to try to make the boat go as fast as possible as he's steering it on or away from the wind.
**Q. For this race he was the skipper?**
A. He was the helmsman or the skipper. He's always the skipper as the owner.
**Q. In general, what were the duties and responsibilities of the skipper on that date?**
A. As the skipper of the boat, he's in charge of all the competitors aboard the boat, all of the crew. He's responsible for their conduct during the event. He's responsible for making sure that his boat is prepared for the regatta. That it's prepared for all the safety regulations; that it's prepared to race. It complies with all the rules and regulations that we're racing under. And he also takes good care of -- he is responsible for taking good care of the crew, as he'd like to.
**Q. Now, what was Mr. Foley's position during that race?**
A. Jack Foley is the boat captain. He works for Blair Brown. He is responsible for making sure



that all the equipment works. He's responsible for getting the boat to the regatta on time. He's responsible for making sure that all the sails are there. They're all in good condition, all the parts are there. The bottom's clean. The mast is tuned. He's in charge of a lot of those things and he spends a lot of time doing that. That's his position, primary position.
**Q. Do you know if in 2002 he was compensated for the work he performed for Mr. Brown?**
A. I don't know.
**Q. During the race, what were Mr. Foley's responsibilities?**
A. Jack generally is in the middle of the boat somewhere. I don't recall what he was doing exactly. He would have been somewhere on the mid rail doing something toward the center of the boat. He could have been adjusting halyards in the middle. If something -- he could have probably been in the pit area, I would think, but I'm not a hundred percent sure.
**Q. Who would have the responsibility for -- the responsibility is with Mr. Brown for steering the boat during the race?**

A. Yes.
**Q. Who had responsibility for deciding what course the boat would follow? What course the boat would take?**
A. Well, I direct Mr. Brown and he decides to follow or not to follow my advice.
**Q. You give him options?**
A. I give him options, yes.
**Q. And is there anyone -- was there anyone in the crew that day who had the responsibility to watch out for other boats on the course?**
A. Before the start, a bowman goes up to the bow and looks over the front of the boat and watches the other boats. There's a lot of boats close maneuvering before the start; so, we find it prudent to do that.
After the start, the bowman comes back and I settle down on the rail. I sit behind the helmsman, Mr. Brown, and I watch boats to leeward as well as watching for wind shifts to weather and wind changes to weather, but I look to leeward.
Quite frequently, the trimmer -- it could have been -- it might have been Steve Cruse, but



he would often have the trimmer looking to leeward as well frequently.
**Q. Would the trimmer sit to leeward?**
A. No. The trimmer would check the sail trim to leeward, check it every once in a while, but no, the trimmer doesn't sit to leeward.
**Q. And would you always sit on the windward side?**
A. If there's wind. We had 14 knots of breeze that day. And in that kind of wind, the whole crew would be on the weather rail.
**Q. Would there be any person who would watch to leeward other than yourself --**
A. On a constant basis --
**Q. -- when the boat's upwind?**
A. -- just a main sheet trimmer and occasionally a Genoa trimmer. The main sheet trimmer is faced to the inboard side and doesn't have to -- can peek down underneath the boom to see leeward quite frequently.
**Q. But would still be sitting on the weather rail?**
A. Yes.
**Q. Do you know who the main sheet trimmer was on that day, July 14th?**
A. I would guess Jim Taylor, but I'm not a hundred



percent sure.
**Q. Now, would that same system remain in place as the boat approached a mark?**
A. Yes. The only thing that might happen is that some of the people forward, say, the forward third the crew, would start to move forward, to the bow, to start to -- ready to spinnaker, to hoist the spinnaker around the weather mark. And so, you'd have two or three people leaning in or going forward to do some sail adjustments as you near the mark especially.
**Q. Now, let me ask you this: If you started at a point about 500 yards before this collision, would you explain to us what happened starting from that point?**
A. Well, we were quite a ways out. I don't recall anymore how far it was, but we were on the starboard layline, meaning that the wind was coming over the right side of our boat as we were approaching the mark. So, we were headed straight at the mark on the wind for quite a while. And we were set up with -- we were comfortable with that situation because we had the right-of-way and we were making the mark.



Other boats approached from the port side, from our leeward port side and one or two crossed, and SIRENA, which is the boat we're talking about here, I think thought that they were going to cross us, cross in front of our bow, that is, in front of the boat. And at the last second or two, there's not much time, they determined that they couldn't cross in front of us and they tried to bear down, away from the wind, which is in a direction toward us. And about that same time, we also bore away from the wind slightly in anticipation of them crossing in front of us; and the boats collided almost bow to bow.
Their bow missed our bow by -- or the bows missed each other by probably no more than several inches.
**Q. You mean the stem of each boat?**
A. The stem of each boat. It was that close. And the closing speed, each boat was probably going about 7 knots or so --
**Q. I'm sorry to interrupt you. Was each boat going about the same speed as you approached the mark?**

A. Yes. The two boats are almost the same exact size, they go almost the same speed. So, the speed of the boats would have been around 7 knots, maybe a tenth or two more, but around that when we collided with each other.
And their boat, SIRENA, their starboard side, their leeward starboard side came down on our windward starboard side and there was a lot of damage done at the beginning. And then the legs of our crew members, they were in a normal hiking position, were jammed between the boats; and that's how the injuries occurred.
The boats then -- both boats then had -- they both had damage. We had injured crew members, so we both discontinued the race.
**Q. Did the hulls of each boat come in contact?**
A. Yes, they did. They came in contact at the bow and they came down until the point where the crew members' legs got in between. The boats were in contact. Our masts, our rigs did not hit, though, which is because they were on the weather side. I think that's what kept that from happening.
**Q. Let's just go back. If we went to a point about**



**500 yards before, you were at that point on the layline to the windward mark?**
A. I can't say it was that far out. I don't remember anymore. I just know that as we approached them, we had not done any maneuvers for a bit. I can't say it was 500 yards. It wasn't material to what actually ended up happening later.
**Q. When you say on the layline for a bit, would you say more than a minute?**
A. Yes, I would say so.
**Q. More than five minutes?**
A. Probably not.
**Q. How long was it before the collision that you saw SIRENA?**
A. I saw them a ways out. I saw them coming on port. I could see that. I'm looking pretty carefully. As part of the race course where the boats are all coming together, I'm looking pretty carefully as to where everybody's positioning and setting up. It's not just for safety. A lot of it is just trying to make sure we're in the best position possible to round the mark in the best spot possible.



**Q. Let's go to that point. About how far was your boat from the mark at that point when you saw them quite a ways away?**
A. I would say at least 150 yards.
**Q. Were you both approximately equal distance from the mark?**
A. Yes.
**Q. And at that point your boat was on the layline?**
A. Yes, we were. Yes.
**Q. Did you maintain the same course right up until the point of the collision?**
A. Yes, we did.
**Q. Except for turning down?**
A. Except for turning down at the last second. We didn't turn very much, either. Their maneuver was much more than ours.
**Q. After observing SIRENA at that point, did you turn your boat to windward at all?**
A. No.
**Q. As a racing tactic, you did not turn windward at all?**
A. No.
**Q. When you saw SIRENA at that point, did you think it would clear you, or not?**



A. I didn't think they were going to clear us, no. We were anticipating having to bear off, meaning to miss the back end of their boat as they went by us. That's why we're bearing off, actually.
**Q. Now, go back. At this point, about 150 yards, when you saw them?**
A. Not at that point. No. I wouldn't have known whether they were going to cross us or not. At that point they could have crossed us, meaning cleared us, in front of us, or not. At that point you just don't know. There's a lot of waves out there and a lot of changes going on and so you can't really tell.
**Q. When you saw them, you were on the windward rail?**
A. Yes.
**Q. Were you looking inboard or outboard?**
A. I was looking inboard.
**Q. Did you maintain that position right up until the time of the collision?**
A. Yes, I did.
**Q. Is it fair to say that you watched SIRENA right up until the point of the collision?**

25

A. I would have been able to see SIRENA until she was almost up very much in front of us.
**Q. Did you watch it all the way through?**
A. I wouldn't have been able to see her bear off at the very last second. So, I think the last boat length, I probably -- the Genoa was trimmed in all the way. So, that gives me a blind spot at the very forward corner of the boat. So, probably for the last boat length I wouldn't have been able to see them, I would say.
**Q. But you would say 150 yards before the mark, up until one boat length before the collision, you watched SIRENA constantly?**
A. I would say I monitored them carefully, yes.
**Q. Did you watch the boat the whole time?**
A. I can't say for sure that I would have.
**Q. Would you take a look at it and then direct your attention elsewhere and then come back and look at it?**
A. Yes.
**Q. At some point --**
A. There are others boats around, too. I have to watch what else is happening.
**Q. Were there any boats windward to your boat**

26

**within that 150 yard distance of the mark?**
A. I don't recall anymore.
**Q. Were there any boats besides SIRENA to leeward of your boat within that distance of 150 yards?**
A. Nobody would have been to leeward of us at that point. Maybe -- perhaps leeward to SIRENA, but I wouldn't recall. That wouldn't have been part of the incident.
**Q. Now, up until this point of one boat length before the collision, did you observe SIRENA alter course at all either upwind or downwind?**
A. No, I didn't.
**Q. And it's your testimony that Mr. Brown did not alter course either up or down?**
A. No.
**Q. Before that point?**
A. No.
**Q. And so one boat length before the collision was SIRENA still perpendicular to your boat crossing the bow?**
A. I would say just about, yes. It was very much that close, yes.
**Q. And at that point you couldn't see it?**
A. I couldn't see her starting to change course,

27

no.
**Q. And for that one boat length you couldn't see it at all?**
A. I can't recall exactly.
**Q. And for that one boat length, do you know whether or not Mr. Brown turned the boat down, his boat downwind?**
A. He would have turned.
**Q. Did he?**
A. Because we were aware that they were not going to cross us. So, we started to bear away.
**Q. He did turn it donwwind, Mr. Brown?**
A. Away from the breeze. Not downwind. But away from upwind.
**Q. Away from upwind?**
A. Yes.
**Q. And SIRENA did the same? SIRENA turned downwind, away from the wind?**
A. She did, yes.
**Q. Where was the bow of SIRENA when you first saw it after that blind spot in relation to your boat?**
A. Her bow was in a swiping motion coming down toward us. As I saw her cross our bow, I saw

28

her spin, spin down.
**Q. Did it make a 90 degree turn?**
A. Probably about 80 degrees or so. 70 to 80 degrees, I'd say. It's hard to say. It's been a while, but it was probably not 90 degrees, no.
**Q. But that's your best memory today?**
A. Yes.
**Q. And at that point, when it turned down, how far was each boat from the mark, from the windward mark?**
A. I don't recall anymore. I would say probably about -- my guess is about three boat lengths, probably. I don't know if that's even drawn in there.
**Q. But very close to the mark?**
A. It was fairly close to the mark, yeah.
**Q. At that point did you notice any boats to the left of SIRENA having rounded the mark and going in the other direction?**
A. There was a boat that was ahead of the two of us.
**Q. They had already rounded the mark?**
A. He was barely ahead of us, but was rounding the

mark, yes, or just rounding the mark.

**Q. Did you see any other boats in that position?**

A. I didn't see any other boats that were ahead of us there. I think we were second or third.

**Q. Now, as SIRENA approached your boat, did you say anything to anybody?**

A. I would have been in communication with Blair. Describing what's happening.

**Q. What did you tell Mr. Brown?**

A. I said there's a boat. There is a port tack we have to watch out for. You know, we may have to duck this boat. That's what it's called when you bear way from the wind a little bit to go behind somebody else.

**Q. Did you say anything else to anybody?**

A. I don't recall whether we yelled starboard to the other boat or not. I think the other boat was aware that we were there and I can't recall whether we yelled starboard or not. I don't know. I don't remember anymore.

**Q. As you looked at the other boat, could you see where Mr. Loeb was?**

A. Well, I don't really -- I know what he was doing. I know what he always did, but...



**Q. But on that day your own observations?**

A. On that day I wasn't watching anybody's particular spot on board that boat.

**Q. You don't know where Mr. Tripp was either then as the boats approached the mark?**

A. No. As the boats approached the mark, I didn't know that.

**Q. But again, within that 150 yard distance, you were on the windward rail looking downwind?**

A. Yes. I would have seen who the people were. I would have seen Mr. Tripp and Mr. Loeb, but I can't say that I recall that anymore.

**Q. Could I ask you to draw a diagram of just if we took perhaps that area four boat lengths before the mark?**

A. Yeah.

MR. COOK: Off the record.

(OFF THE RECORD)

THE WITNESS: How would you like me to draw this?

MR. PLUNKETT: Start at the point, say, about four boat lengths before the mark, where you could see still SIRENA before the blind spot, just before the blind spot.



A. The blind spot is such a small time. It would just be -- I could almost see her almost all the time, because the blind spot is just a quick time. We're passing at 90 degrees to each other at 7 knots. The blind spot isn't really a very important thing here.

**Q. I'm just saying as a point of reference.**

A. Okay. She would have to be -- she would have to be -- I can't get this exact. It's really impossible.

**Q. I understand.**

A. It's been so much time.

**Q. And this would be -- this would be --**

A. I'd be sitting here. I'd be sitting right there.

**Q. And this would be just before, I refer to it as the blind spot, just before it went behind the gyb, so you couldn't see it?**

A. It was just as it was going behind the gyb, not before. They were really up in front of us at this point for a very brief moment.

**Q. What was the approximate distance between those two hulls at that point, about a boat length?**

A. Probably about a boat length, a boat length and



a half.

**Q. Can you just draw with a line, if you could, just a line from each hull, the course that each boat took up to the point of the collision?**

A. Well, it's going to be hard to do exactly. We were coming -- we were just going straight like that (Indicating), and they were going straight like that (Indicating). And then we sort of went like that (Indicating).

**Q. And your boat turned downwind just as SIRENA, again, for a reference point, entered that blind spot?**

A. No. We -- well, the helmsman's would have been never blind. He would have been aware of where SIRENA was. He would have seen her and he would have been bearing off in a way to miss her and he couldn't have done that without knowing where she was exactly. And so, he would have had to have been looking at her side and at her transom. So, if there was ever a blind spot, it could have been from me. I'm not saying there was one for anybody else.

**Q. I'm referring to your blind spot, where you say you couldn't see it?**

A. Right. It wouldn't have been important to me at that point.

**Q. But Mr. Brown, you think he never did experience a blind spot? He was able to see the boat all the way through?**

A. During this maneuver, he would have been able to see the other boat, yes.

**Q. Do you know that he actually did see it during that whole time period?**

A. I can't say for sure that he did.

**Q. You're assuming that he did?**

A. I'm assuming that he did, yes.

**Q. Did he say anything to you --**

A. There would have been a time when they were approaching where I would have been monitoring them. And then as they got to be closer and became more of a concern to us, he and I would have had a conversation, saying this boat is a concern and you need to monitor where they were as well at this point.

**Q. Is it fair to say that your boat turned to leeward within this distance of one to one-and-a-half boat lengths between the two boats? Is that when it turned to leeward, or**



**before that?**

A. I can't say for sure. We were prepared to bear away for probably three or four boat lengths. And then when it became clear that SIRENA was not going to cross us, which was only -- we probably would have only been a couple of boat lengths away. We would have then started to plan an evasive maneuver and made it when we had to. SIRENA would have been close to crossing us, so our maneuver didn't need to be that large. It could have only been 10 degrees or so.

**Q. I'm not asking what you would have done. I'd like to know what you actually did do.**

A. That's what we did do. We did exactly what we would have done.

**Q. That's what I'm getting at. What did you do?**

A. We did exactly what we should have done in a circumstance with boats crossing us. We bore off exactly in anticipation of missing them and then filing a protest against them afterwards.

**Q. And let me go back and ask again. Was the distance between the two boats when you bore off about two boat lengths, was it that far; or was**



**it this one to one-and-a-half boat lengths?**

A. It's probably one-and-a-half to two boat lengths.

**Q. And it's your testimony --**

A. I'll go with one-and-a-half boat lengths. I think one is pretty close.

**Q. And it's your testimony that prior to that point, at least for 150 yards, your boat remained on the layline to the mark without altering course?**

A. That's correct.

**Q. And SIRENA did the same?**

A. Yes.

**Q. Now, did Mr. Brown say anything to you as the boats approached one another?**

A. I don't recall.

**Q. Did you say anything or did Mr. Brown say anything to the crew as the boats approached one another?**

A. Well, as the boats got really close and SIRENA started to change course, there was a lot of commotion from the crew very quickly. It was all very quick. There was sudden communication. It probably wasn't that decipherable at the last



second.

**Q. But you couldn't tell that SIRENA was turning down until you saw its bow coming around the bow of your boat; is that a fair statement?**

A. I would say that's true, yeah. Can I add something?

**Q. Sure, if you have to explain.**

A. It would be -- in a normal circumstance the port tack boat would bear away, go behind well before that. This was a very unusual circumstance in that they tried to bear away at the very, very last second, when they were practically up in front of us. So, that made -- that was a very unusual thing. I've never seen two boats meet this way before. I'm glad they don't meet this way very often or we wouldn't have a sport.

**Q. Now, this is your best recollection of what occurred, what you're telling us today?**

A. Yes. I did learn more about the incident from the other perspective, by talking to both Bill Tripp and Steve Loeb before and during the protest meeting.

MR. HOLBROOK: Are you going to mark that, Tom?

MR. PLUNKETT: I am.
Q. **Is it possible that your boat moved either upwind or downwind, even if slightly, unbeknownst to Mr. Brown -- strike that. Is it possible that your boat, as it approached that mark, moved upwind or downwind even if slightly?**
MR. COOK: Objection.
MR. HOLBROOK: Objection.
A. I don't see it likely. I think it could have looked that way from the other boat by the waves out there and the boats would have been hobbyhorsing a little bit, but I don't see that being -- no, we did not plan to trap them tactically or anything like that.
Q. **Now, did you see any of those crew members, any of the plaintiffs in this case, actually receive the injuries? Did you see them actually in contact with SIRENA?**
A. No. I wouldn't say that I did. I heard people scream and I saw the boats were together. I knew their legs were on the side, but I couldn't see down over the side of the boat. So, I didn't see that happen. SIRENA's leeward side would have been down our side to touch. It



would have been difficult to see. Although, the stanchions, the two stanchions, the two life stanchions were jamming onto each other.
Q. **They caught one another?**
A. Yes. They were making a lot of noise as part of the incident.
Q. **While that was happening, what did you do?**
A. I just -- I approached these circumstances like I would at any other time in a port/starboard situation, whether it would have been at the weather mark or the middle of the race course. I prepared Blair. And then the incident went according to schedule until the very last second when the other boat, SIRENA, made a maneuver that I had never seen before.
Q. **I'm sorry, I'm not being clear. Once you saw SIRENA turning downwind toward you, what did you do from that point right until the end of the collision?**
A. Oh, I just braced for the collision. It was very quick. It was less than a second. It was real quick.
Q. **And you can't remember Mr. Brown saying anything to you about the other boat or about a**



**collision?**
A. Not at the last second, no. We prepared -- I said, "There's another boat there," ahead of time, you know, that was 15, 20, 30 seconds or whatever. And we prepared for their crossing, anticipating that we may have to bear off, or just as likely, they may have tried to tack onto a starboard tack to our port side. And so, we would have been prepared for that.
And conversely, rather than bearing off, we may have had to head up into the wind if that had happened. So, we were prepared to either bear off or head up; and that was the conversation that we had. When SIRENA altered course going across our bow, there wasn't any time for any conversation.
Q. **You did not expect a collision before that point, then?**
A. No. No, I didn't at all.
Q. **Were the boat not to turn down, did you think that SIRENA would have cleared Mr. Brown's boat?**
A. I think that we would have had to duck down about 10 degrees or so, a little bit.
Q. **You would have had to alter course?**



A. I think so. I think so. SIRENA was almost crossing us; and that's why they thought they could until the very last second. I think. I mean, I don't want to put thoughts into their brains, but that's obviously the case here.
Q. **What do you mean SIRENA was almost crossing?**
A. They were within feet, a few feet of going across our bow, probably. Including not just the bow, but the stern of the boat, the whole boat. And they didn't -- and their tactician, I think, realized very late in the maneuver that they were most likely not going to cross us. And had they not crossed us, they would have had to have -- we would have protested and they would have had to have done penalty turns. I think that that would have been an issue.
I don't think they were trying to bear down to avoid a collision. I think they were bearing down to avoid that situation where they would have to do penalty turns.
Q. **Now, afterwards, the boats both went back into the harbor?**
A. Yes.
Q. **And there was a -- what did you do once you got**

back to the harbor?
A. I went -- well, first, we called the Coast Guard and they came and took some of our crew members off and I went to the New York Yacht Club and I wrote up the protest that's here in our room today. I wrote that myself and I was the sole representative for SFORZANDO.
**Q. No one else for that boat appeared at the protest hearing?**
A. I don't think so. I don't recall, no.
**Q. You handled it entirely for Mr. Brown?**
A. Pretty much whenever I do a protest, I do it all completely on my own.
**Q. Was there a reason Mr. Brown did not participate?**
A. I always find that when more than one party on a boat goes into a protest meeting, the stories get confused. So, I always do it by myself.
**Q. And you wrote up the form?**
A. I did.
**Q. Who represented SIRENA at the hearing?**
A. I don't recall. I think it was Bill Tripp, but I don't remember anymore. I think both Bill Tripp and Steve Loeb went to the meeting. I



don't recall exactly, but I think that they did.
**Q. Do you remember if Mr. Tripp remained for the entire hearing?**
A. If Bill Tripp was the representative, he would have been there the whole time.
**Q. Do you know if he was?**
A. I don't remember. I don't remember.
**Q. Do you know if Mr. Loeb remained there the whole time?**
A. I don't remember.
**Q. What did you tell the committee as to what happened?**
A. I told the committee that we were a starboard tack boat on a starboard tack layline approaching the mark. We were aware that SIRENA was coming up on a port tack, not on the port tack layline. And we were aware that they were -- there was going to have to be some maneuver, or maybe not. We weren't sure at first. It became clear there would have to be a maneuver in anticipation of a collision, or what would have been a collision, and we bore away 10 degrees to avoid that. And unexpectedly, the other boat also did the same thing.



**Q. When you bore away, you did not know what SIRENA was doing; is that correct?**
A. I was not steering the boat.
**Q. That's not what I asked. When your boat bore away, you did not know what SIRENA was doing?**
A. I can't recall exactly. I can't recall.
**Q. Do you know if Mr. Brown knew what SIRENA was doing when he bore away?**
A. I can't say that, either.
MR. PLUNKETT: Can we mark this, please?
(EXHIBIT 1 MARKED FOR IDENTIFICATION)
**Q. What did Mr. Loeb say, if you can remember, at the protest hearing?**
A. I don't remember.
**Q. What did Mr. Tripp say at the protest hearing?**
A. As I recall the protest hearing, their representatives and we were very much in agreement as to what happened. And so, what I said a short while ago was pretty much what they said. They agreed to the facts found in the protest hearing; and so, there really wasn't any disagreement.
I think Mr. Tripp wanted -- he did ask me



questions as you have. Whether we stayed on a constant course before the contact with the boats, that was the only thing I remember being as a bone of contention at all.
But otherwise, the way the boats hit, the way they bore away was not in dispute, as I recall. So, it was -- generally speaking, at a lot of protests you'll find boats don't agree to the facts, but in this case, it seemed like we were pretty close to each other.
**Q. You don't remember what Mr. Loeb said, so you can't say that he agreed with you; is that correct?**
A. Well, I don't remember which one was the representative, but certainly the representative of the boat did whoever that was.
**Q. And you don't know if that was Mr. Tripp or Mr. Loeb?**
A. I don't recall, no.
**Q. Do you remember Mr. Tripp speaking at the protest hearing?**
A. I don't recall anymore.
**Q. Do you remember Mr. Loeb speaking at the protest hearing?**

A. I don't remember which one it was, no. I don't know who spoke. I think they both did, but I don't recall exactly.
**Q. But you can't remember what they said?**
A. I don't remember what they said, no.
MR. PLUNKETT: Now, may we mark this, please?
(EXHIBIT 2 MARKED FOR IDENTIFICATION)
A. The problem is, if I can add, that I spoke with both Mr. Loeb and Mr. Tripp outside the protest room about the incident. So, I can't recall who said what when, whether it was in the protest room or outside the protest room at this point anymore.
**Q. Did you speak with them both before and after the hearing?**
A. To the best of my knowledge I did, yes.
**Q. Both before and after?**
A. Yes. Yes.
**Q. And you spoke with both of them before and after?**
A. Yes.
**Q. Let's go to the period of time before. Can you remember what was spoken about between you and**



**either one of them before the hearing?**
A. I don't remember specifically what was said, when things were said. I just remember what was said.
**Q. What was said?**
A. Well, the one thing that was said to me, whether it was by Mr. Loeb or Mr. Tripp, or both of them, was that when Mr. Tripp realized that SIRENA was not going to cross by us, Mr. Tripp grabbed the wheel from Mr. Loeb and spun the boat down at the last second; that's why their maneuver was so large. I think the tactician realized they weren't going to cross and he made a split-second decision at the very last moment and spun their boat down towards ours. And they both -- both Mr. Loeb and Mr. Tripp told me that.
**Q. And whether or not that was before or after, you can't remember?**
A. I don't recall.
**Q. But you do remember speaking with both of them either before or afterwards or at both times?**
A. Yes. Yes. Yachting is a small world. I know everybody. I know Mr. Tripp very well and I



know Mr. Loeb pretty well, but not as well as Mr. Tripp.
**Q. It's your testimony then that the boats were not going to be able to cross?**
A. SIRENA was not going to be able to cross.
**Q. And you knew that after the blind spot or before the blind spot?**
A. Before. Beforehand.
**Q. Before you knew that?**
A. Yes.
**Q. How many boat lengths before the blind spot did you know that?**
A. I was concerned at least three to four boat lengths before that SIRENA was not going to cross us.
**Q. You knew -- let me make it clear.**
A. I was 90 percent sure she was not going to be able to cross us.
**Q. At three or four boats lengths --**
A. Three or four boat lengths away, yes.
**Q. -- before the collision?**
A. Yes. As of a boat length before the collision, she hadn't made any maneuver to avoid us. So, the only thing we could do to avoid them was to



bear off to go behind them.
**Q. And again, at that point you did not know what SIRENA was doing, the course that it was taking?**
A. I can say that I definitely didn't anticipate her bearing off like she did very hard at the very last second as she was crossing over the top of us.
**Q. You did or did not?**
A. I would not anticipate that, no.
**Q. Now, would you look at this, please? This is Exhibit Number 2. Would you look at that and tell me if that's a copy of a Protest Form that you submitted?**
A. (Witness perusing document) This is, yes. Yes, it is. This is it, yes.
**Q. Does that contain all the pages of the Protest Form? It contains the committee decision, too. The reason I say that is I can't say I received that from the New York Yacht Club.**
A. I think it probably does, yeah. There wouldn't be -- you see that I finished off here. This is it, yeah.
**Q. And the information on page 1, except for the writing up at the top, I take it, is yours?**

A. Yes. That's correct. The information that's written -- that's not mine, but everything else is.
**Q. Everything from the Protest Form down to the racing committee decision is yours, this area?**
A. That's correct.
**Q. Page 2 is the statement which you prepared?**
A. Yes.
**Q. And page 3 is the diagram which you prepared?**
A. Yes.
**Q. And page 4 is the decision of the committee?**
A. Yes.
**Q. Did you remain there that afternoon to wait for the decision of the committee?**
A. Yes. Yes.
**Q. Did you have to go back into the room for it to be announced?**
A. Yes.
**Q. Did Mr. Loeb go back into the room with you?**
A. It would have been just one representative and I don't remember if it was Mr. Loeb or Mr. Tripp, which is a pretty bad memory on my part.
**Q. And you agree with the findings of the Protest Committee?**



A. Yes.
**Q. With their factual findings also?**
A. Let me just take a look here (Witness perusing document) Yes. My drawing here has the two boats another boat length closer to the mark than what I just drew on the other piece of paper, but that's the only thing that's different there that I see. The mark was only -- the point of the mark was the only thing that brought the two boats close together. The rounding of the mark wasn't material to what happened between the two boats. So, the actual distance between the mark and the boats isn't really that important. It's just the fact that it was close and that's what brought the boats close together.
**Q. So, the diagram is a normal part of the Protest Form?**
A. It is.
**Q. And each square, I guess, represents one boat length? Each square represents one boat length?**
A. That's correct.
**Q. And you have drawn it with the mark. Is that what that is; that's the mark in the middle of the circle?**



A. Yes, that's a two-boat length circle.
**Q. So, your diagram shows SIRENA about a boat length from the mark, the stern of it about a boat length from the mark and the bow of the SFORZANDO about two boat lengths from the mark; is that fair to say?**
A. That's what the drawing shows, yes.
**Q. Is that what it was?**
A. I don't recall anymore. It might have been a little bit more than that, I would think.
**Q. Well, this was drawn, I take it, on the day of the incident, was it not?**
A. Yeah. This, though, is not a fact-found thing. So, I don't recall exactly. This is not -- this distance between the boats and the mark isn't part of the facts found. So, I would say that could vary by a boat length or two.
**Q. Well, you were trying to be as accurate as you could in this Protest Form, were you not?**
A. Well, actually, I don't need to be that accurate. We go into the protest room and we recreate the entire incident with the buoy on the Protest Committee table and the boats. So,



I very well may have situated them differently in the room itself. I put this whole Protest Form together in a very short period of time.
**Q. Are you saying that you were not concerned about accuracy and the facts that you presented to the Protest Committee?**
A. I was certainly concerned with accuracy with regards to how the boats approached each other and how they hit each other. The distance to the mark I wasn't that concerned about.
**Q. The distance between the boats you were very much concerned about?**
A. I was very much concerned about, yes.
**Q. You have, at least according to this Protest Form, a collision occurring, beginning, we'll say, almost two boat lengths from the mark?**
A. Yes, I have that there.
**Q. And your diagram shows no alteration in course by your boat; is that correct?**
A. That's correct. That's correct.
**Q. And your diagram does show an alteration in the course of SFORZANDO turning downwind?**
A. SIRENA turning downwind.
**Q. I'm sorry, SIRENA turning downwind?**

53

A. Yes.
Q. And again, that's the information you submitted to the Protest Committee upon which it would base its decision?
A. Yes. But then as we discussed the incident in the protest room, the representative of the other boat asked me if we had borne off at all as part of this and I agreed with him that we had borne off slightly. I'd say most of the maneuvering between the two boats, SIRENA did about more than 75 percent of the turn; SFORZANDO did very little. We were going to make a small adjustment of course to miss the stern of SIRENA as she passed by us. We weren't anticipating making a large maneuver and we never did. It was just maybe 10 degrees or whatever. It was not a large amount.
Q. You don't know who made that remark in the committee hearing, whether or not it was Mr. Loeb or Mr. Tripp?
THE WITNESS: About what?
MR. PLUNKETT: About bearing off.
A. I don't remember who actually said that, but they did tell me how it occurred, though.

54

Q. In the Protest Committee hearing?
A. I don't remember that exactly.
Q. And here you show, again, in this diagram, the boats bow to bow without any downwind maneuver by your boat, by Mr. Brown's boat?
A. I only showed their boat's maneuver. I didn't track the course for our boat. Our boat, as you can see, doesn't have any track on it. It just shows the position of the boats as they hit. I didn't show us turning or anything. It doesn't show us going straight, either.
Q. Now, after the committee rendered its decision, you may or may not have spoken with Mr. Loeb and Mr. Tripp again. What did you do after that?
A. Oh, that was the end of the regatta for us. I went to the hospital, actually.
Q. Who did you see there?
A. I saw Jack, Mary. Actually, I think Mr. Loeb went there, as I recall. I think he did go over there.
Q. Did you speak with anyone at the hospital?
A. I may have spoken with Mr. Loeb there. I don't recall, actually. I don't recall. I don't think I spoke with him there. I don't recall

55

doing that.
Q. Did you speak with anyone at the hospital about what had happened?
A. No. I didn't actually -- I really never discussed what happened exactly with the crew members of even my boat. I really never did.
Q. Did you go there and ask how they were, how they were doing; that type of thing?
A. Exactly.
Q. Nothing about how the collision occurred or the maneuvers up to the point of the collision?
A. No. I think I would have shared eventually with the crew -- they would have been curious. I would have shared all the details of the protest and all that. That would have been natural and normal to do that.
Q. I'm sorry, I misunderstood.
A. The crew would have been curious and I would have told them what happened in the protest room.
Q. So, you did tell them what had happened?
A. I don't know when I would have done that. It would have been with different crew members at different times, which is very normal after any

56

protest.
Q. Did you hear any discussions at the hospital from anybody else or among or between anybody else as to what had happened?
A. No.
Q. And from the hospital I take it you went home?
A. I don't recall anymore. It was in Newport. I live in Marblehead. So, I don't remember if I stayed the night or not. I don't remember.
Q. And you didn't see anyone else from either boat for the remainder of the night?
A. Not that I recall. I may have stayed around. If I did, I would have seen some of the crew, but I don't remember.
Q. Since that night, can you remember having any conversations with anyone about what happened on that day? Other than what you told us about earlier, the conversations with Mr. Cook.
A. We -- I've had conversations -- I had one or two conversations with Bill Tripp over the last couple of years, just both of us expressing our regrets that this ever occurred. That it was too bad it had occurred; and that was about the most of it.

or not, if nobody's found at fault.
**Q. In connection with this particular protest, what would be the adjustment that you would be seeking in connection with the scores?**
A. Well, in this case this wasn't a normal situation and there were injuries. So, I knew that if there was a protest, it was probably -- we might end up here today in a situation like this. I was anticipating that something could very well happen. So, I filed the protest with the thought that something could happen down the road.
**Q. You were asked a series of questions regarding conversations that you had with either Mr. Tripp or Mr. Loeb prior to and at the time of the protest. And if I understand your testimony, you're unable as you sit here today to identify when any particular conversations took place, whether they were before or at the protest hearing?**
A. That's correct. I really wish I could. It really wouldn't matter, but I did have these conversations with one or both of them. And I remember specifically speaking with Mr. Tripp



about what happened and Mr. Loeb said the same thing to me as well, but I don't remember when those conversations occurred.
**Q. And the protest hearing itself, how long was that hearing in total, if you recall, Mr. Slattery?**
A. Well, the hearing itself, the part where we were giving testimony, probably would have lasted about half an hour.
**Q. And you were asked some questions --**
A. The decision probably -- the time it takes somebody to type the decision would have been at least that long.
**Q. I'm going to show you Slattery 2. You were asked some questions by Mr. Plunkett regarding a diagram that was attached to that.**
A. Yes.
**Q. Do you recall, Mr. Slattery, if you prepared that diagram prior to -- strike that. Did you prepare that diagram as part of the protest submission that you provided to the committee?**
A. That would have been submitted with the written documentation that you have there. That's all one piece.



**Q. And you testified that after the protest hearing, you went to Newport Hospital and spoke to the plaintiffs in this case, correct?**
A. I would have been there as support. I don't remember any specific conversations I had with them. There would have been several crew members there, including Mr. Brown would have been there.
**Q. And again, I'm trying to separate out events that you have a recollection of as opposed to what you think probably could have happened.**
A. Nothing, I think, could have happened where I picked it up from anybody on my boat, because I didn't include them in the first place with regards to the facts. I left them out from the very beginning; and so, I never went back to them.
**Q. And that wasn't my question. My question was: As you sit here today, do you have a recollection of having a discussion with the three plaintiffs in this case at Newport Hospital?**
A. No. No. I have not done that. I have not talked to them about the actual incident in that



way.
**Q. Do you recall seeing each of the plaintiffs in this case at Newport Hospital?**
A. No. I do not recall seeing each of them.
**Q. Do you recall seeing any of the plaintiffs in this case at Newport Hospital?**
A. Actually, I don't. I just remember hanging out with Mr. Brown. They may have likely gone into the hospital with me out in the emergency waiting area with Blair for a while. I don't actually remember being there with any of the plaintiffs.
**Q. After the plaintiffs were transported off the vessel, would it be fair to say you didn't have any further contact with them that particular day?**
A. That would be fair to say.
**Q. Would it be fair to say that you have not had discussions with any of the plaintiffs regarding the cause of this particular accident after July 14th of 2002?**
A. To the best of my recollection I would say that's true.
**Q. Other than the discussions that you've told us**

**about today, do you recall having any discussions with Mr. Loeb at any point after July 14th, 2002 regarding the cause of this accident?**
A. I don't recall having any with him. I don't think we ever discussed the incident again after that day.
**Q. And again, the discussions that you had with Mr. Loeb, or the discussions that you may have had on the 14th, you're not able to identify if it was Mr. Loeb or Mr. Tripp, or where those discussions --**
A. That's correct. I can't say exactly where. We saw each other before, after, and during. So, I can't recall exactly.
**Q. You were asked some questions regarding -- you were asked some questions by Mr. Plunkett regarding the events. When you saw SIRENA approximately 150 yards before the accident and you described those events, what was the time period that elapsed between when you first saw SIRENA again before the accident 150 yards away and the point of impact?**
A. I'd have to say that I was aware of her on port



coming from a ways away; and that I was aware of her, at least in terms of her being a concern for us and us being a concern for her, for at least more than a minute. I can't say about the distance, but I know that we knew about each other for a while.
**Q. At one point in your testimony you made reference to we did not plan to trap them tactically. What does that mean, Mr. Slattery?**
A. Well, as you approach a mark, you can steer -- if you're making the mark, you can steer exactly on the wind, or you can steer slightly high, or you can steer slightly low. You can vary your course by 5 or 10 degrees and you can make the other boat think that they can cross or they can't cross, if that's something that you'd want to do; and that's what that's all about.
**Q. In the course of your experience racing boats, have you ever had occasion to do that?**
A. That's something that would be done in advanced racing, yes. Absolutely.
**Q. Is that done on a frequent basis in connection with racing --**
MR. COOK: Objection.



**Q. -- from your experience?**
A. Not frequent, no. Not frequent. The reason why that is is because, you know, it just doesn't -- that sort of thing doesn't happen that frequently. It all depends on how many boats are around. There's a lot of nuances that can cause -- it's all very nuance kind of tactics, that sort of stuff. But in this circumstance, we were in the first race of an event. We weren't really racing SIRENA themselves. We were racing everybody. We wouldn't have been racing aggressively like that at the first weather mark of the first race in the regatta. It just wouldn't have made sense.
MR. O'GARA: I don't have any other questions. Thank you, Mr. Slattery.
MR. HOLBROOK: I don't have any questions.
EXAMINATION BY MR. COOK
**Q. I'd like you to take a look at Exhibit 2 for a minute, Mr. Slattery. On the first page, do you see a reference as to what race number this was?**
**(WITNESS PERUSING DOCUMENT)**



**Q. I'll ask you to look in the upper right-hand corner?**
A. Race Number 3.
**Q. Is that your writing?**
A. Okay. So, it would have been the second day, I guess. The second day of the regatta.
**Q. And I'd like then to have you turn to the diagram, page 3, I believe. What's the numbering on the bottom?**
THE WITNESS: The diagram here?
MR. COOK: Yes.
A. 3 of 4.
**Q. Do you have any understanding of what those grid lines are?**
A. Those are boat lengths.
**Q. The squares are boat lengths?**
A. Yes.
**Q. And the lines going up at 45 degree angles, do you understand those to be the tracks of boats?**
A. I understand those to be the tracks of boats, yes.
**Q. How would you describe the course of SFORZANDO in your diagram?**
A. I would call that about 10 degrees off.

Q. So, that would have been before or after the bear away testified to earlier?
A. That would have been after the bear away.
Q. Heading up, as port and starboard boats are about to cross, when would that be tactically advisable for a starboard tack boat to head up as a port tack boat is approaching?
A. That would be advisable if the starboard tack boat wanted the port tack boat to tack below them; tack before they met. In this case, SFORZANDO, if they had headed -- if we had headed up, we would have wanted SIRENA to tack below us.
Q. Is that what you wanted at the time?
A. No. I didn't want them to tack below us.
Q. What did you want SIRENA to do as they were coming?
A. I wanted them to cross behind us.
Q. Would there have been any tactical advantage for them to tack in front and to leeward of you as you approached the mark? The tactical advantage for SFORZANDO, excuse.
A. If they tacked leeward of us, no; that wouldn't have been good. I mean, if they tacked leeward



of us, they would have probably just followed us there. So, it wouldn't have been good. It would have slowed us down.
Q. So, there was no reason for you to do a maneuver to trap them into tacking, was there?
A. No. We wouldn't have wanted them to do that.
MR. COOK: I have no other questions.
Thank you.

RE-EXAMINATION BY MR. PLUNKETT

Q. Mr. Slattery, it was important for your boat to beat SIRENA on that date, was it not?
A. No, it wasn't. It was still early in the regatta, so it wasn't that important to beat them. That's the point. It wasn't the finish line of the race. It was the first weather mark.
Q. It was important for your boat to finish ahead of SIRENA, was it not?
A. Yes. Yes.
Q. And if you could get to that mark before SIRENA, that was a good thing for your boat, was it not?
A. Yes. That's correct.
Q. That would put you in a better position in that race, would it not?



A. Yes.
Q. And if you headed your boat upwind a little bit as you approached that mark, you knew that SIRENA could not cross you; is that a fair statement?
A. That would be true, yes.
Q. I'd like you to look at this diagram again in Exhibit Number 2. In response to Mr. Cook's question, you're saying this diagram of your boat SFORZANDO shows your boat after it has borne off?
A. It shows us at 10 degrees off the breeze, which would have had us borne off, yes.
Q. You have no arrows indicating your boat has borne off, do you?
A. No, I don't, but we're not that close on course because the close on course is that line that's next the boat 10 degrees up.
Q. Your diagram, which you submitted to the Protest Committee, shows no alteration of course by your boat; is that correct?
A. It doesn't show us on the line. It does show us 10 degrees below, close on course.
Q. But it doesn't show any alteration in course by



your boat; is that correct?
A. It doesn't show an alteration of course, yes.
Q. And again, you were trying to be most accurate with the Protest Committee, weren't you?
MR. COOK: Objection.
A. In this drawing, no. I clarified this in the protest room later on.
Q. So, it's your testimony you were satisfied with submitting an inaccurate drawing to the Protest Committee?
MR. COOK: Objection.
MR. HOLBROOK: Objection.
A. It's not inaccrate. It's not inaccurate. It's just not perfect.
Q. Let's look at that diagram a little further. You have both boats at the point of collision almost two boat lengths from the mark; is that correct?
A. That's correct.
Q. And you say, according to your other diagram, perhaps they should have been about three boat lengths from the mark?
A. I did say that. I don't recall how far we were from the mark anymore.

81

Q. So, if we back up the boats one boat length before, we would have SIRENA backed up and it would be heading on the layline to the mark, would it not?
A. Yes.
Q. One boat length before it was on the layline to the mark and it had not borne off downwind; is that correct?
A. Yeah. Yes, that's correct.
Q. And if we back your boat off one boat length, it would have been on the layline to the mark, would it not, or would it have been 10 degrees off?
A. I don't recall anymore.
Q. It still would have been above the line to the mark, correct?
A. Yes.
Q. It could have made the mark without heading up, correct? Your boat?
A. Our boat could have made the mark without heading up, yes.
Q. At that point, if we backed your boat away one boat length, your boat would have been three boat lengths from the mark, correct?

82

A. That's correct.
Q. At the same point that SIRENA was one boat length from the mark; is that correct?
A. No.
Q. No?
A. No.
Q. Well, SIRENA, if we back it up one boat length, would have been in this box?
A. SIRENA, her bow would have been about two boat lengths from the mark when our bow was about three boat lengths from the mark.
Q. Let's take your diagram --
A. I'm just saying what the case is.
Q. Well, this is the diagram that you submitted to the Race Committee, correct?
A. That's correct.
Q. If we back that up one boat length, SIRENA is on the layline to the mark and it is about one boat length from the mark, correct?
A. That's the way it's drawn there.
Q. That's the way you drew it?
A. Well, I'm not an artist.
Q. And at the same point Mr. Brown's boat would have been back one boat length, the nose of it

83

would have been three boat lengths from the mark, correct?
A. I just showed the progress of the boats, how they met here. I didn't mean to show how far they were from the mark at any given time in relation to each other. Because, as you can see, I'm drawing a line for SIRENA swishing around and I'm showing SFORZANDO in a static position here in this drawing.
MR. PLUNKETT: I move to strike.
Q. I'm going to ask you again, Mr. Slattery. If we back up each boat one boat length, SIRENA is going to be in this box, correct, and it's going to be one boat length from the mark, according to your drawing?
A. No, I don't agree.
Q. Well, if you move it back on this line one boat length, it's in this box, isn't it?
A. I don't agree. That's not the way I meant to draw it.
Q. Well, that's the way you did draw it, isn't it?
MR. COOK: Objection.
A. No, I don't agree.

84

Q. If you back that one up one boat length, that's going to -- the nose of it is going to be three boat lengths from the mark?
A. I don't know how the mark came into play here. I really don't recall. It's my testimony that we would have hit them. And so, they could not have been one boat length when we were at three boat lengths. I would say that. So, I would have to say my diagram is not completely accurate.
Q. It's inaccurate? You submitted an inaccurate diagram to the Race Committee; is that what you're saying?
MR. COOK: Objection.
A. Yes.
Q. How about Exhibit 1; is that inaccurate also or is that accurate?
MR. COOK: Objection.
A. Well, it can be no more accurate than the other one.
Q. So that's inaccurate also, Exhibit 1?
MR. COOK: Objection.
MR. HOLBROOK: Objection.
MR. WIENER: What's the basis of your

objection?

MR. HOLBROOK: It's been gone over three or four times. The witness has answered it three or four times. You know what this is, it's just harassing the witness.

MR. PLUNKETT: I object. It's not harassing the witness. He's changed his answer three or four times.

MR. COOK: It's argumentative. It's putting testimony in Mr. Slattery's mouth.

MR. PLUNKETT: I'm not putting testimony in anybody's mouth.

MR. COOK: Mr. Wiener asked the basis of our objection.

MR. WIENER: Now you're giving argument.

A. The way I draw these two boats running into each other is exactly the same in both drawings, except the mark is in a different position. I don't see how I did anything differently in either one of them. I didn't really look at the other one before I drew this one. These are four years apart and they're so close together after four or five years, I'm actually amazed



myself.

**Q. But they're both inaccurate; is that correct?**

MR. COOK: Objection.

A. I think they show the incident pretty well.

**Q. Now, at a point about three or four boat lengths apart, when the boats were about three or four boats lengths apart, you realized there would be a collision? Am I correct on that, or is it when they were one to one-and-a-half boat lengths apart?**

A. I never knew there was going to be a collision.

**Q. So, at three or four boat lengths apart, you were concerned, but you did not think there was going to be a collision?**

A. I did not think there would be a collision, yes.

**Q. At one to one-and-a-half boat lengths apart, did you think there would be a collision?**

A. Probably at one or less than that I knew that there would be a collision.

**Q. You did?**

A. Yes.

**Q. You knew at that point that the boats would not clear?**

A. I was very confident they weren't going to clear



for each other.

**Q. And they were not going to clear if they held their same course?**

A. Yes, which they actually -- they made that -- that was when they were already headed straight for each other at that point.

**Q. At that point, about one boat length apart, that's when Mr. Brown turned his boat downwind; is that correct?**

A. I would say a boat length and a half or so we would have turned 10 degrees or so. Not a lot; not downwind.

**Q. You turned it downwind, away from the wind?**

A. Yes, 10 degrees or whatever.

**Q. You turned the boat downwind?**

A. Okay, yes.

**Q. About one to one-and-a-half boat lengths -- I'm sorry.**

A. It would have to be at least one-and-a-half boat lengths away.

**Q. When the boats were --**

A. Yes.

**Q. Mr. Brown turned his boat downwind when the boats were about one to one-and-a-half boat**



**lengths apart?**

A. One-and-a-half, I'll say.

**Q. When you turned downwind, you did not -- when Mr. Brown turned the boat downwind, you yourself did not know what SIRENA was going to do; is that correct?**

A. I knew that they were going to continue straight.

**Q. You knew that?**

A. I knew that.

**Q. Why did you know that -- strike that. Did you see it after that point up until it came around the bow of your boat?**

A. She was going straight at that point.

**Q. You did not know whether or not it was going to bear off?**

A. Certainly not, no.

**Q. When you saw it again coming across the bow of your boat, it was already, SIRENA now, turning downwind?**

A. Already turning downwind, yes.

**Q. Was it already turned all the way downwind, that is, had it completed the 90 degree turn, or was it still in the process, or was it at an 80**

**degree turn?**
A. Still in the process.
**Q. Did you watch it complete its turn, that is, turn all the way in to 80 degrees?**
A. It completed its turn as it hit us and then forced it to complete its turn as it spun down into us.
**Q. And you made a statement earlier, that you think that SIRENA turned down to take the 720 degree penalty. It did not turn down to avoid the collision?**
A. They were -- no. They would not have been turning down to avoid the collision. Definitely not. Definitely not.
**Q. What's the basis for your statement that they were not turning down to avoid a collision?**
A. Well, it was my feeling going into the protest that that was definitely the case. And at the end of the protest, myself and a bunch of international jurors were completely in agreement on that.
**Q. Well, I thought either before or after the hearing Mr. Tripp told you that he turned down to avoid a collision?**



A. No. He avoided -- he turned down to try to keep from fouling us. Not to avoid a collision. He certainly didn't mean to cause the collision, I'll say that for sure. He certainly didn't do it on purpose, I know that, but he was doing it to avoid fouling us. If they had tried to cross by us, they would have fouled us, but not caused a collision; that's a different thing.
**Q. It's your testimony now that there would not have been a collision between the two boats if they held course?**
A. There would have been a collision had we held our course, yes, that's correct. There would have been a collision.
**Q. And Mr. Tripp told you that he turned down to avoid fouling, not to avoid a collision?**
A. That's correct.
**Q. Are those his exact words to you?**
A. I don't remember his exact words.
**Q. Do you remember what he said to you?**
A. I do remember, yes. I do remember what he said to me. I do remember.
**Q. Did Mr. Tripp tell you that he turned the boat down --**



A. His exact words I can't tell you.
**Q. -- to avoid fouling you?**
A. Yes.
**Q. He did?**
A. Yes.
**Q. You have a specific memory of that?**
A. I do.
**Q. When did he tell you that, before the committee hearing or afterwards?**
A. I don't recall.
**Q. Do you recall if it was even at the New York Yacht Club?**
A. I think it would have had to have been.
**Q. Do you recall?**
A. I don't remember that, no.
**Q. You don't know where the statement was made?**
A. I don't remember where the statement was made.
**Q. You don't know if was before or after the committee meeting?**
A. No, I don't remember.
**Q. Who else was present?**
A. At the Protest Committee?
**Q. Who else was present when Mr. Tripp made that statement to you?**



A. As far as I'm aware, nobody would have been there.
**Q. Just the two of you?**
A. Just the two of us, yes.
MR. PLUNKETT: That's all I have.
MR. O'GARA: I have no further questions. Thank you.
MR. HOLBROOK: No questions.
MR. COOK: Nothing. Thank you.
(DEPOSITION CLOSED AT 3:45 P.M.)